# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **LIFE SPINE, INC.,** | ) | |
| | ) | **No. 19 CV 7092** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **AEGIS SPINE, INC.,** | ) | |
| | ) | **March 17, 2020** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION and ORDER

Plaintiff Life Spine, Inc. alleges in this diversity case that Defendant Aegis Spine, Inc. engaged in a scheme to access Plaintiff's confidential information relating to spinal surgical products to develop its own competing products. Before the court is Defendant's motion to dismiss Counts I and II (breach of contracts), V (breach of fiduciary duty), VI (fraudulent misrepresentation), VII (fraudulent concealment), VIII (fraudulent inducement), and X (constructive fraud) of the amended complaint. In its supporting memorandum and reply, Defendant clarifies that it does not seek to dismiss Counts VI and VIII but rather to circumscribe those claims to certain statements in the amended complaint. For the following reasons, the motion is granted in part and denied in part:

## Background

In evaluating the current motion to dismiss, the court accepts as true the following well-pleaded facts taken from the amended complaint, drawing all reasonable inferences in Plaintiff's favor. *See Berger v. Nat'l Collegiate Athletic*

*Ass'n*, 843 F.3d 285, 289-90 (7th Cir. 2016). Plaintiff is a medical device company, specializing in spinal surgical products such as its ProLift Expandable Spacer System ("ProLift"), an implant used for patients suffering from degenerative disc disease. (R. 45, Amend. Compl. ¶ 2.) In late 2017, Plaintiff agreed to loan or consign certain medical devices, including ProLift, to Defendant. (Id. ¶¶ 3, 11.) Defendant in turn agreed to sell Plaintiff's devices to surgeons in a specified territory, committing to restrictions on the use and disclosure of Plaintiff's devices and confidential information. (Id. ¶¶ 4, 23.) The parties memorialized the tenets of their relationship in three contracts. (Id.)

First, the parties signed the Confidentiality Agreement ("CA") on December 21, 2017, setting forth the terms for protecting each party's confidential information. (Id. ¶¶ 24-26; R. 45-1, CA ¶¶ 1-9.) The CA limits the use of confidential information to the "Permitted Purpose," or "a purpose in furtherance of a business relationship between [Plaintiff] and [Defendant]," and precludes any "use outside of such relationship." (R. 45, Amend. Compl. ¶ 24; R. 45-1, CA ¶ 1.) The CA also requires both parties to maintain the secrecy of confidential information and to hold it "in trust for the exclusive benefit of the Discloser." (R. 45-1, CA ¶ 2(a).)

Second, the parties executed the Loaner Agreement ("LA") on January 4, 2018, permitting Defendant to receive Plaintiff's devices and use them for demonstrations to potential customers, provided that Defendant "maintain[s], control[s], and properly store[s]" the loaner products and does not use such products

to "reverse engineer[], copy[] or [participate in] other activities, the purpose of which is to compete with" Plaintiff. (R. 45, Amend. Compl. ¶¶ 27-28; R. 45-2, LA ¶ 3(c).) Under the LA Defendant may not transfer Plaintiff's devices "to any other person or entity without . . . prior written consent." (R. 45-2, LA ¶ 3(h)(iii).) And upon request by Plaintiff, Defendant must return the loaner product within 72 hours. (Id. ¶ 3(f).)

Third, the parties signed the Distribution and Billing Agreement ("DBA") on January 25, 2018, paving the way for Plaintiff to make products available to Defendant on a trial basis and for Defendant to sell and use Plaintiff's products and confidential information. (R. 45, Amend. Compl. ¶ 32; R. 45-3, DBA at 1.) The DBA requires Defendant: (1) not to reverse engineer, modify, or copy any functional or design aspects of ProLift, (R. 45-3, DBA ¶ 8(b)); (2) to hold devices on a "loaned" or "consigned" basis and to return products within 72 hours upon request, (id. ¶ 3(c)); (3) to "maintain custody and/or control of each item of Inventory in a fiduciary capacity, as a trustee of [Plaintiff's] property rights," (id. ¶ 3(a)); (4) to promote and sell products in a specific "Territory," (id. ¶ 2(a)); (5) to render to Plaintiff as its own property any "work product" developed by Defendant that "involve[s] the use of [Plaintiff's] equipment, facilities, confidential information, or trade secrets" or "relate[s] to [Plaintiff's] current or planned business activities," (id. ¶ 12(b)); (6) to protect Plaintiff's confidential information, (id. ¶ 7(a), (b)); (7) to act "in accordance with the highest standards of honesty, integrity, and fair dealing," (id. ¶ 2(b)); and (8) not to "persuade any . . . Customer[s] to use or refer patients to any Competitive

Product" or make any "disparaging statements or comments to others," (id. ¶ 8(a), (c)). (R. 45, Amend. Compl. ¶¶ 33-41.) The DBA terminates two months after "the last date that this Agreement is executed." (R. 45-3, DBA ¶¶ 1(b), 9; R. 45-4, DBA Addendum (reinstating and extending terms of original DBA from April 1, 2018, to May 31, 2018).) The DBA also "replace[s] all previous agreements [between the parties] relating to the same or similar matters." (R. 45-3, DBA ¶ 15(a).)

Plaintiff alleges that after the trial relationship ended, Defendant expressed an interest in executing a Stocking Distribution Agreement ("SDA") to continue the business relationship. (R. 45, Amend. Compl. ¶ 6.) Despite reaching an agreement on the terms of the SDA in June 2019, Defendant later "abruptly refused to sign the agreement and terminated [the] relationship." (Id.) Then about three months later, Defendant and its corporate parent, L&K Biomed Co., Ltd. ("L&K"), a medical device company, announced their competing product AccelFix. According to Plaintiff, AccelFix is an expandable spinal implant that is "substantially identical" to ProLift. (Id. ¶¶ 7, 11, 62-64.) In fact, L&K represented to the Food and Drug Administration ("FDA") that Plaintiff's ProLift was the "primary predicate device" for AccelFix and that the products are "'substantially equivalent' in terms of 'use, design, function, materials used and mechanical performance.'" (Id. ¶¶ 8, 66-68.)

Plaintiff alleges that it invested four years and substantial resources to research, design, develop, and test its ProLift device before obtaining FDA clearance and launching the product in March 2016. (Id. ¶ 17.) Its device contains features— such as an expansion mechanism and wand-shaped installer—that make the device

unique and successful.  (Id. ¶¶ 17-21.)  Plaintiff claims that Defendant and L&K are "aggressively marketing" their device "in direct competition with" ProLift, causing "substantial damage" and irreparable harm.  (Id. ¶¶ 9, 70.)  Plaintiff also alleges that Defendant failed to return "numerous loaned or consigned ProLift devices," despite repeated requests.  (Id. ¶ 71.)

## Analysis

Defendant argues that dismissal is appropriate because: (1) as to Counts I and II, the DBA replaced previous agreements and, therefore, neither the CA nor the LA can form the basis for a breach of contract claim; (2) as to Counts V, VII, and X, Colorado's economic loss doctrine bars tort claims based on a breach of contractual duty; and (3) as to Counts VI and VIII, Plaintiff failed to plead with particularity the facts required for allegedly fraudulent statements, except for certain statements identified in Defendant's memorandum.  (R. 46, Def.'s Mot. at 1; R. 47, Def.'s Mem. at 4-12.)  Plaintiff disagrees and responds that: (1) the DBA did not "nullify" the CA or the LA; (2) the law of Illinois, not Colorado, applies here and Illinois's economic loss doctrine does not bar Counts V, VII, or X; and (3) Counts VI and VIII should not be circumscribed to only those statements Defendant identifies. (R. 59, Pl.'s Resp. at 2-15.)

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint, *see Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997), rather than the merits of the case.  Under Rule 8(a), all that is required is "a short and plain statement of the claim showing that the pleader is entitled to

relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing Fed. R. Civ. P. 8(a)) (quotation omitted). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements'" of the claim is insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Instead, factual allegations must give "fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quotation omitted). The allegations must also be facially plausible, meaning that they provide enough factual content to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## A. Counts I and II

Defendant argues that Counts I and II should be dismissed because they are based on alleged breaches of the CA and LA, and the DBA replaced those agreements. (R. 47, Def.'s Mem. at 1.) Under Illinois law,[1] "[a] written contract is fully integrated when it is intended by the parties to be a complete and exclusive statement of the agreement's terms." *West Bend v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 673 (7th Cir. 2015). If a contract is fully integrated, parol evidence may not be admitted to show that a "facially unambiguous provision contains a latent ambiguity." *Id.* Instead, the language in the contract speaks for itself. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999).

Thus, as an initial matter, the court must look to the language of the contract, "without assistance from extrinsic evidence." *Id.* The DBA includes an

---

[1] The parties agree that Illinois law applies to Counts I and II. (R. 47, Def.'s Mem. at 4; R. 59, Pl.'s Resp. at 5.)

"Entire Agreement" clause, stating that the agreement "replace[s] all previous agreements relating to the same or similar matters which [Plaintiff] may have entered with [Defendant]." (R. 45-3, DBA ¶ 15(a).) The DBA further states that it "contain[s] the entire understanding of the parties with respect to the subject matter of this Agreement." (Id.) The court finds no ambiguity in this language. By its own terms, the DBA integrates all prior agreements relating to the same or similar matters. (Id.)

Plaintiff nevertheless argues that the DBA does not "undo" the parties' prior contracts because those agreements are separate and distinct and were not intended to be replaced by the DBA. (R. 59, Pl.'s Resp. at 4-5.) Plaintiff points to language in the DBA stating that the agreement contains the "entire understanding" of the parties only as to the "subject matter of this Agreement." (Id. (quoting R. 45-3, DBA ¶ 15(a)).) Plaintiff attempts to distinguish the subject matters of the CA and LA by suggesting that those contracts do not speak to Defendant's role as "Distributor" of Plaintiff's products, as the DBA does. (Id. at 5-6.) Plaintiff asserts that its interpretation is consistent with its allegations in the amended complaint, stating that "[Plaintiff] would not have agreed to appoint [Defendant] to serve as its ProLift sales representative and distributor . . . had [Defendant] not expressly agreed to the numerous, clear, materials provisions in the [CA and LA]." (Id. at 7.)

Plaintiff's argument lacks merit, especially insofar as it ignores the plain and unambiguous language in the agreements. A review of the LA and CA confirms

that both relate to the same or similar matters addressed in the DBA. As to the LA, its stated "purpose" is for "the loan by [Plaintiff] of products manufactured and distributed by [same] . . . for demonstration purposes." (R. 45-2, LA ¶ 1.) The LA refers to Defendant as "Loanee" and sets forth its duties pertaining to loaner products received from Plaintiff. (Id. ¶¶ 2-3.) The DBA in turn refers to Defendant as "Distributor" but expressly sets forth terms relating to "Loaner Sets" to be "loaned to [Defendant] until a Set is consigned." (R. 45-2 at 1 & ¶ 3(b).) Plaintiff claims this distinction between "Distributor" in the DBA and "Loanee" in the LA is dispositive. (R. 59, Pl.'s Resp. at 5-6; see also R. 45-3 ¶ 3(b).) Plaintiff acknowledges the "Loaner Sets" provision in the DBA but argues that it is merely "complementary" to, and does not replace, the LA. (R. 59, Pl.'s Resp. at 7.) But the DBA's integration clause is not facially ambiguous, and it expressly "replace[s] all previous agreements relating to the same or similar matters." (R. 45-3, DBA ¶ 15(a).) The DBA's inclusion of terms governing the loan of Plaintiff's products to Defendant is similar to, if not the same as, matters the LA covered. The DBA therefore replaced the LA once the parties fully executed the DBA. (R. 29, Compl. ¶ 27.)

The same is true with the CA. The CA's purpose, according to Plaintiff, is to "ensur[e] the protection of each party's confidential information . . . disclosed within the relationship." (R. 45, Amend. Compl. ¶ 24.) To that end, the CA permits disclosure of certain confidential information only "in furtherance of a business relationship or transaction between [the parties]," and not for any "use outside of

such relationship." (R. 45-1, CA ¶ 1.) The CA includes a remedies clause allowing for an injunction in the event of a breach. (Id. ¶ 6.) In the same vein, the DBA includes a section addressing "confidential information," which specifies that the parties may use each other's confidential information only "for the purpose set forth in this Agreement," and not "for any purpose other than as required for performance of such party's obligations hereunder." (R. 45-3, DBA ¶ 7(a).) The DBA also includes a provision allowing for an injunction in the event of a breach of the agreement. (Id. ¶ 7(d).) Given that the DBA and CA address similar, if not the same, matters pertaining to confidential information, (compare R. 45-1, CA ¶¶ 1, 6 with R. 45-3, DBA ¶ 7), the DBA also replaced the CA.

Even if the court were to consider extrinsic evidence—which it need not and cannot do here—such evidence is of no avail to Plaintiff. Despite Plaintiff's claims that it would not have entered into the DBA if Defendant had not agreed to keep the CA and LA intact, Plaintiff averred otherwise in its original complaint. In the original complaint Plaintiff alleged that "[t]he purpose of the [LA] was to allow [Defendant] to receive ProLift devices on loan from [Plaintiff] to make demonstrations to prospective customers *while the parties finalized a [DBA]."* (R. 29, Compl. ¶ 27 (emphasis added).) Plaintiff removed the emphasized language in its amended complaint. Even so, Plaintiff cannot now adopt a contrary position in an effort to save the LA from integration. *See N.H. v. Maine*, 121 S. Ct. 1808, 1814 (2001) (finding that, "to protect the integrity of the judicial process," parties must not be permitted to "deliberately chang[e] positions according to the exigencies

9

of the moment"). Courts may invoke the doctrine of judicial estoppel at their discretion to prevent "parties from playing fast and loose with the courts." *Id.* (internal citation and quotations omitted). The court does so here, given Plaintiff's clear admission that the LA was executed to govern the provision of loaner products to Defendant until a DBA could be finalized. (R. 29, Compl. ¶ 27.)

Finding that the DBA replaced the CA and LA does not end the court's analysis as to the viability of Counts I and II. Plaintiff argues that the court still must decide whether it states viable claims. (R. 59, Pl.'s Resp. at 8-9.) Here Plaintiff alleges that it met Defendant in late 2017. (R. 45, Amend. Compl. ¶ 3.) The parties executed the CA on December 21, 2017, and the LA on January 4, 2018. (Id. ¶¶ 24, 27, 74, 88.) They then executed the DBA on January 25, 2018. (Id. ¶ 32.) Plaintiff asserts that breaches could have occurred within the narrow window between December 21, 2017, and January 25, 2018, and points for support to paragraphs 43-45 of its amended complaint. (R. 59, Pl.'s Resp. at 8-9.) But paragraph 43 expressly states that Plaintiff did not provide confidential information or deliver ProLift products to Defendant until all "Agreements," including the DBA, were "in place and [Plaintiff's] rights and interests [were] secured." (R. 45, Amend. Compl. ¶ 43; see also id. ¶ 23 (defining "Agreements" as referring to the CA, LA, and DBA); R. 61, Pl.'s Reply at 6.) Thus, Defendant could not have breached the CA or LA before the DBA was in place because Defendant had not yet received any confidential information or products.

Plaintiff argues that it is "not obligated to plead the specific moments that [Defendant] breached each individual contract term." (R. 61, Pl.'s Reply at 6.) It is of course true that Plaintiff need not plead every detail of every alleged breach. *See Gen. Elec. Capital Corp.*, 128 F.3d at 1080. However, Plaintiff must allege enough factual content to provide "fair notice" of its claims and "the grounds upon which it rests" to allow the court to reasonably infer that Defendant may be found liable. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. Plaintiff has not done so here, despite having had "a second bite at the apple" to plead viable claims under Counts I and II. (R. 61, Def.'s Reply at 6; see also R. 45, Amend. Compl. ¶¶ 24-31, 74-100.) Plaintiff has not presented enough allegations that Defendant breached the CA or LA before January 25, 2018—and in fact, Plaintiff's amended complaint establishes otherwise. Counts I and II of Plaintiff's amended complaint are therefore dismissed with prejudice.

## B.  Counts V, VII, and X

Defendant argues that Counts V, VII, and X should be dismissed because they are barred by Colorado's economic loss doctrine. (R. 47, Def.'s Mem. at 6-9.) Before evaluating the merits of this argument, the court must first determine which state law governs because the parties dispute whether Colorado or Illinois law applies to the claims in these counts.[2] Defendant argues that the contractual

---

[2]  Defendant contends that Colorado law applies to Counts V-X, and XIII. (R. 47, Def.'s Mem. at 2.) But Defendant does not move to dismiss Counts IX and XIII. (R. 46, Def.'s Mot. at 1.) As to Counts VI and VIII, Defendant concedes that federal law applies to its Rule 9(b) arguments. (R. 47, Def.'s Mem. at 4.) The court therefore decides which state's law applies only to Counts V, VII, and X.

choice-of-law provisions do not apply to Counts V, VII, and X, and that Colorado law governs because Colorado has the "most significant relationship" with the underlying conduct. (Id. at 2.) Plaintiff counters that "the law of the place of injury controls," and here that place is Illinois. (R. 59, Pl.'s Resp. at 9-10.)

Because a federal court exercising diversity jurisdiction applies the choice-of-law rules from the state in which the court sits, Illinois choice-of-law principles govern the court's analysis here. *See McCoy v. Iberdola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). Turning first to the parties' contractually agreed choice-of-law provisions, such terms generally are enforced under Illinois law. *See Busbice v. Vuckovich*, No. 17 CV 1640, 2018 WL 6272047, at *2 (N.D. Ill. Dec. 1, 2018). Where a plaintiff alleges both tort and contract claims, contractual choice-of-law clauses are construed to govern both sets of claims only where "it is clear that this is what the parties intended." *Medline Indus., Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 862 (N.D. Ill. 2002).

The parties agree that the written agreements the parties entered into are governed by Illinois law.[3] (R. 47, Def.'s Mem. at 2; R. 59, Pl.'s Resp. at 9.) More importantly, the DBA identifies this district as "the appropriate venue and exclusive [jurisdiction] for the resolution of any and all disputes, claims or actions

---

[3] (R. 45-1, CA ¶ 9 ("This Agreement . . . shall be governed by and construed in accordance with the laws of Illinois without taking into account its principles on conflicts of law."); R. 45-2, LA ¶ 13 ("This Agreement shall be governed, construed and enforced in accordance with the laws of the State of Illinois, without regard to principles of conflict of laws of such State."); R. 45-3, DBA ¶ 15(b) ("This Agreement and any amendments hereto shall be governed by and construed by the laws of the State of Illinois, without regard to conflict of law principles.").)

arising out of or in connection with this Agreement." (R. 45-3, DBA ¶ 15(b).)

Defendant argues that the parties' contractual choice-of-law terms do not apply to the tort claims alleged in Counts V, VII, and X but provides no explanation. (R. 47, Def.'s Mem. at 2-4.) In response Plaintiff lodges only a "skeletal" challenge in a footnote suggesting that the parties' contracts mandate the application of Illinois law to its claims that relate to a breach of fiduciary duty. (R. 59, Pl.'s Resp. at 10 n.2.)

Under Illinois law, a conflict in state laws must exist before the court may conduct a choice-of-law analysis. *Moje v. Fed. Hockey League*, 377 F. Supp. 3d 907, 915 (N.D. Ill. March 28, 2019). Defendant, as the party seeking a choice-of-law determination, bears the burden of proving "the existence of an outcome-determinative conflict." *Id.* In its motion and supporting memorandum, Defendant makes little effort to demonstrate how Illinois's economic loss doctrine differs from Colorado's doctrine. (See R. 46, Def.'s Mot.; R. 47, Def.'s Mem.) In its reply Defendant admits for purposes of this motion that Illinois and Colorado laws conflict on the question of whether the economic loss doctrine requires dismissal of Counts V, VII, and X. (R. 61, Def.'s Reply at 7 n.4.) But an argument first made in a reply brief is strongly discouraged and may amount to a waiver, *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011).

In deciding which state's laws govern in the event of a conflict, Illinois employs the "most significant relationship" standard, meaning that "the law of the place of injury controls unless Illinois has a more significant relationship with the

occurrence and with the parties." *Walls v. VRE Chi. Eleven, LLC*, 344 F. Supp. 3d 932, 947-48 (N.D. Ill. 2018) (quoting *Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 503-04 (7th Cir. 1998) (internal quotations omitted)). Under this standard the court considers: "(1) the place of the injury; (2) the place where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) the place where the relationship between the parties is centered." *Fredrick*, 144 F.3d at 503-04.

Here the most important factor, the alleged place of injury, weighs in favor of Illinois. *See Walls*, 344 F. Supp. 3d at 947-48. "[W]here the injury is loss of customers or trade, the injury occurs at the place of loss . . . but is most keenly felt at the principal place of business." *Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United*, No. 88 CV 20265, 1993 WL 78756, at *18 (N.D. Ill. Feb. 26, 1993). Plaintiff's principal place of business is in Illinois, and it claims to have suffered damages and irreparable harm "predominantly in Illinois." (R. 45, Amend. Compl. ¶¶ 10, 129-31, 151, 153, 181-82; R. 59, Pl.'s Resp. at 10.) Illinois therefore has "a strong interest in providing remedies to its injured citizens." *Country Mut. Ins. Co. v. Sunbeam Prods., Inc.*, 500 F. Supp. 2d 986, 989 (N.D. Ill. 2007).

The place where the injury-causing conduct occurred also points toward Illinois. Plaintiff alleges that certain misconduct, including the launch of Defendant's competing product, occurred in Illinois. (R. 45, Amend. Compl. ¶¶ 62-64.) Plaintiff further alleges that Defendant's misrepresentations were directed toward Illinois where key representatives of Plaintiff were located. (R. 59, Pl.'s Resp. at 11.) Defendant counters that the allegedly tortious conduct occurred in

Colorado, where it received and used Plaintiff's confidential information and devices purportedly to develop and market its own competing product.[4]  (R. 47, Def.'s Mem. at 3; R. 61, Def.'s Reply at 7-8.)   But because Plaintiff alleges that it received fraudulent misrepresentations and relied on those statements in Illinois, this factor favors Illinois.  *See Telular Corp. v. Mentor Graphics Corp.*, 282 F. Supp. 2d 869, 873-74 (N.D. Ill. 2003).

Defendant argues that the next factor, the parties' place of domicile, weighs in favor of applying Colorado law.  (R. 61, Def.'s Reply at 10.)  The court disagrees. Defendant argues that corporations are domiciled "*only* in the state of incorporation," meaning that Plaintiff is domiciled in Delaware and Defendant in Colorado.  (Id. (emphasis in original).)  However, the Supreme Court has held that a corporation's domicile is the place where it is "fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853-54 (2011). Plaintiff makes clear that its home is in Illinois, where it has its nerve center and allegedly relied to its detriment on Defendant's misrepresentations.  (R. 59, Pl.'s Resp. at 10-11.)  The court thus concludes that this factor weighs in favor of applying Illinois law.

---

[4]   Defendant points to cases discussing the misappropriation of confidential information or trade secrets to argue that the court should apply the law where Defendant's business is located.  (R. 61, Def.'s Reply at 8.)  But Counts V, VII, and X set forth claims for breach of fiduciary duty, fraudulent concealment, and constructive fraud, not misappropriation.  The cases cited by Defendant therefore do not change the court's analysis.  *See, e.g., Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 830 (N.D. Ill. 2019) (conducting a choice-of-law analysis for Illinois Uniform Trade Secret Act and Defend Trade Secrets Act claims).

Finally, the "place where the relationship of the parties is centered" also tips the balance in favor of Illinois. Each of the parties' contracts includes clauses selecting Illinois as supplying the controlling law, indicating the parties considered their relationship to be centered in Illinois. (See R. 45-1, CA ¶ 9; R. 45-2, LA ¶ 13; R. 45-3, DBA ¶ 15(b).) Defendant has its principal place of business in Colorado, and aspects of the parties' relationship no doubt had some bearing on Colorado. (R. 47, Def.'s Mem. at 3.) But taken together, the choice-of-law factors weigh in favor of applying Illinois law to Counts V, VII, and X.

Turning to the merits of Defendant's motion to dismiss Counts V, VII, and X, Defendant argues that Colorado's economic loss doctrine negates the validity of tort claims that have no fiduciary duty separate and apart from that created by the underlying conduct. (Id. at 6-9.) As explained above, Illinois law governs here, and Defendant does not advance any argument suggesting that Illinois's economic loss doctrine requires the same result. The court therefore denies Defendant's motion to dismiss Counts V, VII, and X.

But even if the court were to consider Illinois's economic loss doctrine, Counts V, VII, and X survive. In Illinois the economic loss doctrine—referred to as the *Moorman* doctrine—bars "recover[y] in tort for purely economic losses" stemming from a failure to perform a contractual duty. *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 71 (1982); *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 567 (7th Cir. 2012). The *Moorman* doctrine is designed "to prevent disgruntled buyers from recovering more than what they would in a breach of contract action."

*Prmconnect, Inc. v. Drumm*, No. 15 CV 417, 2016 WL 3014814, at *5 (N.D. Ill. May 26, 2016). The doctrine does not preclude tort claims, however, "[w]here a duty arises outside of the contract." *Wigod*, 673 F.3d at 567. Put differently, claims for breach of fiduciary duty or other torts that exist "independent of the contract," as opposed to "by operation of the contract itself," are exempted from the *Moorman* doctrine because of the "extra-contractual duty between the parties." *Id.* (citing *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 693 (7th Cir. 2011)).

Thus, the *Moorman* doctrine does not bar recovery of Plaintiff's claim for breach of fiduciary duty. *See Aaron Transfer & Storage, Inc. v. Bekins Van Lines, Inc.*, No. 02 CV 1836, 2002 WL 31509775, at *2 (N.D. Ill. Nov. 12, 2002) (noting that a breach of fiduciary duty claim is not barred by the *Moorman* doctrine); *Integrated Genomics, Inc. v. Kyrpides*, No. 06 CV 6706, 2010 WL 375672, at *14 (N.D. Ill. Jan. 26, 2010) (same); *St. Paul Fire & Marine Ins. Co.*, 774 F. Supp. 485, 490 (N.D. Ill. 1991) (same). Nor does the doctrine preclude Plaintiff's claims for fraudulent concealment or constructive fraud. *See BP Amoco Chem. v. Flint Hills Res., LLC*, 489 F. Supp. 2d 853, 857-58 (N.D. Ill. 2007) (finding an exception to the *Moorman* doctrine "where a party intentionally makes false representations," including "claims of fraudulent inducement"). This district has explained that "[f]raud in the inducement presents a special situation where the parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent

behavior." *Id.* at 858 (internal quotations and citation omitted). Accordingly, the court denies Defendant's motion to dismiss Counts V, VII, and X.

## C.    Counts VI and VIII

Finally, Defendant argues that Counts VI and VIII should be dismissed insofar as they seek recovery beyond three specific statements identified in the amended complaint. (R. 46, Def.'s Mot. at 1.) Defendant previously moved to dismiss these counts because of an alleged failure to satisfy the heightened pleading requirements under Rule 9(b). (R. 32, Def.'s Mot.; R. 33, Def.'s Mem. at 9-10.) Plaintiff then filed its amended complaint, pleading additional details related to statements allegedly made by Defendant:

- In late 2017, Life Spine and Aegis met at that year's North American Spine Society ("NASS") convention in Orlando, Florida. There, Aegis personnel, including Aegis's Marketing Director Alex Kang, explained to Life Spine personnel on hand that Aegis was expanding its medical device distribution business in the United States and was interested in selling and distributing Life Spine's ProLift devices. ("First Alleged Statement")

- Following the NASS convention, Mariusz Knap, Life Spine's Vice President of Marketing and Business Development, met with Mr. Kang and Aegis's CEO Tony Ahn. During that meeting, Mr. Ahn and Mr. Kang claimed that Aegis wanted to be a Life Spine distributor of ProLift and wanted its sales of ProLift to grow over time. ("Second Alleged Statement")

- [Mr. Ahn and Mr. Kang] further claimed that Aegis wanted the benefits of a long-term relationship, including increased discounts on its purchase price of ProLift devices as its sales grew. ("Third Alleged Statement")

(R. 45, Amend. Compl. ¶ 22; see also R. 47, Def.'s Mem. at 9-11.) Defendant now seeks to limit Plaintiff's recovery under Counts VI and VIII to these alleged statements. (R. 46, Def.'s Mot. at 1.)

Defendant relies on Rule 9(b) in arguing that the allegations in the amended complaint lack the required specificity. (R. 47, Def.'s Mem. at 9-12.) Rule 9(b) requires that a complaint "state with particularity the circumstances constituting fraud or mistake." *See Greer v. Advanced Equities, Inc.*, 683 F. Supp. 2d 761, 768 (N.D. Ill. 2010) (internal citation and quotation omitted). To meet this requirement, the complaint must specify "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *See Sears v. Likens,* 912 F.3d 889, 893 (7th Cir. 1990). "By requiring the plaintiff to allege the who, what, where, and when of the alleged fraud, the rule requires the plaintiff to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co.,* 172 F.3d 467 (7th Cir. 1999) (citation omitted). Nevertheless, "the exact level of particularity that is required will necessarily differ based on the facts of the case." *See SEC v. Kameli*, 373 F. Supp. 3d 1194, 1201 (N.D. Ill. 2019) (internal quotations omitted).

Here the court finds that Plaintiff has satisfied Rule 9(b) with respect to the First, Second, and Third Alleged Statements. Defendant does not genuinely argue otherwise and seeks instead to cabin Plaintiff to these identified statements. (R. 46,

Def.'s Mot. at 1; R. 47, Def.'s Mem. at 12.)  Plaintiff responds that Defendant unfairly attempts to "circumscribe" its fraud claims to statements "made during and after the 2017 NASS convention."  (R. 59, Pl.'s Resp. at 13.)  Plaintiff argues that its amended complaint alleges additional fraudulent statements that are sufficient to serve as a basis for its fraud claims.  (Id. at 14.)

Plaintiff points to the following example: "During its time as Life Spine's ProLift sales representative and distributor, Aegis represented that it was interested in continuing its relationship with Life Spine, including by negotiating and signing a Stocking Distribution Agreement" ("Fourth Alleged Statement"). (R. 45, Amend. Compl. ¶ 135.)  Earlier in its amended complaint, Plaintiff elaborates:

> Aegis personnel claimed that Aegis was eager to form a relationship with Life Spine and wanted its sales of ProLift to grow over time. They also claimed that Aegis wanted the parties' relationship to be a long-term relationship, which would be governed by an agreement whereby Aegis would purchase its ProLift inventory from Life Spine rather than receive inventory on a consigned basis.

(Id. ¶ 22.)  Plaintiff cites email correspondence, attached as exhibits to its amended complaint, to support its allegations.  (See, e.g., R. 45-6, 45-7, 45-8, 45-9.)  In its reply Defendant admits that to the extent such exhibits include fraudulent statements, they pass muster under Rule 9(b).  The court therefore determines that the Fourth Alleged Statement, along with any fraudulent statements in Exhibits R. 45-6, 45-7, 45-8, 45-9 (collectively, "Fifth Alleged Statement"), also satisfy Rule 9(b).  These allegations provide a general overview of Defendant's allegedly

fraudulent statements, "sufficient to notify [Defendant] of its alleged role" in a fraudulent scheme. *See Kameli*, 373 F. Supp. 3d at 1201.

However, Plaintiff does not identify with particularity any other statements upon which it relies as the basis for Counts VI or VIII. Nor does the amended complaint give fair notice of other statements upon which Plaintiff relies for these claims. Rule 9(b) therefore "is properly invoked to dispel . . . uncertainty." *Id.* at 1203. Accordingly, the court limits Counts VI and VIII to the statements and exhibits expressly identified herein.

## Conclusion

For the foregoing reasons, the motion is granted insofar as Counts I and II are dismissed with prejudice and Counts VI and VIII are limited to the statements identified herein. However, the motion is denied as to Counts V, VII, and X.

**ENTER:**

_____

**Young B. Kim**
**United States Magistrate Judge**