## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LIFE SPINE, INC., | ) | |
| | ) | No. 19 CV 7092 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| AEGIS SPINE, INC., | ) | |
| | ) | January 11, 2021 |
| Defendants. | ) | |

### MEMORANDUM OPINION and ORDER

After Life Spine, Inc. ("Life Spine") sued Aegis Spine, Inc. ("Aegis") alleging breach of the parties' Distribution and Billing Agreement ("DBA") and misappropriation of Life Spine's trade secrets and confidential information, Aegis brought three counterclaims against Life Spine. In its amended counterclaims, Aegis alleges that Life Spine breached the DBA and tortiously interfered with Aegis's third-party contracts and prospective economic advantage. (R. 107, Countercls. ¶¶ 12-48.) The parties have consented to this court's jurisdiction, (R. 43), and currently before the court is Life Spine's motion to dismiss Aegis's counterclaims. For the following reasons, the motion is granted:

### Background

A description of the allegations underlying Life Spine's amended complaint against Aegis is set forth in the court's opinion partially granting Aegis's motion to dismiss. (R. 70.) The following additional facts are taken from Aegis's amended counterclaims. (R. 107.)

The parties entered into the DBA on January 25, 2018, and after executing two separate addenda, they extended the DBA through August 31, 2018. (Id. ¶¶ 33-36.) In the DBA the parties agreed that Aegis would serve as a sales representative of Life Spine's "products." (Id. ¶ 38.) The DBA defines "products" as "those products offered by [Life Spine] which are available for distribution in the United States, which may be amended by [Life Spine] in its sole and absolute discretion at any time and from time to time as specific Products are added, modified, or deleted within [Life Spine]'s product line." (Id.) Life Spine also agreed to exercise "commercially reasonable efforts" to deliver products to Aegis and its customers by specified delivery dates. (Id. ¶ 39.)

While the DBA was in effect, Life Spine provided Aegis with only one version of its products to distribute—the ProLift expandable cage and its accessories. (Id. ¶ 41.) Life Spine did not inform Aegis that it had developed an updated version of the ProLift device—which the parties refer to as the "ProLift Post-Pack"—and did not offer the same to Aegis for sale. (Id.) Instead, Life Spine provided the ProLift Post-Pack ("Post-Pack") to other distributors that compete with Aegis. (Id. ¶ 42.) Aegis also alleges that Life Spine failed to deliver "its products to Aegis and Aegis' customers on time, resulting in Aegis' customers being frustrated and less willing to use the products Aegis was attempting to sell or distribute to its customers." (Id. ¶ 44.)

Aegis claims that despite knowing that Aegis had contracts with customers for the ProLift device, Life Spine made the Post-Pack available to Zimmer, one of

Aegis's competitors.  (Id. ¶ 15.)  According to Aegis, Life Spine not only provided Zimmer with the Post-Pack, but also gave "Zimmer and perhaps other distributors" the identities of Aegis's customers and encouraged the other distributors to market the updated device to Aegis's customers.  (Id.)  Aegis claims that those alleged actions caused Aegis's customers to "stop using the units that Aegis was providing to them," and induced them to breach their contracts to buy the outdated ProLift product from Aegis.  (Id. ¶ 16.)

Finally, Aegis alleges that it had a reasonable expectation of establishing contractual or business relationships with several customers listed on its marketing documents, including surgeons it had approached or planned to approach to sell the ProLift device.  (Id. ¶ 22.)  Life Spine knew about those prospective relationships, but nonetheless provided other distributors with the Post-Pack to sell to Aegis's prospective customers, causing them to lose interest in the earlier version of the ProLift that Aegis sold.  (Id. ¶¶ 23-25.)  In December 2018 Life Spine also induced Aegis to buy the earlier version of the ProLift devices through a special arrangement, while concealing the fact that it was allowing other distributors to sell the Post-Pack.  (Id. ¶ 26.)  Based on these allegations, Aegis claims that Life Spine breached the DBA and tortiously interfered with Aegis's contracts and prospective business relationships.

## Analysis

Life Spine moves to dismiss Aegis's counterclaims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  A Rule 12(b)(6) motion to

dismiss tests the sufficiency of the complaint, *see Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997), rather than the merits of the case. Under Rule 8(a), all that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief," meaning the allegations must give "fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing Fed. R. Civ. P. 8(a)) (quotation omitted). The allegations must also be facially plausible, meaning that they provide enough factual content to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In analyzing a motion to dismiss the court considers the facts set forth in the counterclaims to be true and draws all reasonable inferences in favor of the non-moving party. *See Cozzi Iron & Metal Works, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 574 (7th Cir. 2001).

## A.    Count III

Starting with the breach of contract counterclaim, Aegis alleges that Life Spine breached the DBA in three ways: (1) by failing to offer Aegis all of the products in its product line for distribution; (2) by failing to inform Aegis about the Post-Pack; and (3) by failing to timely deliver products to Aegis. (R. 107, Countercls. ¶¶ 32-45.) To state a claim for breach of contract under Illinois law, Aegis must allege that: (1) the parties had a valid and enforceable contract; (2) Aegis performed under the contract; (3) Life Spine breached the contract; and

(4) the breach resulted in injury to Aegis.[1]  *See Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015).  In Illinois, courts construe contracts to give effect to the intent of the parties, based on the "plain and ordinary meaning" of the contract language.  *Stamley v. Altom Transport, Inc.*, 958 F.3d 580, 586 (7th Cir. 2020) (citation and quotation omitted).  The court reads the contract as a whole, giving effect to each term in light of the others.  *Id.*

In moving to dismiss the breach of contract claim, Life Spine argues that the allegations fail to state a claim because the DBA did not require it to allow Aegis to sell every product in its product line.  In response, Aegis argues that the "products" definition, the appointment clause, and the inventory clause in the DBA—when read together as a whole—support its claim that Life Spine was obligated to provide it with the Post-Pack.[2]  (R. 156, Def.'s Resp. at 4.)  Section 1.e of the DBA defines "products" as "products offered by [Life Spine] which are available for distribution in the United States, which may be amended by [Life Spine] in its sole and absolute discretion at any time and from time to time as specific Products are added, modified, or deleted within [Life Spine]'s product line."[3]  (R. 45, Am. Compl. Ex. 3,

---

[1]  The parties agree that Illinois law governs Aegis's counterclaims.

[2]  Although the parties disagree over the meaning of various provisions of the DBA, neither side has argued that the DBA's terms are ambiguous or asserted that extrinsic evidence is necessary to determine the DBA's meaning.  *See Emergency Med. Care, Inc. v. Marion Mem'l Hosp.*, 94 F.3d 1059, 1061 (7th Cir. 1996) ("[T]he fact that the parties disagree over the precise meaning of a contractual provision does not render the contract ambiguous.").

[3]  Because Life Spine attached the DBA to its amended complaint, it is considered a part of the pleadings for all purposes.  *See* Fed. R. Civ. P. 10(c).

DBA § 1.e.)  The appointment clause, found in Section 2.a, states that Life Spine "hereby appoints [Aegis] as an independent sales representative of the Products, who is authorized to solicit Sales from Customers" in a "Territory" consisting of a specific list of surgeons.  (Id. § 2.a.)  The inventory clause, found in Section 3.a, states that Life Spine "will use all reasonable efforts to provide [Aegis] a quantity of each Product that is adequate for [Aegis] to achieve sales quotas established pursuant to this Agreement."  (Id. § 3.a.)  Aegis argues that taken together, these terms demonstrate that the DBA required Life Spine to let Aegis sell "any and all of ProLift products offered in the [United States], including the ProLift Post Pack." (R. 156, Def.'s Resp. at 4.)

The court finds that Aegis's allegations are insufficient to support its breach of contract claim with respect to Life Spine's failure to provide it with the Post-Pack for sale.  Aegis has not alleged that any of the DBA's terms expressly required Life Spine to make available to Aegis every product in its product line.  The only term Aegis points to that requires Life Spine to "provide" it with products—the inventory clause—simply obligates Life Spine to supply Aegis with a sufficient number of each product to allow Aegis to meet its sales quota.  (R. 45, Am. Compl. Ex. 3, DBA § 3.a.) Aegis has not alleged anywhere in its counterclaims that it failed to meet its sales quota or that the amount of product Life Spine provided to Aegis prevented it from meeting that quota.

To the extent that Aegis argues that the "products" definition and appointment clause, when read together with the inventory clause, required Life

Spine to provide all of its products to Aegis, such allegations still fall short. The appointment clause adds little to the analysis, because it does not require either party to do anything. Instead, the clause simply clarifies Aegis's role as a sales representative for Life Spine's products. *See Pharm. Horizons, Inc. v. SXC Health Sols., Inc.*, No. 11 CV 6010, 2012 WL 1755169, at *3 (N.D. Ill. May 15, 2012). Given that the appointment clause merely authorizes Aegis to sell Life Spine products, it cannot create a contractual duty obligating Life Spine to supply its entire line of products to Aegis.

As for the "products" definition itself, it does not identify any products by name, does not state that Life Spine must provide Aegis with all of its products, and explicitly gives Life Spine the sole authority to add products "in its sole and absolute discretion at any time and from time to time as specific Products are added, modified, or deleted within [Life Spine]'s product line." (R. 45, Am. Compl. Ex. 3, DBA § 1.e.) In other words, the DBA provides Life Spine discretion to determine the scope of the product line included in the DBA's "products" definition. But even if the appointment clause and the "products" definition are read together to authorize Aegis to sell all of Life Spine's products available in the United States, including the Post-Pack, there is nothing in the DBA requiring Life Spine to provide all of its products to Aegis. The DBA unambiguously requires Life Spine to provide only enough product for Aegis to meet its sales quota, and Aegis does not allege that Life Spine's failure to provide it with the Post-Pack prevented it from meeting its sales quota. Notably, Exhibit B to the DBA, which describes Aegis's sales quota,

requires Aegis to make minimum purchases of "each product . . . as follows," and the chart that "follows" identifies only the ProLift and no other products. (Id. § 1(i) & Ex. B.)

Even drawing every reasonable inference in Aegis's favor, the provisions Aegis cites do not, either individually or taken together, reflect an intent by the parties at the time they entered the DBA to require Life Spine to provide Aegis with every product in its product line for sale. The court may not read into a contract terms that do not exist, and here the parties did not explicitly state that Life Spine had to provide Aegis with all of its products. *See Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 380 (7th Cir. 2000). Because the DBA neither expressly requires nor creates a reasonable inference obliging Life Spine to provide Aegis with every one of its products, Aegis's allegations that Life Spine breached the DBA by failing to provide it with the Post-Pack fail to state a claim on which relief can be granted.

Turning to Aegis's claim that Life Spine breached the DBA by failing to inform it about new products—namely, the Post-Pack—Aegis argues that Life Spine violated the implied covenant of good faith and fair dealing. (R. 156, Def.'s Resp. at 3, 6-7.) Aegis argues that the DBA's "products" definition gave Life Spine discretion regarding when and how to inform Aegis of product updates (not whether to inform it), and that it sufficiently alleged that Life Spine breached the duty of good faith in its exercise of that discretion. Specifically, Aegis argues that it had a reasonable expectation that Life Spine would inform it of product updates, and that by

8

concealing the existence of the updated ProLift and by selling Aegis additional first-generation ProLift devices without informing it that other distributors were selling the newer version, Life Spine violated its duty of good faith and fair dealing. (Id. at 7-8.)

Although the covenant of good faith and fair dealing is read into every Illinois contract, it cannot be the source of independent duties. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992); *see also Wilson v. Career Educ. Corp.,* 729 F.3d 665, 673 (2013) (holding that under Illinois law the implied covenant of good faith cannot be used as a basis for an independent cause of action). In other words, the covenant of good faith and fair dealing does not obligate the parties to a contract to take actions that are not expressly set forth in the contract. *Ill. ex. rel. Hammer v. Twin Rivers Ins. Co.*, 16 CV 7371, 2017 WL 2880899, at *6 (N.D. Ill. July 5, 2017). Instead, the implied duty of good faith is a tool of construction used in circumstances in which a contract vests discretion in one party with respect to its obligations under the contract. *Plymouth Pharm., Inc. v. Walgreen's Co.*, No. 06 CV 708, 2006 WL 8460559, at *2 (N.D. Ill. Nov. 20, 2006). The duty of good faith requires the party exercising discretion to do so in a way that is not arbitrary or capricious and that comports with the parties' reasonable expectations. *Id.* The purpose of the duty of good faith is to "ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's

right to receive the benefit of the contract." *Gore v. Ind. Ins. Co.*, 876 N.E.2d 156, 161 (Ill. App. 1st 2007).

Aegis alleges that Life Spine exercised its discretion in a manner contrary to the duty of good faith and fair dealing by failing to "inform Aegis that it was developing and had developed" the Post-Pack. (R. 107, Countercls. ¶ 45.) As an initial matter, Aegis concedes that the DBA does not include any express terms requiring Life Spine to "inform" Aegis about its ongoing products development. (R. 156, Def.'s Resp. at 3, 6-7.) The duty of good faith cannot be used to create obligations that do not exist in the contract. *Hammer*, 2017 WL 2880899, at *6. Instead, to survive the motion to dismiss, Aegis must plausibly allege that the DBA vested discretion with Life Spine as to whether to inform Aegis about updated products and that Life Spine exercised that discretion in a manner contrary to Aegis's reasonable expectations. But strikingly, in its response to the current motion Aegis disavows any link between the discretion vested in Life Spine pursuant to the DBA's "products" definition and an obligation to inform Aegis about updates. Specifically, Aegis states that "[u]nder the DBA's language, this discretion does not apply to Life Spine's obligation to *inform* Aegis of its updated product offerings; it applies to [Life Spine]'s discretion to decide whether and when to make new Products." (R. 156, Def.'s Resp. at 6 (emphasis in original).) However, if as Aegis asserts the contractually conferred discretion does not apply to the alleged duty to inform, then the duty to exercise discretion in good faith does not come into play.

Although Aegis argues that Life Spine lacked discretion as to whether to inform it about product updates, it nonetheless asserts that Life Spine had discretion with respect to when to provide such notice and that Life Spine violated Aegis's reasonable expectations in that regard. (Id. at 6-7.) Aegis asserts that it reasonably expected timely notification of product updates "because [Life Spine] agreed to 'use all reasonable efforts' to provide Aegis its products." (Id. (quoting DBA § 3.a).) The language it quotes is from the DBA's inventory clause, but again, that clause only requires Life Spine to use reasonable efforts to supply Aegis with a sufficient number of each product to allow Aegis to meet its sales quota. (R. 45, Am. Compl. Ex. 3, DBA § 3.a.) It does not speak to a duty to inform. Aegis has pointed to no contractual provisions, taken together or alone, that expressly or implicitly require Life Spine to inform it of product updates, and has argued that the cited provision giving Life Spine explicit discretion under the contract does not apply to the alleged obligation to give notice. Accordingly, its allegations with respect to breach of a duty to inform under the DBA fail to state a claim on which relief could be granted.

Finally, as to Aegis's claim that Life Spine failed to deliver products in a timely manner, Life Spine argues that this claim should be dismissed because the contract only required Life Spine to exercise "commercially reasonable efforts" to deliver its products in a timely manner, (see R. 45, Am. Compl. Ex. 3, DBA § 3.h), and Aegis failed to allege that Life Spine's efforts were commercially unreasonable. Life Spine also argues that Aegis failed to sufficiently allege damages stemming

from any failure to timely deliver products. Life Spine points out that Aegis did not identify any actual, pecuniary harm, but rather simply alleged that the delays "frustrated" its customers and made them "less willing" to use the ProLift device. (R. 178, Pl.'s Reply at 8.) The court agrees that Aegis's counterclaims fail to allege that Life Spine's conduct fell short of "commercially reasonable" efforts to provide products in a timely manner, and that the allegations regarding its customers' displeasure are insufficient to show that Aegis suffered actual, pecuniary harm as a result of Life Spine's alleged breach. But because these shortcomings may be corrected with additional pleadings, Aegis's allegations with respect to timely delivery and damages related thereto are dismissed without prejudice. By contrast, the allegations that Life Spine violated the DBA by failing to provide Aegis with or inform it of the Post-Pack are dismissed with prejudice.

## B.    Count I

Life Spine next argues that Aegis's counterclaim alleging tortious interference with contract should be dismissed because Aegis failed to allege that Life Spine directed its conduct toward third parties that had contracts with Aegis. Aegis alleges that Life Spine improperly provided other distributors, including Zimmer, with the Post-Pack and encouraged them to sell the Post-Pack to Aegis's customers, making Zimmer and "perhaps other distributors" Life Spine's "agent, cat's paw, or pawn" in marketing the Post-Pack to Aegis's customers. (R. 107, Countercls. ¶ 15.) In response to the motion to dismiss, Aegis argues that it sufficiently alleged that a principal-agent relationship existed between Life Spine

and Zimmer and that Zimmer's alleged conduct in marketing the Post-Pack to Aegis's customers at Life Spine's behest is sufficient to state a claim that Life Spine tortiously interfered with Aegis's contracts with its customers. (R. 156, Def.'s Resp. at 10-11.)

To state a claim for tortious interference with contract under Illinois law, Aegis must allege: "(1) the existence of a valid and enforceable contract between the plaintiff and another party; (2) that the defendant was aware of the contractual relationship; (3) an intentional and unjustified inducement of a breach of the contract by the defendant; (4) the subsequent breach of the contract by the other party, caused by the defendant's inducement; and (5) damages." *Williams v. Shell Oil Co.,* 18 F.3d 396, 402 (7th Cir. 1994). Illinois law also makes clear that "any tortious interference by a defendant . . . must be directed toward the third party, not the plaintiff." *LaSalle Bank Nat'l Ass'n v. Moran Foods, Inc.*, 477 F. Supp. 2d 932, 939 (N.D. Ill. 2007). In other words, the claim must be "premised on acts immediately directed at a third party which cause that party to breach its contract with the plaintiff." *George A. Fuller Co. v. Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331 (7th Cir. 1983).

Life Spine is correct that Aegis's tortious interference allegations are insufficient insofar as they only identify conduct that Life Spine directed toward Zimmer and other distributors, not conduct directed at any of Aegis's customers. Specifically, Aegis alleges that "Life Spine improperly provided Zimmer and perhaps other distributors with the identity of Aegis's customers and

facilitated/encouraged Zimmer and perhaps other distributors to market the updated ProLift device to Aegis' customers on behalf of Life Spine." (R. 107, Countercls. ¶ 15.) According to the counterclaim, Life Spine's conduct directed toward Zimmer resulted in some of Aegis's customers deciding not to use the first-generation ProLift devices and to breach their contracts with Aegis. (Id. ¶ 16.) These allegations suggest that Life Spine's conduct had a downstream impact on Aegis's customer contracts, but Aegis has to allege more than a ripple effect to state a claim for tortious interference. To survive the motion to dismiss, it must allege that Life Spine directed its conduct toward Aegis's customers, not to its own third-party distributors. *See George A. Fuller Co.*, 719 F.2d at 1330-31. Those allegations are missing here.

Aegis argues that even though it has not alleged direct interference between Life Spine and Aegis's customers, its counterclaim survives based on its allegations that Zimmer acted as Life Spine's agent in marketing the Post-Pack to Aegis's customers. (R. 156, Def.'s Resp. at 11.) For support Aegis points to its claim that Life Spine "'facilitated/encouraged' Zimmer and other distributors to, <u>on its behalf</u>, 'market the updated ProLift device to Aegis' customers.'" (Id. (quoting R. 107, Countercls. ¶ 15) (emphasis in original).) An agency relationship exists where "the principal has the right to control the method and manner in which the work is carried out by the agent" and "the agent is capable of subjecting the principal to personal liability." *See Knapp v. Hill*, 657 N.E.2d 1068, 1071 (Ill. App. 1st 1995). To survive dismissal, Aegis must allege the factual predicate for the agency

14

relationship, including the basis of Zimmer's authority, the scope of its authority to act on behalf of Life Spine, and the factual basis on which Life Spine was able to control Zimmer's actions. *See Zurich Capital Markets, Inc. v. Coglianese*, No. 03 CV 7960, 2005 WL 1950653, at *3 (N.D. Ill. Aug. 12, 2005). Claims that Life Spine was able to "facilitate" or "encourage" Zimmer to market its products in a certain way fall far short of allegations that Life Spine controlled Zimmer or that Zimmer could subject Life Spine to liability.

To the extent Aegis relies on the doctrine of apparent authority to prop up its agency claim, the allegations still fall short. To base its tortious interference claim on the idea of apparent authority, Aegis must allege that a third party reasonably relied on Life Spine's manifestation of authority to Zimmer to act on its behalf. *See Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020). To state a claim under the doctrine of apparent authority the plaintiff must allege: "(1) that the principal held the agent out as having authority or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that an agency relationship existed; and (3) the third person relied on the agent's apparent authority to his detriment." *Oliveira-Brooks v. Re/Max Int'l, Inc.*, 865 N.E.2d 252, 260 (Ill. App. 3d 2007). Aegis fails to point to any allegations in its counterclaim that meet this requirement, instead relying solely on its claims that Life Spine "encouraged" and "facilitated" Zimmer's conduct in marketing the Post-Pack to Aegis's customers. Just as those allegations

15

are insufficient to support a claim of actual agency, they fall short of the pleading requirements for apparent authority. *See Warciak*, 949 F.3d at 357.

To the extent Aegis relies on a "cat's paw" theory of liability in its counterclaim, it has essentially abandoned any such claim in response to the motion to dismiss. Aegis makes fleeting reference to the "cat's paw" idea in its counterclaim, summarily asserting that by facilitating or encouraging Zimmer to market the Post-Pack to Aegis's customers Zimmer acted as Life Spine's "cat's paw or pawn." (R. 107, Countercls. ¶ 15.) Life Spine argues that the "cat's paw theory" only applies in the employment discrimination context and does not save Aegis's tortious interference claim here. In the employment context, the cat's paw theory applies when "a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015) (quotation and citation omitted). None of Aegis's allegations tracks that idea, and Aegis attempts to fend off dismissal merely by faulting Life Spine for not citing any Illinois case holding that the cat's paw theory only applies in the employment context. (R. 156, Def.'s Resp. at 10.) Aegis has made no attempt to explain how a cat's paw theory would apply here, nor has it pointed to allegations that would support such a theory. Accordingly, Life Spine's motion to dismiss is granted with respect to the tortious interference with contract counterclaim. However, because it is possible that the pleading shortcomings with respect to the agency relationship

between Life Spine and Zimmer may be remedied through compliance with Rule 8(a), the dismissal with respect to this claim is without prejudice.

## C.  Count II

Life Spine argues that Aegis's tortious inference with business relationships counterclaim fails for similar reasons.  Aegis alleges that Life Spine tortiously interfered with its prospective business relationships by marketing the Post-Pack to Aegis's prospective customers, causing those potential customers to lose interest in the older version of the ProLift device Aegis was authorized to sell, and by inducing Aegis to purchase more of the older version of the ProLift devices in December 2018. (R. 107, Countercls. ¶¶ 24-26.)  To state a claim for tortious interference with prospective business relationships Aegis must allege: "(1) a reasonable expectation of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from defendant's interference."  *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007) (quotation and citation omitted).

Life Spine seeks dismissal of this counterclaim based primarily on Aegis's failure to plead adequately the first and third elements.  Life Spine again argues that Aegis failed to allege that Life Spine's conduct was directed toward third parties who were Aegis's potential customers, rather than toward Life Spine's own distributors.  But in contrast to its allegations with respect to tortious interference with contract, in its tortious interference with prospective business advantage claim

Aegis alleges direct conduct by Life Spine toward the third-party customers with whom Aegis allegedly expected to do business. Specifically, Aegis alleges that "Life Spine designed and manufactured an updated and more effective ProLift device that Life Spine sold directly to Aegis' prospective customers[.]" (R. 107, Countercls. ¶ 24.) These allegations are sufficient to demonstrate a direct link between Life Spine's conduct and Aegis's prospective customers.

Life Spine next argues that Aegis failed to sufficiently plead that it had a reasonable expectation of future business with any prospective customer. Aegis alleges that it "had a reasonable expectancy of forming valid contractual or business relationships with prospective customers identified by Aegis on its marketing documents as Tier 1 through Tier 4 target customers, including surgeons who had been approached or were to be approached by Aegis' employees or sales representatives to purchase products Aegis was distributing, including the ProLift system." (Id. ¶ 22.) But sparse allegations that Aegis's employees had simply "approached" prospective customers, or even more thinly, that Aegis planned to approach prospective customers in the future, are insufficient to fulfill the first element's pleading requirements. To survive a motion to dismiss, Aegis must allege more than a mere hope that potential customers would do business with it in the future. *See Kiebala v. Boris*, No. 16 CV 7478, 2017 WL 4339947, at *4 (N.D. Ill. Sept. 29, 2017) (collecting cases), *aff'd* 928 F.3d 680 (7th Cir. 2019). In its response, Aegis points to cases in which claims survived dismissal based on allegations that the plaintiff had invested significant time or resources cultivating a relationship.

*See, e.g., Maximum Indep. Brokerage, LLC v. Smith*, 218 F. Supp. 3d 630, 642 (N.D. Ill. 2016).  But there are no such allegations here.  Aegis asserts that the court can reasonably infer that customers who purchased the Post-Pack from Life Spine and its distributors would have purchased the ProLift had the Post-Pack not been available.  (R. 156, Def.'s Resp. at 13.)  But this kind of speculation about customers' potential purchasing preferences does not give rise to any reasonable inference in Aegis's favor.  As such, Aegis's allegations about having approached or having planned to approach certain target customers are insufficient to plausibly allege a reasonable expectancy of future business.  *See Twombly*, 550 U.S. at 570 (noting that allegations must be sufficient to push claim "across the line from conceivable to plausible").

Life Spine also argues that the allegations fail to state a claim that it interfered either intentionally or without justification with Aegis's expectations, because according to it, Life Spine had no duty to inform Aegis about the updated Post-Pack during the term of the DBA and because nothing in the DBA prevented it from doing business with Aegis' customers.  (R. 113, Pl.'s Mem. at 12-15.)  For the reasons set forth above, Life Spine is correct that Aegis has not sufficiently alleged any contractual duty to inform it about updated products under the DBA, so to the extent Aegis relies on those allegations, they are insufficient to allege unjustified interference.  With respect to Life Spine allowing other distributors to sell products to Aegis's customers, Aegis argues that the terms of the DBA defining its territories and customers, taken together, are enough to establish its reasonable expectation

19

that Life Spine would not allow distributors to go after its customers. The DBA defines Aegis's "territory" as the customers listed on Exhibit A, which identifies specific surgeons. (R. 45, Am. Compl. Ex. 3, DBA § 2.a.1.) It also includes a restrictive covenant identifying "Company Customers" as those with whom Aegis established a relationship through Life Spine and prohibiting Aegis from selling products to those Company Customers for a year after the expiration of the DBA. (Id. § 8.a.) Aegis argues that these terms support an inference that it was reasonable for Aegis to expect that Life Spine would not allow other distributors to market products to Aegis's customers. But the restrictive covenant Aegis cites flows in only one direction, preventing Aegis from selling to Life Spine's customers for a year after the DBA's termination. In fact, as Life Spine points out, the parties expressly agreed that Life Spine reserved the right "to engage in direct selling" during the DBA's term. (Id. § 2.a.ii.) There are no terms preventing Life Spine from selling to Aegis's prospective customers. Especially in light of the provision preserving Life Spine's right to sell its products directly to customers, the inference Aegis suggests is unreasonable. Without more, it has not sufficiently alleged that Life Spine's conduct in selling the Post-Pack or allowing other distributors to sell it to Aegis's potential customers was unjustified.

Finally, to the extent Aegis claims that Life Spine failed to disclose material facts in connection with the December 2018 sale of ProLift devices, Life Spine argues that the allegations fail to meet the Rule 9(b) particularity requirements for pleading claims that sound in fraud. In response, Aegis does not deny that this

20

claim sounds in fraud but argues that its allegations are sufficient to meet the Rule 9(b) pleading standards. Because Aegis's claim hinges on Life Spine's alleged failure to inform it about the existence of the Post-Pack in order to induce Aegis to purchase the outdated ProLift in December 2018, the claim sounds in fraudulent omission. *See Borsellino*, 477 F.3d at 507 (noting that whether a claim sounds in fraud turns on the factual allegations, not the claim's label).

To state a claim for fraudulent omission under Illinois law, the "plaintiff must allege that the defendant concealed a material fact when [it] was under a duty to disclose that fact to plaintiff." *Toulon v. Continental Cas. Co.*, 877 F.3d 725, 737 (7th Cir. 2017) (quotation and citation omitted). The duty to disclose may arise from a fiduciary relationship or relationship of special trust, or where a defendant tells a half-truth obligating it to disclose the full truth. *Id.* Although Life Spine alleges throughout its amended complaint that Aegis owed it fiduciary duties under the DBA, in its counterclaims Aegis fails to allege the source of Life Spine's alleged duty to disclose flowing to Aegis in connection with the December 2018 sale. Aegis did not address this requirement in its response, even though Life Spine raised the issue in its opening brief.[4] (See R. 113, Pl.'s Mem. at 15.) Arguments that a party fails to raise in response to a motion to dismiss generally are deemed forfeited. *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015). Accordingly, the

---

[4] Aegis writes that its fraud allegations are based on Life Spine "failing to disclose the updated ProLift when there was a duty to disclose," (R. 156, Def.'s Resp. at 15), but it does not identify the source of that duty or point to allegations that describe such a duty in connection with the December 2018 sale. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

allegations regarding Life Spine's fraudulent omission in the course of the December 2018 sale fail to state a claim for relief.

## Conclusion

For the foregoing reasons, Life Spine's motion is granted. Counts I and II are dismissed without prejudice and Count III is dismissed with prejudice in part and without prejudice in part.

ENTER:

**Young B. Kim**
**United States Magistrate Judge**