## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **LIFE SPINE, INC.,** | ) | |
| | ) | **No. 19 CV 7092** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **AEGIS SPINE, INC.,** | ) | |
| | ) | **March 15, 2021** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION and ORDER

Life Spine, Inc. ("Life Spine") brings this lawsuit pursuant to the court's diversity jurisdiction against Aegis Spine, Inc. ("Aegis"), a former distributor of one of its proprietary surgical devices, alleging that Aegis used its access to Life Spine's confidential and trade secret information to create knock-off surgical devices that compete directly with Life Spine's products in violation of its legal obligations. Before this court is Life Spine's motion for a preliminary injunction, in which it seeks an order preventing Aegis from developing, manufacturing, marketing, distributing, or selling its competing line of surgical devices pending trial. (R. 122.) For the following reasons, the motion is granted:

### Procedural History

Life Spine brought this action on October 28, 2019, and six weeks later the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 1; R. 43). Shortly thereafter Life Spine filed its amended complaint, alleging that Aegis had breached three separate contracts, violated federal and state trade secrets laws,

breached its fiduciary duties, engaged in acts of fraud and misrepresentation, and committed conversion. Life Spine also seeks a declaratory judgment holding that Aegis's line of competing surgical devices belongs to Life Spine. (R. 45.) Aegis moved to dismiss seven of the amended complaint's thirteen counts. (R. 46.)

On March 17, 2020, this court granted Aegis's motion to dismiss in part, dismissing two counts alleging breach of the parties' Loaner and Confidentiality Agreements, after concluding that the parties' subsequent Distribution and Billing Agreement ("DBA") replaced those agreements. (R. 70, Mem. Op. at 6-10.) The court also limited the scope of Counts VI (fraudulent misrepresentation) and VIII (fraudulent inducement) to the five alleged fraudulent statements identified in the opinion. (Id. at 18-21.) In all other respects, the court denied the motion to dismiss.

After engaging in several months of preliminary injunction discovery, Life Spine filed its motion for a preliminary injunction on August 28, 2020. (R. 114.) After the motion was fully briefed, the court held a nine-day hearing ending on November 3, 2020, at which eleven witnesses, including one expert witness, testified.[1] The parties also submitted numerous exhibits in support of their positions, including designated deposition excerpts from an additional four witnesses, as well as dueling, post-hearing proposed findings of fact and conclusions of law. Based on the testimony and documentary evidence presented at the hearing, the court makes the following findings:

---

[1] Because of travel and facility restrictions related to the COVID-19 pandemic, the hearing took place by video.

## Facts

"When a motion for preliminary injunction is presented to a court in advance of hearing on the merits, [the court] is called upon to exercise its discretion upon the basis of a series of estimates." *Arjo, Inc. v. Handicare USA, Inc.*, No. 18 CV 2554, 2018 WL 5298527, at *1 (N.D. Ill. Oct. 25, 2018) (internal quotation and citation omitted). The court's factual findings at this stage are inherently preliminary and may be modified after a trial on the merits. *Id.*; *see Tech. Pub. Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984) ("A factual finding made in connection with a preliminary injunction is not binding on the court in the trial on the merits[.]"). With that in mind, the court provides the following factual recitation pursuant to Federal Rules of Civil Procedure 52(a)(2) and 65. This statement of facts is based on the testimony and evidence presented at the hearing, and where necessary, the court's assessment of witnesses' credibility.

### A.    Life Spine's ProLift Expandable Cage

Life Spine is a company based in Huntley, Illinois, that designs, develops, and sells medical devices that are surgically implanted for the treatment of spine disorders. (Tr.[2] 54-56.) Life Spine's best-selling device is the ProLift Expandable Spacer System ("ProLift"), which is made up of a small implant—more commonly referred to as a "cage" in the industry—and an installer. (Tr. 55, 60-61, 64-66.) The ProLift cage is designed to be inserted into the spine of patients suffering from

---

[2] All citations to "Tr." in this opinion refer to the transcript from the preliminary injunction hearing or designated deposition transcripts that were entered into evidence. "PX" refers to Plaintiff's exhibits and "DX" refers to Defendant's exhibits.

degenerative disc disease.  The ProLift installer attaches to the ProLift cage and is used to insert the cage into the patient's spine and then expand the cage to restore spinal disk height.  (Tr. 64-66.)  Expandable cages like the ProLift represent a significant advancement from static cages, which maintain a fixed height, because expandable cages reduce the amount of trauma in a patient's tissue, shorten the duration of surgery, and reduce the patient's recovery time.  (Tr. 61-64, 262.)

Life Spine spent more than three years designing and developing the ProLift, beginning in late 2012 and ultimately receiving 510(k) clearance from the FDA to market the cage in March 2016.[3]  (Tr. 69, 88, 568-69; DX 14.)  The development process took more than three years from design to regulatory clearance because expandable cages are complex devices comprised of multiple small components and requiring precise engineering to ensure that they maintain their strength and integrity over the course of potentially decades of intense spinal pressure.  (Tr. 69-70, 1184.)  Life Spine engineers started the ProLift design process by studying publicly available information about existing expandable cages through the internet.  Life Spine engineers also studied existing patents, which typically include drawings showing a device's features and components.  (Tr. 555, 558-59.)  Several of the patents for expandable cages show devices that feature an upper endplate, lower endplate, base ramp, nose ramp, and screw that is used to expand the cage,

---

[3]  Before a company can introduce a new medical device into interstate commerce it must seek clearance from the FDA.  The 510(k)-approval process allows a company to gain that clearance by showing that its device is "substantially equivalent" to an already-approved predicate device out in the market.  *See* 21 U.S.C. § 360(k); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 478 (1996).

and Life Spine included these same features in its design of the ProLift. (Tr. 557-58, 561-62.)

After reviewing public information about existing expandable cages, Life Spine's engineering team embarked on a process of trial and error to ensure the device could meet FDA-required performance standards. (Tr. 581-82; DX 86 at 17998.) The process resulted in multiple redesigns after failed testing to adjust the device's components and subcomponents, sometimes by mere fractions of millimeters, to ensure those components interacted in a way that produced a high-quality device that could meet FDA testing requirements. (Tr. 627-28, 1476-77.) The design history file[4] for the ProLift includes about 30 sets of engineering drawings reflecting each modification made to the device over time. (Tr. 626.) In November 2015 Life Spine applied to the FDA for 510(k) approval for the ProLift, listing two predicate devices designed by other companies. (DX 92; DX 93.) The FDA approved its application in March 2016. (DX 14.)

Life Spine maintains protections to prevent what it considers to be trade secrets and confidential information related to the ProLift design from being discovered or made public. In particular, Life Spine considers the precise dimensions and measurements of the ProLift components and subcomponents and their interconnectivity to be trade secrets. Those specifications can only be discovered by a third party if that third party has unfettered access to both the ProLift and specialized measurement equipment. (Tr. 159-60, 1449, 1453-54, 1460-

---

[4] A design history file captures and categorizes all changes made to a device over the course of the development process. (Tr. 626.)

62.)  To protect what it considers to be confidential and trade secret information, before allowing any third party to have prolonged or unsupervised access to the ProLift and before providing a third party with detailed information about the ProLift, Life Spine requires the third party to sign a confidentiality agreement. (Tr. 74, 148, 1111-12.)  Although Life Spine displays the ProLift at industry conventions, it allows third parties to hold or interact with the ProLift only while being supervised by a Life Spine employee.  (Tr. 923-27.)  The precise dimensions of the ProLift's components and subcomponents are not included in Life Spine's marketing materials.  (Tr. 1106, 1465-66.)

Nor are the precise dimensions of ProLift's components and subcomponents discernible from patent materials.  (Tr. 619-20, 1462.)  Life Spine received a patent for the original ProLift from the United States Patent and Trademark Office ("USPTO") in October 2017.  (DX 32.)  Life Spine's patent includes drawings and figures that show the components of the ProLift, including its endplates, wedges, and dovetailed grooves and how they interact.  (Tr. 613-14; DX 32.)  However, the patent does not include the precise dimensions or measurements of those components.  (Tr. 619-20, 1462.)

## B.    Aegis's Relationship with L&K Biomed, Inc.

Aegis is a medical device company based in Englewood, Colorado.  For more than 10 years, Aegis has marketed and sold medical devices to treat spinal conditions.  (Tr. 254-55, 1539.)  Aegis currently sells an expandable cage called the "AccelFix-XT," which is the focus of this litigation, along with devices called

"CastleLoc," "PathLoc," "PEEK" and other static cages, and various plates, screws, and rods. (Tr. 1376-77, 1538-39.)

Aegis is a subsidiary of L&K Biomed, Inc. ("L&K"), a South Korea-based medical device company. L&K is a designer, developer, and manufacturer of devices used in spine surgeries and is a direct competitor of Life Spine in the medical device market. (Tr. 154, 1642.) L&K is also the majority shareholder of Aegis's stock and Aegis employees provide information to L&K on its request. (Tr. 239; Cha Dep. Tr. 74.) Several current and former Aegis employees have worked for L&K, including: Aegis's current CEO, Tony Ahn; Aegis's current Director of Research and Development ("R&D"), Jack Lee; and Aegis's former Marketing Director, Alex Kang, who is now employed at L&K. (Tr. 239-40.)

## C. L&K's Decision to Develop an Expandable Cage

In April 2016 Aegis sold static cages on behalf of L&K but did not have an expandable cage product in its inventory to offer to customers. Around that time Aegis informed L&K that it was important to develop an expandable cage product because the market for it was rapidly expanding in the United States. (Tr. 259-60; PX 253-1A at L&K 1754.) L&K agreed that it needed to develop an expandable cage to replace its static PEEK cage, because expandable cages could command higher prices than static cages. (Tr. 1618-19; PX 253-1A at L&K 1758.) L&K acknowledged that its "lack of information on expandable cage" posed a significant challenge to its design process, as did its lack of experience with expandable cages. (Tr. 1620-21; PX 253-1A at L&K 1761.) L&K opened a design history file and began

7

a patent review process headed by Sang-Soo Lee, a patent attorney and engineer employed by L&K in South Korea. (PX 253-2A.)

When L&K initiated the design process for its expandable cage, Aegis's current R&D Director, Jack Lee, was employed as L&K's R&D Director. In his R&D role for L&K, Jack Lee approved Aegis's request to have L&K develop an expandable cage, approved the development plan, and served as the Project Manager for the expandable cage development. (Tr. 645, 653; PX 253-2A at L&K 1773-74.) In the design history file L&K noted that it expected the process from design of the expandable cage through regulatory clearance to take more than two years and projected a launch date for the product in the second half of 2018. (PX 253-2A at L&K 1771-72.) Despite this projection, there was a delay in the project from spring 2016 through spring 2018. (Tr. 1622.)

## D. Aegis's Relationship with Life Spine

On October 16, 2017, Aegis CEO Ahn met with L&K's chairman at Aegis's Colorado office. The two discussed plans to develop an expandable cage and Ahn reiterated the importance of having an expandable cage to sell in the United States, where the market for such devices continued to grow. (Tr. 254-56, 267.) The following day, Alex Kang, Aegis's then Marketing Director, contacted Mariusz Knap, Life Spine's Vice President of Marketing and Business Development. (Tr. 131-32; PX 13.) They agreed to meet in person at the North American Spine Society ("NASS") conference, and at that meeting Kang proposed to Knap that Aegis serve as a distributor of the ProLift. (Tr. 131-32, 251-52.) Kang represented to

Knap that Aegis was interested in a long-term distribution relationship with Life Spine. (Tr. 138.)

Two months later Kang asked Knap to send him a ProLift device for demonstration purposes, explaining that he had surgeon customers who wanted to examine it. (Tr. 132; PX 4.) Knap informed Kang that before that could happen, and before Life Spine would share detailed information about the ProLift, Aegis would have to sign Confidentiality and Loaner Agreements, both of which are standard in the expandable cage industry.[5] (Tr. 132; Kang Dep. Tr. 79-80.) The Confidentiality Agreement included language allowing Aegis to use Life Spine's confidential information only "in furtherance of a business relationship or transaction between" Life Spine and Aegis and that Aegis could not share that confidential information with third parties. (PX 5 §§ 1-2.) The Loaner Agreement prohibited Aegis from showing the device to anyone who intended to use it "for purposes of reverse engineering, copying, or other activities" in order to compete with Life Spine. (PX 6 § 3(c).) Kang signed these agreements on Aegis's behalf. (Tr. 136-38.)

After Kang signed the Confidentiality and Loaner Agreements, Life Spine provided Aegis with a ProLift set that included the expandable cage and installer, and Aegis used that set in a demonstration for a surgeon. (Tr. 277-78.) Kang asked

---

[5] Like Life Spine, Aegis requires third parties to sign similar agreements before it allows others access to its devices, and its employees have acknowledged that it does so because it would be irreparably harmed if others were to gain access to its confidential information and use it to steal trade secrets or reverse engineer its products. (Tr. 510; Cha Dep. Tr. 53.)

Knap not to attend the demonstration. (Tr. 277; PX 4 at Aegis 3246-47.) During the demonstration Kang told the surgeon that Aegis and L&K were working together to develop an expandable cage and asked for his assistance with the project. The surgeon agreed to help. (Tr. 279.)

On January 25, 2018, Life Spine and Aegis entered into a DBA, authorizing Aegis to solicit sales of the ProLift from a list of surgeons, including the surgeon who attended Kang's demonstration and an additional surgeon who had agreed to help Aegis and L&K in developing an expandable cage to compete with the ProLift. (Tr. 267, 278-79; PX 1, DBA § 2(a).) At the time the parties entered into the DBA, Aegis did not disclose to Life Spine that it was assisting L&K in its efforts to develop a competing expandable cage or that it had recruited surgeons from its customer list under the DBA to contribute to L&K's expandable cage development process. (Kang Dep. Tr. 43-44.)

Under the terms of the DBA, Aegis made numerous promises to Life Spine in exchange for the right to distribute the ProLift. For example, in the DBA's inventory clause, Aegis agreed that it would "maintain custody and/or control of each" ProLift device that Life Spine provided it and that Aegis would serve in a "fiduciary capacity" and as "trustee" of Life Spine's property rights in the ProLift. (PX 1, DBA § 3(a).) Aegis further agreed not to "attempt" and to "prevent its employees and contractors from attempting" to: discover the "ideas" or "design" elements underlying the ProLift; "create derivative works" from or "reverse

engineer" the ProLift; or "copy the design, knowledge, functionality, or otherwise" of the ProLift "in any way." (Id. § 8(b).)

The DBA also includes protections for Life Spine's confidential information. In describing the scope of protected "confidential information," the DBA makes clear that such information:

> may include but is not limited to copyright, trade secrets or other proprietary information, techniques, processes, schematics, software source documents, pricing and discount lists and schedules, customer lists, contract terms, customer leads, financial information, sales and marketing plans, and information regarding the responsibilities, skills and compensation of employees.

(Id. § 7(a).) Aegis agreed not to use Life Spine's confidential information "for any purpose other than required for performance" of its obligations under the DBA. (Id.) Aegis further agreed not to make Life Spine's confidential information available to any third party without Life Spine's prior written consent. (Id. § 7(b).) The DBA also includes a provision requiring Aegis to ensure that its employees understood these obligations and to "take appropriate action by instruction, agreement, or otherwise with [its] employees to satisfy its obligations under this Agreement with respect to the use, copying, modification, protection, and security of Confidential Information." (Id.) Further, the DBA includes a survival clause pertaining to the obligations described above, expressly stating that these duties "will survive the expiration or termination of this Agreement." (Id. § 15(h).)

Despite expressly agreeing that Aegis's employees understood the obligations set forth in the DBA, Kang did not give Ahn a copy of the DBA or explain to him his obligations under the agreement. (Tr. 511-12.) Nor did anyone explain to Jack Lee,

11

the former L&K's R&D Director who eventually moved to the United States to serve as Aegis's R&D Director, the legal obligations that the DBA imposed on Aegis, and he testified that he never read the agreement.  (Tr. 656-57.)

## E.    The Expandable Cage Kickoff Meeting

Shortly after Aegis and Life Spine entered into the DBA, Jack Lee moved from South Korea to Colorado to serve as Aegis's R&D Director.  (Tr. 290, 638.) Sang-Soo Lee, who had worked under Jack Lee during his tenure at L&K, became L&K's new R&D Director.  (Tr. 663.)  After Jack Lee arrived in Colorado, he had a video conference with Sang-Soo Lee to prepare for an upcoming meeting about the expandable cage development and Sang-Soo Lee gave Jack Lee materials to use during the meeting.  (Tr. 663-64.)  Those materials included patents for several expandable cages, including the ProLift patent.  (PX 31.)

On March 17 and 18, 2018, Aegis held an "Expandable Cage Kickoff Meeting" at a hotel outside Denver.  (Tr. 289, 662.)  Present at the meeting were Aegis employees and three surgeons who had agreed to assist Aegis in developing an expandable cage ("the surgeon consultants").  (Tr. 267-68, 294.)  During the meeting Jack Lee made presentations on several topics related to the plan to develop an expandable cage—what is now sold by Aegis as AccelFix-XT—that would compete with the ProLift.  (Tr. 289, 292, 662.)  Aegis brought a ProLift set to the kickoff meeting for the surgeon consultants to examine, and they in fact examined the set. (Tr. 300-01; Cha Dep. Tr. 121-22.)  Aegis identified the ProLift as a competing device to its future expandable cage.

12

### F.     Aegis's Disclosure of ProLift Information to L&K

After Aegis signed the DBA, it asked Life Spine to design a custom installer for Aegis's customers that included a custom feature.   Life Spine's Director of Marketing, Jim Fried, sent Kang at Aegis an email including a picture of and details about the custom installer.  (PX 71.)  Kang forwarded the email to Sang-Soo Lee at L&K, despite knowing that Life Spine considered the information to be confidential.  (Kang Dep. Tr. 136; PX 71.)  In that email to Sang-Soo Lee, Kang said he would send L&K another email "after checking all the . . . specifications" of the custom installer.  (PX 71.)  Sometime after sending this email Kang left Aegis and went to work for L&K in South Korea, but he continued to use his Aegis email address when corresponding with Life Spine about the ProLift.  (Kang Dep. Tr. 141; PX 88.)  He also blind-copied Sang-Soo Lee at L&K when corresponding with Life Spine about the ProLift using his Aegis email address.  (Tr. 1645; PX 88.)

Aegis also shared with L&K ProLift information it obtained from the surgeon consultants it hired to assist Aegis and L&K in developing the AccelFix-XT.  On the first day of the Expandable Cage Kickoff Meeting, the surgeon consultants entered into agreements that allowed them to consult with both Aegis and L&K on the design process for the AccelFix-XT.   (Tr. 304-05; PX 32-35.)   The surgeon consultants purchased and used the ProLift in surgeries, then provided feedback to Aegis and L&K about the ProLift's surgical performance.  (Tr. 683-84, 721-23.)  Aegis and L&K incorporated that feedback into their design process.  For example, after assessing how the ProLift performs during surgical implantation, the surgeon

consultants recommended changing the insertion shape and teeth angle of the AccelFix-XT. (Tr. 678-83.) Jack Lee forwarded that input to L&K and recommended that it incorporate the advice into future designs. (PX 60A; PX 60B.) He also sought the surgeon consultants' feedback on which instruments to include in the AccelFix-XT instrument set, and they provided their opinions based on their use of ProLift instrument sets during surgeries. (Tr. 707-10; PX 66; PX 68.) One surgeon consultant shared with Aegis his thoughts on the ProLift's torque technique and gave suggestions for re-designing the AccelFix-XT's installer based on his experience using the ProLift. (Tr. 720-23; PX 58; PX 90.) Similarly, another surgeon consultant recommended modifying the AccelFix-XT installer to solve an issue he was having with the ProLift installer. (PX 120.) Aegis shared this feedback with L&K. Aegis considers these two surgeon consultants to be key designers of the AccelFix-XT and both consultants are identified as its inventors in the design patent application filed with the USPTO. (Inzitari Dep. Tr. 173-74, Tr. 538; PX 168.)

## G. Aegis's Shipment of the ProLift Devices to L&K

Aegis CEO Ahn admits that in May 2018 he sent a ProLift cage to L&K in South Korea, and in June 2018 he sent L&K both a ProLift cage and a ProLift installer. (Tr. 311-12.) He did so at the request of Sang-Soo Lee, who said that seeing the devices would be helpful to L&K's development of the AccelFix-XT. (Tr. 314, 1662.) Sang-Soo Lee had previously only seen images of the expandable cages on the internet, and he wanted to see the "real product." (Tr. 1597.) Ahn

neither sought Life Spine's permission to share the ProLift with L&K nor informed Life Spine that he had done so after the fact. (Tr. 312.)

The hearing evidence is murky regarding what happened to the ProLift cages and installer that Ahn sent to L&K. Sang-Soo Lee testified that he did not see the ProLift cage that Ahn sent in May 2018, and that he only learned about the device's arrival "later." (Tr. 1660.) As for the ProLift cage and installer Ahn sent in June 2018, Sang-Soo Lee testified that after requesting this shipment he decided not to open the package box when it arrived, because he did not want L&K to have to pay for it. (Tr. 1597-98.) He testified that L&K returned the unopened box with the cage inside, but he did not identify to whom he gave the box, could not say whether anyone else opened the box after he handed it off to someone else at L&K, and could not produce shipping records showing that the box was in fact returned to Aegis. (Tr. 1597, 1599, 1663-64.) As for the installer, Sang-Soo Lee testified that he "saw" the ProLift installer but did not measure, test, or photograph it, and that he gave it to L&K's R&D department to be returned to Aegis. (Tr. 1599.) No other witnesses testified at the hearing as to what happened to the ProLift cages and installer Aegis sent to L&K.

In August 2019 Aegis informed Life Spine's corporate compliance officer and Manager of Contracting Operations, Jenn Jesse, for the first time that it could not return one of the consigned ProLift cages because, according to Aegis, it had received an empty box for that cage. (Tr. 891, 911-12.) This raised a red flag for Jesse, who in the course of her 10 years at Life Spine had never heard of a

15

distributor claiming that Life Spine shipped an empty product box. (Tr. 915-16.) Jesse asked to see a photo of the empty box, and what Aegis sent did not alleviate her concern. (Tr. 914-15.) The photo showed that someone had affixed a second anti-tampering sticker over the box's original anti-tampering sticker, which indicated to Jesse that someone was trying to hide the fact that the box had been opened. (Id.; PX 147.)

Aegis also failed to return several ProLift installers that remain in its possession. (Tr. 910-11; PX 235.) After receiving the ProLift installer from Aegis in June 2018, Sang-Soo Lee emailed Jack Lee to inform him that L&K was copying the basic design of the ProLift installer for the AccelFix-XT. (PX 65 at Aegis 16658.) Materials from a meeting a few months later show that L&K designed the AccelFix-XT installer to allow "compatibility with" the ProLift. (PX 76 at Aegis 11740.)

## H.    L&K's Possession of ProLift Testing Data

Aegis's witnesses also struggled to explain how L&K came to be in possession of ProLift testing data. In order to receive clearance from the FDA to sell an expandable cage, the applicant company must meet the FDA's rigorous testing requirements for both static shear and dynamic shear compression. (Tr. 595, 631-32, 1476-77.) A static shear compression test measures how much load the device can withstand on a one-time basis before breaking or deforming, while a dynamic shear compression test determines whether the device can withstand 5 million cycles of multiple load forces in repetition without breaking. (Tr. 1478-79.) Life Spine performed shear compression tests on multiple ProLift specimens during its

design process and submitted the results to the FDA. (Tr. 1485.) Life Spine considers the results of its shear compression testing to be confidential trade secrets because the FDA does not disclose or publish test results submitted in connection with a 510(k) application. (Tr. 1485.) If a competitor were to access Life Spine's shear compression testing data, it would allow the competitor to short-cut the trial-and-error testing process by giving it a starting load number that it knows will satisfy the FDA. (Tr. 1486.) Life Spine never shared its testing data publicly or with Aegis. (Tr. 625, 1485.)

Despite never having received ProLift testing data from Life Spine, Aegis and L&K somehow obtained that information. On October 4, 2018, L&K and Aegis held a meeting to discuss progress on the AccelFix-XT's development. The materials from the meeting include a reference to the result a shear compression test for the ProLift. (PX 74 at 11718.) The result reflected in that document is similar to the static shear compression test result that Life Spine achieved for the ProLift. No witness for Aegis explained where the number for the ProLift test result came from or how it came to be included in the meeting materials. Sang-Soo Lee testified that he did not know "how that information came about." (Tr. 1668.) Life Spine also submitted evidence that an employee of L&K's R&D team sent an email representing that L&K kept its "ProLift Data" and its "AccelFix test data" in separate folders on its computer system, but Aegis never produced this data or the folders referenced in the email in discovery. (PX 101 at L&K 388.)

## I. AccelFix-XT's Design History File

The design history file L&K maintained for the AccelFix-XT reflects that in late 2018 L&K executives were disappointed with its prototype's repeated testing failures. L&K had been working with an outside contractor to design and develop its expandable cage, but on December 18, 2018, it decided to bring the design process in-house and start from scratch. (Tr. 1672-75, 1198; PX 253-4A at L&K 1940-42.) Three months later, in March 2019 L&K submitted its application to the FDA for 510(k) approval for the AccelFix-XT cage. (Tr. 1675-76.) Although the design history file for a medical device is supposed to record each step taken in the design process, documentation in the AccelFix-XT design history file from the period from January 2019 through April 2019 is sparse. (Tr. 1199-1202.) In fact, L&K did not add a single document to the design history file between January 28, 2019, and April 17, 2019. (Tr. 1670.)

During that time, L&K redesigned the AccelFix-XT to change a square component to a dovetail feature in such a way that its key measurements are essentially identical to the ProLift dovetail feature. (Tr. 1173.) In fact, the redesigned dovetail connection matches the ProLift dovetail connection down to a fraction of a millimeter. (Id.) (Tr. 1173.) Put another way, the measurements of the two devices' dovetail radii differ by a size less than the width of a human hair. (Tr. 1458-60.)

There are no engineering documents in the AccelFix-XT design history file documenting the steps L&K took in making these design changes. (Tr. 1201-02.)

The entire design history file includes only two engineering drawings and only 38 pages of documentation for the period between December 2018 and March 2019, when L&K undertook a complete redesign of its device. (Tr. 1202, 1296; PX 253-54, 4A at L&K 1943-81.) By contrast, the ProLift design history file includes about 30 engineering drawings and thousands of pages of documentation. (Tr. 626.)

On June 10, 2019, L&K closed the design history file for the AccelFix-XT, showing that the design was complete. (Tr. 1611-12; PX 253-59 at L&K 2311.) The FDA approved L&K's 510(k) application on September 16, 2019. (DX 18.) In response, Aegis's VP of Marketing circulated a congratulatory email to both groups of Aegis and L&K employees acknowledging that gaining FDA clearance for the AccelFix-XT had "involved many team members across the Aegis Spine and L&K organizations." (PX 154.)

## J. The End of the Distribution Relationship

Less than a month after the DBA expired on August 31, 2018, Knap, not knowing about Aegis's relationship with L&K, met with Ahn at the 2018 NASS convention to discuss the future of the parties' distribution relationship. (Tr. 170-71.) Knap testified that they agreed that Aegis and Life Spine would continue to operate under the terms of the DBA until the parties could come to terms on a Stocking Distribution Agreement. (Tr. 170-71.) Aegis continued to submit purchase orders for the ProLift after the DBA expired and Life Spine continued to fill those orders. (Tr. 175-76; PX 244.)

In December 2018 Knap reached out to Ahn to gauge Aegis's interest in purchasing additional ProLift cages. (Tr. 172-73.) In response, Aegis purchased 45 ProLift cages. (Tr. 207; DX 6.) Life Spine sold Aegis these cages directly, instead of maintaining them on a consignment basis as was the practice under the DBA. (Tr. 209, 974.) The parties used the same purchase order to complete this transaction as the form they used both before and after the term of the DBA ended. (DX 6; PX 244.) Aegis paid a lower unit price for the 45 cages it purchased in December 2018 than it had paid previously under the DBA. (Tr. 209.) Aegis later sought to return some of the 45 cages, but Life Spine refused to accept them. (DX 66 at LifeSpine 12440.)

In March 2019 Jesse emailed Kang a draft Stocking Distribution Agreement. (PX 93 at LifeSpine 7935.) Kang had not informed Jesse or anyone at Life Spine that he had left Aegis and moved to South Korea to work for L&K. (Kang Dep. Tr. 18, 37.) In May 2019 Aegis's CFO sent a request to Life Spine for a draft Stocking Distribution Agreement, copying Kang at his Aegis email address, and falsely informing Life Spine that Kang was "on a business trip to Korea." (PX 116 at Aegis 30563.) Thereafter, Jesse exchanged redlined drafts of the Stocking Distribution Agreement with Heidi Cha, Aegis's then Marketing Manager. (Tr. 897-98.)

By May 2019 Cha knew that Aegis would not be selling Life Spine products once the AccelFix-XT launched in the third quarter of 2019. (Cha Dep. Tr. 226-27.) Nevertheless, on June 17, 2019, Cha emailed Jesse an update of the Stocking

Distribution Agreement that included a two-year term. (Tr. 902; PX 116.) Jesse accepted the changes, provided pricing information Cha had requested, and believed they had reached a final agreement. (Tr. 899-900; PX 117.) Neither party executed the agreement, and a month later, on July 29, 2019, Cha emailed Jesse to say that Aegis would not sign the Stocking Distribution Agreement. (PX 138.) The following month Cha emailed Jesse a draft agreement proposing a "ramp down" period so that Aegis could continue to sell the ProLift for 30 days and acknowledging that "there has been no change in terms and conditions that were agreed to on January 18, 2018," the date of the DBA. (PX 147.) In the months between the December 2018 sale and the end of the parties' relationship, Aegis purchased about 300 ProLift devices from Life Spine. (Tr. 176.)

At the September 2019 NASS convention, Life Spine learned for the first time that Aegis was launching the AccelFix-XT in direct competition with the ProLift. (Tr. 921-22.) Aegis brought the AccelFix-XT to market in September 2019.

## K. The ProLift and the AccelFix-XT Cages Are the Same

At the preliminary injunction hearing, John Ashley, a medical device developer with over 30 years' experience designing medical products, offered expert testimony on Life Spine's behalf. Ashley opined that the ProLift cage and the AccelFix-XT cage are "essentially the same." (Tr. 1141-42, 1150.) He testified that the ProLift and the AccelFix-XT have the same five fundamental components—two endplates, a nose ramp, a base ramp, and an expansion screw, which function together in substantially the same way. (Tr. 1150-51.) In both devices, the

21

endplates and ramps are connected by dovetail-shaped grooves and a screw that controls the cage's expansion. (Tr. 1151.) These dovetails are so similar that their specifications vary only by fractions of a millimeter. (Tr. 1168-69, 1456-60.)

Ashley also testified that the two cages are so similar that the ProLift installer can be attached to and used to expand the AccelFix-XT device.[6] (Tr. 1174-75.) He described this fact as "shocking," because expandable cage installers are designed to function with their own products. (Tr. 1175.) He testified that for the ProLift installer to attach to the AccelFix-XT, eight separate corresponding components of the two cages must be compatible. (Tr. 1181-82.) Ashley further testified that he had never seen another company's installer that could be used to attach to a different company's device.[7] (Tr. 1175.)

Ashley also expressed surprise with respect to L&K's development timeline for the AccelFix-XT. He explained that the design history file for the AccelFix-XT reflects that after significant testing failures in December 2018, L&K decided to redesign the device, and went from redesign to an application for FDA 510(k) clearance by March 2019. (Tr. 1191-92, 1198, 1200-01.) In this three-month redesign period L&K incorporated the dovetail feature that Ashley considers to be

---

[6] The reverse is not true. The AccelFix-XT installer does not attach to the ProLift cage. (Tr. 1272.) Additionally, the attachment achieved between the ProLift installer and the AccelFix-XT cage is not a stable one and allows for some degree of wiggle in either direction. (Tr. 1260-62.) To be used safely in surgeries, an installer and cage need to have a firm, stable connection. (Tr. 607-08.)

[7] Aegis CEO Ahn testified that it would be "impossible" to produce a device that could be used with another company's installer without knowing the specifications of the other company's device. (Tr. 319.)

substantially the same in design and measurement to the ProLift dovetail. (Tr. 1183, 1202, 1210-11.) According to Ashley, 18 months is a reasonable timeframe to develop an expandable cage, and the 3-month development time reflected in the AccelFix-XT's design history file for the period from when L&K started its redesign to its 501(k) application is much shorter than what he would have expected. (Tr. 1183-85, 1191-92.) According to Ashley, only one document exists in the AccelFix-XT design history file that provides any summary of the testing or design process L&K used from January 2019 through March 2019. (Tr. 1199-1202.)

In formulating his opinion regarding the devices' similarities, Ashley reviewed more than 20 different expandable cage devices, and he concluded that the ProLift and the AccelFix-XT are the only two devices of that sample that are "essentially the same." (Tr. 1151-52.) Based on his review of these products and the similarities in components, functionality, and specifications of the two devices, Ashley opined that the AccelFix-XT is a "derivative product" based off the ProLift cage. (Tr. 1212.) He further opined that L&K used either the ProLift cage itself or detailed information about the ProLift to develop the AccelFix-XT. (Tr. 1211-12.)

## L. The ProLift and the AccelFix-XT Are Competing Devices

The United States market for surgical spinal devices consists of surgeons and hospitals. Life Spine invests significant resources into developing long-term relationships with its surgeon customers because it takes time to educate each surgeon on how to use the ProLift. (Tr. 76-77, 951-52.) Before selling medical

devices to hospitals, a company must go through a registration process during which a hospital typically requires a copy of the FDA's 510(k) approval, a product catalogue, a surgical technique guide, and list prices.[8] (Tr. 376-78, 420-21.) Life Spine's goal has been to develop "niche contracts" with hospitals by showing that the ProLift is a unique product that can meet a hospital's clinical needs. (Tr. 958.) Because hospitals require lengthy approval processes and limit the number of companies that can sell them devices, this strategy helps a relatively small company like Life Spine to get "a foot in the door." (Tr. 55, 957-58, 1087-88.) Once Life Spine has approval for a niche contract with a hospital for the ProLift, it may expand its business with that hospital by offering additional products for sale. (Tr. 55, 957-58, 1087-88.)

Life Spine has lost both surgeon and hospital customers since Aegis brought the AccelFix-XT to the market. At least two of Aegis's surgeon customers stopped purchasing the ProLift after the launch of the AccelFix-XT. (Tr. 953-54.) (They are the same surgeons who served as Aegis's surgeon consultants in designing the AccelFix-XT.) Additionally, Life Spine has lost at least 10 surgeon customers since the AccelFix-XT launched. (Tr. 951.) As for its hospital customers, Life Spine submitted evidence that one hospital that previously had purchased devices from Life Spine invited it to apply for a new niche contract by demonstrating the ProLift's status as a unique product. (Tr. 959.) Life Spine learned that the hospital was considering the AccelFix-XT for the same contract. Life Spine did not win that

---

[8] Hospitals do not pay the list price but use the list price as a reference for negotiations. (Tr. 379.)

niche contract. (Tr. 960.) Jesse testified that several hospitals have stopped purchasing the ProLift since the AccelFix-XT launched, and that Life Spine has been losing more niche contracts with hospitals since the fall of 2019. (Tr. 960-61, 1047-48.)

Life Spine also showed that Aegis is attempting to gain a competitive advantage by engaging in negotiations to allow another company, which is a player in the same medical device market, to distribute the AccelFix-XT or to purchase the licensing and property rights to the AccelFix-XT. (Tr. 351-52.) In connection with those negotiations, Aegis provided this potential third-party purchaser with samples of the AccelFix-XT so that it could conduct its own testing of the device. (Tr. 353.)

Furthermore, Life Spine submitted evidence that Aegis used its knowledge of ProLift's distributor price to undercut Life Spine's prices in competing for customers. For example, in Aegis's email correspondence discussing pricing for the AccelFix-XT, Cha—who was Aegis's then Marketing Manager—noted that "[t]he only comparative pricing that . . . we have access to is Life Spine's pricing to us." (PX 136.) In that context she proposed a price for the AccelFix-XT that she characterized as being "extremely competitive." (Id.) Jesse testified that since the AccelFix-XT came to market she has fielded requests from hospitals to lower the price of the ProLift. (Tr. 948-49.)

## Analysis

Life Spine seeks an injunction preventing Aegis from developing, manufacturing, marketing, distributing, or selling the AccelFix line of products pending trial. Because a preliminary injunction is "an exercise of a very far-reaching power," it is "never to be indulged in except in a case clearly demanding it." *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 965 (7th Cir. 2018) (quotation and citation omitted). The burden is on the moving party to demonstrate by "a clear showing" that this "drastic remedy" is warranted. *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998) (quotation and citation omitted). The court engages in a two-step analysis to determine whether an injunction should issue. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015). First, the moving party must demonstrate that it has a reasonable likelihood of success on the merits, that it will suffer irreparable harm absent an injunction, and that it has no adequate remedy at law. *Id.* at 662.

Second, if the moving party satisfies the threshold factors, the court then balances the potential irreparable harm to the moving party in the absence of an injunction against the potential irreparable harm to the enjoined party should the court grant the relief sought. *Valencia*, 883 F.3d at 966. The court also considers the potential impact of the proposed injunction on non-parties, a factor referred to as "the public interest." *Id.* The court weighs these harms on a sliding scale against the moving party's likelihood of success, meaning the stronger Life Spine's

showing that it is likely to prevail on the merits at trial, the less the balance of harms must weigh in its favor. *See Turnell*, 796 F.3d at 662.

## A. Likelihood of Success on the Merits

Because the bulk of the evidence presented at the hearing is centered on Life Spine's likelihood of succeeding on its breach of contract, trade secret misappropriation, breach of fiduciary duty, and declaratory judgment claims, the court begins with this step of the threshold analysis. Through the years courts in this circuit have applied a low bar here, finding that the moving party must show only a "better than negligible" chance of success, but the Seventh Circuit recently observed that this articulation has been "retired." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020) (petition for cert. filed Feb. 8, 2021). Accordingly, "a mere possibility of success is not enough"; instead, the moving party must make "a strong showing" that involves demonstrating how it "proposes to prove the key elements of its case." *Id.*

### 1. Breach of Contract

Life Spine argues that it has made the requisite showing that it is likely to succeed on its claims that Aegis breached several provisions of the DBA over the course of the parties' relationship and beyond, including those: establishing Aegis's fiduciary duties with respect to its custody of the ProLift; prohibiting Aegis from using Life Spine's information to reverse engineer or copy the ProLift; and requiring Aegis to maintain confidentiality. To succeed on its breach of contract claims under Illinois law, Aegis must demonstrate: "(1) the existence of a valid and enforceable

contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff."[9] *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015) (quotation and citation omitted). In response to the current motion, Aegis argues that Life Spine has not shown that it is likely to succeed on its breach of contract claims because, according to Aegis, after the DBA expired it was free to use information derived from the ProLift devices it purchased from Life Spine however it wished. (R. 128, Def.'s PI Resp. at 6.) Aegis further asks this court to conclude that the information it shared with L&K was in the public domain and therefore not confidential, that there is insufficient evidence that Aegis or its surgeon customers tried to reverse engineer or copy the ProLift, and that Life Spine was not damaged by Aegis's decision to send ProLift devices to L&K during the DBA's term.[10]

**(a)    The Survival Clause**

The parties do not dispute that the DBA is a valid and enforceable contract, but they disagree about whether Aegis continued to be bound by its confidentiality restrictions, fiduciary provisions, and copying prohibitions after the DBA expired on August 31, 2018. In its initial brief responding to the current motion, Aegis argues that it owned the 45 ProLift cages it purchased from Life Spine in December 2018

---

[9]  There is no dispute that Illinois law governs the breach of contract claims.

[10]  Aegis further asserts that Life Spine failed to perform or materially breached the DBA by failing to inform Aegis or provide Aegis with its updated ProLift product, the ProLift Post Pack. (R. 200, Def.'s COL at 81.) For the reasons set forth in this court's January 11, 2021 opinion, (R. 194), the court finds those arguments unpersuasive.

"free and clear" of any of the restrictions set forth in the DBA. (R. 128, Def.'s PI Resp. at 6.) It acknowledges that it decided to redesign its prototype and start from scratch after a December 18, 2018 meeting, and argues that because by then the DBA had expired, Aegis was free to forward, copy, or create derivations of the ProLift cages it purchased in December 2018. (Id. at 13-14.) Life Spine counters that under the DBA's survival clause, Aegis continued to be bound by the provisions at issue here even with respect to transactions that occurred after the DBA lapsed in August 2018. (R. 137, Pl.'s Reply at 9.)

The DBA includes a survival clause expressly stating that the duties set out in the provisions at issue here, including the confidentiality and anti-copying provisions set forth in Sections 7 and 8, "will survive the expiration or termination of this Agreement." (PX 1, DBA § 15(h).) The confidentiality provision restricts both parties from using each other's confidential information "either directly, or indirectly, for any purpose other than as required for performance of such party's obligations" under the DBA. (Id. § 7(a).) The DBA's restrictive covenants prevent Aegis or its contractors from even attempting to "reverse engineer," "create derivative works," "discover any underlying ideas," or "copy the design, knowledge, functionality, or otherwise" of the ProLift. (Id. § 8(b).) Taking these provisions together and reading them as a whole, as the court must, *see Stampley v. Altom Transp., Inc.*, 958 F.3d 580, 586 (7th Cir. 2020), they reflect the parties' intent that Aegis's obligation to protect Life Spine's confidential information and refrain from using it to copy the ProLift would endure beyond the DBA's expiration. Aegis offers

29

no alternative interpretation for the survival clause. The court concludes that it would undermine the plain language of the relevant provisions to interpret the DBA as meaning that once the parties' distribution relationship ended Aegis became free to use Life Spine's confidential information, including by copying and directly competing with the product that is at the center of the parties' contractual agreement. Accordingly, the court finds that under the DBA's express terms Aegis's obligations to refrain from copying the ProLift or from using Life Spine's confidential information for any purpose other than meeting its obligations as a distributor survive beyond the DBA's August 2018 expiration. *See Miller UK, Ltd. v. Caterpillar, Inc.*, No. 10 CV 3770, 2015 WL 6407223, at *2 (N.D. Ill. Oct. 21, 2015) ("Granting [Defendant] carte blanche to use [Plaintiff]'s confidential information as it pleased post-termination would be an anomalous result inconsistent with the Supply Agreement's stated intent to prevent such unlimited use.").

Confronted with the survival clause, Aegis urges the court to find that the parties' course of conduct in connection with the December 2018 sale severs any obligations that otherwise survived under the DBA. (R. 200, Def.'s COL ¶ 21.) Specifically, Aegis points out that under the DBA Aegis distributed the ProLift on a consignment basis, meaning that Aegis maintained custody of consigned products without taking ownership and paid Life Spine for them only after completing a sale. (Id. ¶ 8.) However, in December 2018 Life Spine deviated from its prior practice and sold Aegis ProLift cages "directly," meaning Aegis paid for them and took control of them without first completing a sale to a customer. (Id.) Aegis also points

30

to the undisputed evidence that Life Spine sold Aegis these 45 cages at a lower price than it had previously charged, used a purchase order to complete the transaction that did not expressly reference the DBA, and later refused Aegis's request to return some of the purchased cages. (Id. ¶¶ 10-13.) Based on these differences, Aegis urges the court to find that the survival clause does not incorporate the DBA's terms into the December 2018 sale of the 45 cages.

The court disagrees. For purposes of the survival clause, whether a singular transaction took place under a consignment structure or through a direct sale is a distinction without a difference. Nothing in the plain language of the survival clause suggests that the relevant restrictions would only apply to consignment sales after the DBA expired, nor does any reference to "consignment" appear in the confidential information clause or the clause prohibiting reverse engineering. (PX 1, DBA §§ 7, 8(b), 15(h).) Aegis has not shown that anything about the December 2018 transaction alters the plain meaning of the survival clause, which is that Aegis's obligations not to disclose Life Spine's confidential information or copy its products persist even after the DBA expired. Moreover, the undisputed evidence demonstrates that Life Spine would not have sold any cages to Aegis if Aegis had not first executed the DBA.

Even if the DBA's plain language were not conclusive, the hearing evidence establishes that the December 2018 transaction did not nullify Aegis's obligations under the survival clause. From the time the DBA expired in August 2018 until the end of the parties' relationship in the summer of 2019, Life Spine allowed Aegis to

continue distributing the ProLift while the parties negotiated a permanent contract. (Tr. 175-76, PX 244.)  Knap testified that at the September 2018 NASS convention he and Ahn agreed that the parties would continue under the terms of the DBA while they negotiated a Stocking Distribution Agreement, and that such an arrangement is common in the medical device industry.  (Tr. 170-71.)  The purchase order the parties used to complete the December 2018 sale is the same form the parties used for transactions under the DBA and in other transactions after the DBA expired.  (Compare DX 6 with PX 244.)  The DBA contemplates the possibility that Life Spine might offer Aegis discounts, (PX 1, DBA § 4.f), so the fact that Life Spine did so in the December 2018 transaction does not represent a meaningful shift for purposes of the survival clause.  And even a year after the DBA expired, in drafting a new agreement to allow Aegis to continue selling the ProLift after the Stocking Distribution negotiations failed, Aegis's CFO included a provision confirming that there were no changes to the terms set out in the DBA.  (PX 147.) In short, no evidence presented at the hearing supports a conclusion that Aegis's obligations under the survival clause ceased to exist based on the parties' conduct during the December 2018 sale.  Accordingly, Life Spine is likely to succeed in showing that the obligations preserved in the survival clause extended beyond the DBA's expiration, and that the December 2018 transaction did not terminate those obligations.

**(b)** **The Confidentiality Provision**

Life Spine has shown a high likelihood of success on its claim that Aegis breached the DBA's confidentiality provision by sharing its confidential information with L&K for the purpose of helping L&K develop its own expandable cage and by failing to ensure that Aegis's employees protected Life Spine's confidential information. This court has already deemed plain and unambiguous the language set forth in Section 7 of the DBA's confidentiality clause. (R. 70, Mem. Op. at 9.) Accordingly, the court looks to the confidentiality provision's terms to discern its meaning. *See Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 792 (7th Cir. 2014). In defining "Confidential Information," the DBA states:

> Confidential Information may include but is not limited to copyright, trade secrets or other proprietary information, techniques, processes, schematics, software source documents, pricing and discount lists and schedules, customer lists, contract terms, customer leads, financial information, sales and marketing plans, and information regarding the responsibilities, skills and compensation of employees.

(PX 1, DBA § 7(a).) The confidentiality provision's nondisclosure section states that "[e]ach party agrees not to disclose or otherwise make such Confidential Information available to third parties without the other party's prior written consent." (Id. § 7(b).) An exception exists if the disclosing party can prove that the Confidential Information "was in the public domain at the time it was disclosed or has entered the public domain through no fault of such disclosing party." (Id.)

Life Spine considers the ProLift cages and installers to be confidential and therefore restricts third-party access to those devices without a nondisclosure agreement to prevent the discovery of measurements of ProLift components and

subcomponents and how they interact. Life Spine has submitted evidence, and Aegis does not dispute, that in May 2018 Aegis sent L&K a ProLift cage, and in June 2018 it sent L&K a ProLift cage and installer, without informing Life Spine or receiving its prior written consent. Aegis urges the conclusion that these shipments did not violate Section 7(b) because, according to it, the ProLift cage and installer do not fall within the DBA's definition of Confidential Information. Aegis points out that the list of categories of confidential information set out in the definition do not include a specific or general reference to cages, installers, or related words like "inventory" or "sets." (R. 200, Def.'s COL ¶ 102.)

Aegis's argument ignores the fact that the list set out in the DBA's definition of confidential information is non-exhaustive—it specifically states that confidential information "may include but is not limited to" the examples it sets forth. And there is no real dispute that the ProLift cage and installer house within them information about the "techniques" and "processes" that apply to how their components and subcomponents interact. Based on these factors alone, the court concludes that Life Spine has a reasonable likelihood of showing that ProLift sets constitute confidential information under the DBA.

Moreover, Life Spine has produced substantial evidence both that Aegis understood that Life Spine considered ProLift sets to be confidential and that cages and installers are generally understood within the medical device industry to qualify as confidential information. *See Advance Process Supply Co. v. Litton Indus. Credit Corp.*, 745 F.3d 1076, 1079-80 (7th Cir. 1984) (noting that under UCC "trade

usage and course of dealing may be used to explain or supplement the express terms of an unambiguous contract," but not to contradict it). For example, it is undisputed that when Aegis asked Life Spine to provide it with a ProLift cage for a client "demonstration" before the DBA was signed, Life Spine required Aegis to sign confidentiality and loaner agreements as a precondition before allowing Aegis to take custody of the cage. (Tr. 132; Kang Dep. Tr. 79-80; Cha Dep. Tr. 49.) Life Spine submitted evidence that it never allows a third party to access ProLift cages or installers without signing a confidentiality agreement, and that it does not even let third parties handle ProLift devices at trade shows unless the person is directly supervised by a Life Spine employee. (Tr. 923-27.) Life Spine provided credible evidence that it is "common for medical device manufacturers to treat their expandable cages and the instrumentation that goes along with it as . . . confidential." (Tr. 1112.) Similarly, Aegis does not allow third parties to access the AccelFix-XT implants without confidentiality protections in place. (Tr. 510.) This evidence supports Life Spine's contention that the parties intended and knew that the DBA's definition of confidential information applied to the ProLift cages and installers. Thus, Life Spine is likely to succeed in showing that Aegis's choice to send the ProLift devices to L&K breached Section 7(b) of the DBA.

Even if Life Spine could not show that the ProLift devices qualify as confidential information under the DBA, there is evidence that Aegis shared other forms of confidential information with L&K. For example, it is undisputed that after Life Spine designed a custom installer at Aegis's request and sent an email to

Kang at Aegis including details and descriptions of the custom features and instructions for its use, Kang forwarded the email to L&K. (PX 71.) The DBA's confidential information definition includes "techniques, processes, [and] schematics," and Kang knew the email included such confidential information. (PX 1, DBA § 7(a); Kang Dep. Tr. 136.) The DBA's definition for confidential information also covers "sales and marketing plans," (PX 1, DBA § 7(a)), and according to Life Spine, even the fact that it was working on a custom device for a customer falls within that scope. Aegis has not suggested that the fact that Life Spine was providing it with custom changes was public information. *See La Calhene, Inc. v. Spolyar*, 938 F. Supp. 523, 530 (W.D. Wis. 1996) (noting that confidentiality of on-going R&D efforts can be secret where efforts were taken to maintain confidentiality and only few people were privy to work being done).

Insofar as Aegis asserts that the ProLift cage and installer, or the information set forth in the email Kang forwarded to L&K, were already in the public domain and therefore outside the scope of the DBA's confidentiality provision, the court is unpersuaded. As explained above, Life Spine has shown that the ProLift is sold only with confidentiality restrictions in place, and that Life Spine does not allow third parties to access the ProLift system without such restrictions in place. (Tr. 73, 148, 932-33, 1111-12.) Aegis has not submitted any evidence suggesting that the public can freely access either the ProLift cage or installer. Although images of the components of the ProLift are available publicly through patent information, Aegis fails to offer any evidence showing that precise details

about these components, such as exact dimensions or specifications, are publicly available. To the extent that Aegis points to a surgical technique guide for a Life Spine product available on the internet to suggest that such information is publicly available, it has not shown that the information disclosed in Kang's email exists in that guide. (R. 200, Def.'s COL ¶ 113 (citing DX 10).) More importantly, Life Spine submitted evidence showing that any dimensions published in its surgical technique guides are rounded approximations that do not disclose the components' exact specifications and are insufficiently detailed to allow a competitor to copy the ProLift. (Tr. 1106, 1462, 1465-66.) Accordingly, Life Spine is likely to show that Aegis breached Section 7(b).

Moreover, Aegis does not and cannot dispute that it violated the terms of Section 7(b) relating to its obligation to train its employees with respect to its obligation to protect Life Spine's confidential information. (PX 1, DBA § 7(b).) Life Spine submitted evidence showing that after Kang signed the DBA on Aegis's behalf, Aegis failed to meet this obligation. For example, CEO Ahn testified that he never read the DBA after it was signed and no one explained to him the company's obligations under the agreement. (Tr. 511-12.) Similarly, R&D Director Jack Lee testified that he neither read nor was informed about his obligations to keep Life Spine's confidential information secure. (Tr. 656-57.) Yet ignorance of Aegis's obligations under Section 7(b) is no excuse. After Aegis received access to the ProLift and corresponding confidential information, both Ahn and Jack Lee worked together with L&K to provide input on the development process for the AccelFix-XT.

Jack Lee forwarded to L&K feedback he received from Aegis's surgeon consultants based on their use of the ProLift during surgeries—access they had only because of Aegis's relationship with Life Spine under the DBA. The evidence that Jack Lee forwarded this kind of proprietary information to L&K without having been trained in his obligations under the DBA takes the air out of Aegis's argument that its breach "is without effect." (See R. 200, Def.'s COL ¶ 114.) Life Spine has successfully demonstrated it is likely to succeed in showing that Aegis breached this aspect of Section 7(b).

Lastly with respect to the confidentiality provision, Life Spine is likely to succeed in showing that Aegis breached Section 7(a), which restricts Aegis from using Life Spine's confidential information "for any purpose other than as required for performance" of its obligations under the DBA. (PX 1, DBA § 7(a).) As set forth above, Aegis shared ProLift cages and an installer with L&K specifically to help with its AccelFix-XT design process, a purpose far removed from its role as Life Spine's distributor. The same is true for the information it shared with L&K about Life Spine's custom installer. But even if the court were to conclude that those two categories do not constitute confidential information, there is still evidence that Aegis used its access to Life Spine's distributor pricing information to help set prices for the AccelFix-XT to make it competitive with the ProLift in the marketplace. Specifically, Cha emailed Aegis's VP of Marketing in July 2019 about setting the price for the AccelFix-XT before its launch. After noting that "the only comparative pricing that . . . we have access to is ProLift's pricing to us," Cha

38

proposed a price that would be "extremely competitive" with the ProLift. (PX 136.) Aegis does not and cannot dispute that pricing information is confidential under the DBA, given that it is specifically listed as such in the DBA's definition of confidential information. (PX 1, DBA § 7(a).) Because Cha's email shows Aegis used Life Spine's pricing information for a purpose unrelated to its distribution role, and in fact for the purpose of directly competing with the ProLift, Life Spine has a very high likelihood of success in showing that Aegis breached Section 7(a) of the DBA.

### (c)    The Restrictive Covenants Provision

Life Spine is also likely to succeed in showing that Aegis breached Section 8 of the DBA, which incorporates restrictive covenants prohibiting Aegis from even attempting to "reverse engineer," "create derivative works," "discover any underlying ideas," or "copy the design, knowledge, functionality, or otherwise" of the ProLift. (PX 1, DBA § 8(b).) Life Spine has presented credible evidence that Aegis did exactly that in working together with L&K to develop the AccelFix-XT. Specifically, Aegis attempted to and did discover the underlying specifications of the ProLift and then shared that information with surgeon consultants and L&K to reverse engineer the ProLift. (Tr. 678-83.) The surgeon consultants are key designers of and are listed among the inventors of the AccelFix-XT. (Inzitari Dep. Tr. 173-74, Tr. 538; PX 168.) There is evidence that Aegis and L&K set out to incorporate "the basic structure" of the ProLift installer into the AccelFix-XT installer, (PX 65 at Aegis 16658), and in fact ended up designing an installer for the

39

AccelFix-XT that can attach to and expand a ProLift cage, a feature that Aegis's own CEO testified could not happen without access to the dimensions of the ProLift cage, (Tr. 319, 1175, 1177-82). And Ashley credibly testified that the most likely explanation for the substantial equivalence of the ProLift and AccelFix-XT cages and the near identity of some of the specifications of their internal components is that the AccelFix-XT was derived from information gleaned from the ProLift. (Tr. 1150, 1168-69, 1211-12.)

Aegis responds to this evidence by asserting that L&K is not bound by the DBA and that it was L&K, not Aegis, that developed the AccelFix-XT. Again here, the court is not persuaded. As set forth above, there is a cascade of evidence showing that Aegis provided input and information to L&K to assist it in the AccelFix-XT design process while it was distributing the ProLift. Aegis's surgeon consultants and its CEO are key designers of and are listed as inventors of the AccelFix-XT in its patent application. (Inzitari Dep. Tr. 173; Tr. 538; PX 168.) Ahn admitted that he has represented that the AccelFix-XT is the product of a joint development effort between Aegis and L&K. (Tr. 353.) Aegis's VP of Sales and Marketing testified that he understood throughout his time at Aegis that the AccelFix-XT project was a joint project between Aegis and L&K, and when the AccelFix-XT won its FDA 510(k) clearance, he circulated a congratulatory email to both Aegis and L&K employees acknowledging that the approval process had "involved many team members across the Aegis Spine and L&K organizations. (Inzitari Dep. Tr. 172; PX 154.) Given the evidence presented at the hearing,

Aegis's assertion that it had no role in developing the AccelFix-XT is simply not credible.

Aegis also asserts that the AccelFix-XT's development was a multiyear endeavor that began long before Aegis had access to the ProLift, and that this timeline refutes any finding that the AccelFix-XT is a ProLift copy. (R. 200, Def.'s COL ¶ 122.) Again, this assertion is unpersuasive given its own past representations and the hearing evidence. In its response to the current motion, Aegis acknowledged that it decided in December 2018 to redesign its prototype and to start "from scratch." (R. 128, Def.'s PI Resp. at 14.) The evidence shows that in December 2018, after months of being spoon-fed ProLift information by Aegis, L&K accomplished that redesign in less than four months. Life Spine's expert testified that the design history file for that time period is lacking in the documentation that should accompany a redesign of the type L&K undertook.[11] (Tr. 1183-85, 1202, 1296.) The court concludes that the most likely explanation for the speed of L&K's redesign and evidence of the "essential sameness" of the resulting AccelFix-XT and the ProLift is that Aegis violated Section 8 by assisting L&K in reverse engineering a derivative product. Accordingly, Life Spine is likely to succeed in showing that Aegis breached Section 8 of the DBA.

---

[11] It is worth noting that Aegis itself has taken the position at times in this litigation that as of December 2018 it was free to do whatever it pleased with the ProLift devices it purchased that month, including "create derivative works" of the ProLift. (R. 128, Def.'s PI Resp. at 13.)

### (d)  The Fiduciary Duty Provision

Life Spine has also shown a strong likelihood of success on its claim that Aegis breached Section 3(a) of the DBA, which requires Aegis to "maintain custody and/or control of each" ProLift device that Life Spine provided it and to serve in a "fiduciary capacity" and as "trustee" of Life Spine's property rights in the ProLift. (PX 1, DBA § 3(a).)  It is uncontested that Ahn permitted L&K to gain custody and control of a ProLift cage in May 2018 and a ProLift set in June 2018 when he sent them to L&K at the request of Sang-Soo Lee, L&K's R&D Director.  (Tr. 311-12, 314, 1662.)  Aegis nonetheless argues that these actions did not amount to a breach of Section 3(a) because it "understood" that section to mean that if it lost any of Life Spine's products it would have to pay for them, and according to Aegis, none of Life Spine's products is missing.  (R. 200, Def.'s COL ¶¶ 115, 117.)  This purported "understanding" flies in the face of the provision's plain language, which clearly states that Aegis agreed to maintain custody and control of the products in a fiduciary capacity.  That the DBA requires Aegis to compensate Life Spine for lost products does not mean that Aegis was free to turn custody of ProLift devices over to a third party, let alone to a direct competitor of Life Spine.

The same is true for Aegis's conduct in displaying a ProLift set at the March 2018 Expandable Cage Kickoff Meeting, where it allowed two surgeon consultants to examine the set.  Aegis now asserts that this conduct did not violate Section 3(a) because, it says, its intent in showing the surgeons the ProLift device was to sell them Life Spine's products.  (R. 200, Def.'s COL ¶ 118.)  The evidence suggests

42

otherwise.  The Kickoff Meeting was not a sales or marketing meeting—it was a new product development meeting.  The surgeons at the meeting were recruited by Aegis specifically to help L&K design an expandable cage, and the presentations Aegis made to those surgeons were related to that design plan.  (Tr. 267-69, 289, 294.)  At the meeting Aegis identified the ProLift as a competing device to its proposed expandable cage.  (Cha Dep. Tr. 121-22.)  The two surgeons present at the meeting later provided Aegis with extensive feedback on their experience using the ProLift for the purpose of helping Aegis and L&K develop a competing product.  Given the evidence that Aegis allowed the surgeons to examine the ProLift for the purpose of helping it to develop a device that would compete directly with the ProLift, Life Spine is likely to succeed in showing that this conduct also breached Aegis's fiduciary duties under the DBA.

Aegis's only other argument with respect to this course of conduct rests on its assertion that Life Spine was not damaged by its breaches of Section 3(a).  This argument is underdeveloped, but it appears to rest on the idea that no one at L&K opened or examined the ProLift cages and installer that Ahn sent to Sang-Soo Lee.  As set forth in detail below in section A(3), the evidence strongly suggests that someone at L&K did open the ProLift cage boxes and that L&K used its contents to inform its development process for the AccelFix-XT.  As for the Kickoff Meeting, the evidence supports a likely conclusion that the surgeon consultants who were given access to the ProLift set worked with Aegis and L&K to use information about the

ProLift to compete with Life Spine. Accordingly, Life Spine is likely to succeed in showing that it was damaged by Aegis's breach of its contractual fiduciary duties.

## 2.    Breach of Fiduciary Duty

For the same reasons set forth in the preceding three paragraphs, Life Spine has made a showing of likely success with respect to its common law claim for breach of fiduciary duty. To prevail on this claim, Life Spine must show that: (1) a fiduciary relationship existed between the parties; (2) Aegis owed Life Spine specific duties; (3) Aegis breached those duties; and (4) Life Spine suffered damages as a result. *See Chi. City Bank & Tr. Co. v. Lesman*, 542 N.E.2d 824, 826 (Ill. App. Ct. 1st Dist. 1989). As set forth above, Life Spine has shown that under the DBA Aegis agreed to serve as Life Spine's distributor "in a fiduciary capacity," and that the parties agreed that Aegis had specific duties to maintain custody and control of Life Spine's property and to serve as "trustee" of Life Spine's property rights. (PX 1, DBA § 3(a).) Life Spine has also shown a high likelihood of success in demonstrating that Aegis breached those duties by allowing L&K, along with surgeon consultants who were hired to develop a competing product, to access ProLift cages, and that Life Spine was harmed by their use of that information to shortcut the design process for the AccelFix-XT. Because Aegis does not raise any distinct arguments in response to Life Spine's common law claim, the court concludes for the same reasons set forth above that Life Spine is likely to succeed on its merits.

### 3. Misappropriation of Trade Secrets

Life Spine has shown a strong likelihood of success on its trade secrets misappropriation claims, which arise under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1. Because the definitions in these statutes overlap, the court analyzes Life Spine's likelihood of success on the two claims together. *See Aon Risk Servs. Cos., Inc. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 847 (N.D. Ill. 2019). To prevail on its trade secrets claims Life Spine must establish that: "(1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner." *See Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016). Life Spine's trade secrets misappropriation claim stems from its assertion that Aegis shared with L&K three categories of information that it considers to be trade secrets: (1) the combination, dimensions, and interconnectivity of the ProLift's components and subcomponents; (2) static shear compression testing data; and (3) information about how Life Spine prices the ProLift. Life Spine asserts that it was damaged by this misappropriation because Aegis and L&K, working together, used Life Spine's trade secrets to reverse engineer the ProLift device and then to undercut its prices in the spinal device market.

Aegis first argues that Life Spine cannot show that the combination, dimensions, and interconnectivity of ProLift components constitute trade secrets because that information is already in the public domain. Information qualifies as a

trade secret under the ITSA where it: "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d); *see also Liebert Corp. v. Mazur*, 827 N.E.2d 909, 921 (Ill. App. Ct. 1st Dist. 2005). Life Spine asserts that there is economic value in keeping the specifications of the ProLift components secret, because allowing competitors to access that information would allow them to copy or give them a leg up in copying the ProLift device to produce competing products. Life Spine has also offered evidence that it takes reasonable efforts to keep the precise specifications and interconnectivity of the ProLift's components and subcomponents secret by not publishing those details and by putting confidentiality restrictions in place before allowing a third party to access or even handle the ProLift without Life Spine's supervision.[12] (Tr. 74, 148, 1111-12, 1462, 1465-66.) *See InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 661 (9th Cir. 2020) (concluding that licensing agreements with confidentiality restrictions in place "during and after the terms of the agreement . . . constitute reasonable measures" to protect trade secret information).

In support of its argument that details regarding the ProLift's components are not trade secrets, Aegis points to evidence that the publicly filed ProLift patent

---

[12]    Notably, Aegis takes similar steps to ensure that third parties sign confidentiality agreements before accessing the AccelFix-XT, because allowing unfettered access to the device could jeopardize its trade secrets. (Tr. 510, Cha Dep. Tr. 53.)

materials reveal the shape, identity, and interrelationship of the device's components, including the cage's dovetail shapes in the grooves. (R. 200, Def.'s FOF ¶ 60.) Accordingly, Aegis urges the court to conclude that the information Life Spine seeks to protect is in the public domain. But Aegis's argument ignores the fact that it is not the existence of the five main components and how they interact that Life Spine considers to be trade secret. Rather, it is the precise dimensions of the ProLift's components and subcomponents and how those specifications impact their interconnectivity. *See Thermodyne Food Serv. Prods., Inc. v. McDonald's Corp.*, 940 F. Supp. 1300, 1305 (N.D. Ill. 1996) ("The interrelationship of the component parts and technologies which comprise the . . . technology certainly constitutes the type of information which could qualify as a trade secret under the ITSA."). Aegis offers no evidence showing that the specific measurements and dimensions of the ProLift's components and subcomponents are publicly available through patents or elsewhere. To the contrary, the evidence at the hearing supports a conclusion that those specifications can only be discerned by someone with unfettered access to the ProLift system and sophisticated testing or measurement technology. (Tr. 159-60, 1449, 1453-54, 1460-62.)

Aegis also argues that as soon as Life Spine began marketing the ProLift system, it lost any trade secret protection it may otherwise have enjoyed in the specific dimensions of its components. According to Aegis, once the ProLift entered the "stream of commerce," the information lost any applicable trade secret status because any third party could discover the device's dimensions and specifications.

(R. 200, Def.'s COL ¶ 47.)  But the cases it cites in support of this position involve goods and devices than can be purchased by the public without any restrictions in place.  For example, in *Brandwynne v. Combe Int'l Ltd.*, 74 F. Supp. 2d 364, 378 (S.D.N.Y. 1999), a district court applying New York law found that a product sold for personal use lost any trade secret protection once it was offered to the public for sale without any restrictions, and where the claimed trade secret was "readily visible and ascertainable upon inspection in the open market."  By contrast, it is impossible for a member of the public to go to a store or pharmacy and purchase a ProLift cage or installer.  (Tr. 73-74.)  Life Spine sells the ProLift system to hospitals through distributors that are subject to confidentiality restrictions and that maintain oversight responsibilities for the ProLift prior to its use in surgery. (Tr. 85, 927-37.)  Moreover, these cages are implanted inside human bodies by surgeons.  As such, Aegis's citations to cases involving products that can be purchased off the shelves in stores have little bearing on the analysis here.

Aegis further argues that Life Spine is unlikely to succeed in showing that it misappropriated the trade secrets housed in the ProLift system because the fact that its engineers studied publicly available patent information regarding the ProLift explains any similarities between the ProLift and the AccelFix-XT.  Again, Life Spine submitted evidence showing that information about the specific dimensions and how they impact the interconnectivity of the ProLift's components and subcomponents is not available in Life Spine's publicly available patent materials.

48

Life Spine may establish misappropriation in one of three ways: "by improper acquisition, unauthorized disclosure, or unauthorized use." *See Liebert*, 827 N.E.2d at 925 (emphasis omitted). Life Spine has presented substantial circumstantial evidence pointing to a conclusion that Aegis engaged in unauthorized disclosure by allowing L&K's engineers to access and study the internal components of the ProLift cage and installer. *See Aon Risk Servs.*, 415 F. Supp. 3d at 848 (noting that plaintiff may rely on circumstantial evidence in support of misappropriation claims, "because direct evidence of theft and use of trade secrets is often not available"). First, it is undisputed that Aegis provided L&K with unfettered access to two ProLift cages and an installer when it sent them to Sang-Soo Lee in May and June 2018. It is also undisputed that L&K's R&D department had access to the kind of measurement equipment that would have allowed it to ascertain the specifications of the ProLift's components and subcomponents.

Additionally, the court finds that Sang-Soo Lee's testimony that he returned the ProLift cage he received without opening the box or allowing others to open the box lacks credibility. He asked Ahn to send him a ProLift set specifically because he believed that seeing the device would be helpful to L&K's development of the AccelFix-XT and he wanted to see the "real product" instead of just looking at images. (Tr. 314, 1597, 1662.) Despite specifically asking to see the device, Sang-Soo Lee testified that he never saw the cage Ahn sent in May 2018, and that after receiving the June 2018 shipment, he decided not to open the box because he did not want L&K to have to pay for the device. (Tr. 1598, 1660-61.) The court finds this

explanation doubtful, given the evidence that L&K's R&D department had a significant budget for the development of the AccelFix-XT. (Tr. 1662.) Furthermore, the court finds it unlikely that Sang-Soo Lee, who is both a patent attorney and an engineer, would not have understood that to accomplish his goal of viewing the "real product" he would need to open the box, rendering the device unsterile and therefore not suitable to be used in surgeries. Adding to the court's reservations is Sang-Soo Lee's inability to identify to whom he gave the box for its return, to say whether anyone else opened the box after he handed it off, or to produce shipping records showing that the box was returned to Aegis. (Tr. 1663-64.)

Life Spine also presented evidence supporting a conclusion that Aegis failed to return a ProLift cage to Life Spine and that the cage remains missing. When the parties' distribution relationship ended Aegis informed Jesse for the first time that it could not return one of the consigned ProLift cages that Life Spine had sent because according to Aegis, it had received an empty box. (Tr. 911-12.) Jesse credibly testified that she was skeptical of this assertion, because over the course of her 10 years at Life Spine she had never heard a distributor say that Life Spine had sent it an empty box. (Tr. 915-16.) Jesse also credibly testified that when she asked for evidence of the purportedly empty box, the picture Aegis sent elevated her concerns because the photo showed that someone had placed a second anti-tampering sticker over the box's original anti-tampering sticker, misapplying the sticker in the process. (Tr. 914-16.) Based on its review of the photo and Jesse's

testimony, (id.; PX 147), the court concludes that the most likely explanation is not that Life Spine sent Aegis an empty box, but that someone had opened the box, removed the ProLift cage, and then attempted to cover up the fact that the box had been opened.[13]

Life Spine's misappropriation claim is also supported by Ashley's expert opinion that the most likely explanation for how the ProLift and AccelFix-XT are "essentially the same" is that L&K and Aegis had access to and used information about the ProLift's components to reverse engineer the device in its design process. (Tr. 1211-12.) Ashley demonstrated how the dovetail connection features of the two devices are so similar that their specific measurements vary by only fractions of a millimeter. (Tr. 1168-69, 1172-73.) He also credibly testified that he was surprised to find that the ProLift installer can be used to attach to and expand an AccelFix-XT device because to achieve that connection, eight distinct components of the two cages must be compatible. (Tr. 1174-75, 1177-82.) Aegis's own CEO testified that it would be "impossible" to produce a device that could be used with another company's installer without knowing the specifications of the other company's device. (Tr. 319.) Moreover, Ashley credibly testified that the design history file for the redesign of the AccelFix-XT was lacking in the kind of documentation one would expect to explain how L&K went from deciding in December 2018 to redesign its device to submitting in March 2019 an FDA 510(k) application. (Tr. 1191-92, 1201-02.) In addition to the sparse documentation, Ashley found it implausible that the

---

[13] Moreover, it is undisputed that Aegis failed to return several ProLift installers that remain in its possession. (Tr. 910; PX 235.)

redesign effort L&K undertook—and one that resulted in a dovetail feature that was the same in design and essentially the same in measurement as the ProLift's dovetail feature—could be accomplished in a three-month period. (Tr. 1191-92, 1209-12.) *See Dulisse v. Park Int'l Corp.*, No. 97 C 8018, 1998 WL 25158, at *3 (N.D. Ill. Jan. 9, 1998) (noting that surprisingly short timeline for developing competing product supports reasonable likelihood of success on misappropriation claim). This unrebutted evidence strongly supports a conclusion that L&K had access to Life Spine's trade secrets during its design process.

Perhaps the strongest evidence that L&K studied and used Life Spine's trade secrets is that Aegis has failed to provide any explanation for the fact that in October 2018 Aegis and L&K shared a power point presentation that includes a specific value representing the results of shear compression testing for the ProLift cage. Aegis half-heartedly argues that testing data is not a trade secret because it is derived from a ProLift cage and the cage itself is not confidential. The court rejects the idea that the ProLift cage is not confidential for the reasons set forth above. Moreover, Life Spine has submitted evidence showing that it takes steps to maintain the confidentiality of its testing data and that it derives value from keeping that data secret, because allowing a competitor access would give it a leg-up in reverse engineering a competing product. (Tr. 1485-86.)

Although it is undisputed that Life Spine never shared its ProLift testing data publicly or with Aegis, (Tr. 625, 1485), Aegis and L&K jointly created a slide presentation for an October 2018 meeting in which the specific shear compression

testing data for the ProLift is listed. No witness for Aegis explained where this number came from or how it came to be included in the meeting materials. Sang-Soo Lee testified that he did not know "how that information came about," (Tr. 1668), and not a single witness for Aegis was able to explain how that data fell into its hands. Based on the hearing evidence, the court concludes that the most likely explanation is that L&K used its access to the ProLift cage to conduct its own testing. The circumstantial evidence supporting that conclusion includes: (1) the evidence that an employee of L&K's R&D team sent an email referencing a folder for "ProLift Data" but Aegis never produced this folder or data, (PX 101 at L&K 388); (2) L&K's R&D department has access to testing equipment; (3) the head of L&K's R&D department received two ProLift cages from Aegis to assist in its design process; (4) the most likely explanation for the empty ProLift box is that someone at L&K opened the box, removed the device, and tried to make it look like the box had not been opened; and (5) unfettered access to a ProLift cage and testing equipment would allow L&K to reproduce Life Spine's testing data. Especially considering Aegis's failure to explain the source of the testing data in the slide presentation, this evidence supports a finding that Life Spine is likely to show that L&K conducted testing on a ProLift cage using information that Aegis misappropriated.

Additionally, substantial evidence shows that Aegis was actively misleading Life Spine about its intent to assist in developing a competing device to the ProLift and its funneling of Life Spine's information to L&K, which supports a finding of misappropriation. *See Mickey's Linen v. Fischer*, No. 17 CV 2154, 2017 WL

3970593, at *11 (N.D. Ill. Sept. 8, 2017) (rejecting defendant's attempt to explain circumstantial evidence of misappropriation given evidence defendant lied and changed stories). The evidence demonstrates that Aegis first approached Life Spine about forming a distribution relationship the day after it met with L&K to discuss the need to develop an expandable cage. (Tr. 131-32; PX 13.) Kang asked that a Life Spine representative not attend a "demonstration" of the ProLift he performed with a surgeon Aegis then recruited to help design the AccelFix-XT. (Tr. 277; PX 4 at Aegis 3246-47.) Kang did not inform Life Spine when he left Aegis to work at L&K, and then he continued using his Aegis email to correspond with Life Spine about the ProLift while blind copying L&K employees on that same correspondence. (Kang Dep. Tr. 141, 1645; PX 88.) This evidence reinforces the court's conclusion that Aegis likely used its distribution relationship with Life Spine to gain access to confidential and trade secret information about the ProLift, and then funneled that information to L&K.

The third category of information Life Spine argues Aegis misappropriated is information about the prices it charged Aegis for the ProLift cage and installer. Pricing information can qualify as a trade secret where there is evidence that the trade secret holder takes steps to keep that information secret, it is not generally ascertainable from public information, and there is value derived from keeping the information secret. *Allied Waste Servs.*, 177 F. Supp. 3d at 1112; *Arjo*, 2018 WL 5298527, at *4. Life Spine submitted evidence that it only provides access to its standard distributor price information to entities with confidentiality agreements

and that it derives value from keeping this information secret, because that secrecy allows it more negotiating flexibility when dealing with smaller distributors. (Tr. 945-46.) Aegis has not pointed to evidence showing that the distributor price is generally known in the industry or otherwise ascertainable from publicly available information. Life Spine submitted evidence suggesting that Aegis used its knowledge of the ProLift's distributor price to set a price for the AccelFix-XT that Aegis knew would undermine Life Spine's price. (PX 136.) The court thus concludes that Life Spine has some likelihood of succeeding in showing that its standard distributor price is a trade secret and that Aegis misappropriated that trade secret by using it for purposes other than in service to Life Spine.

### 4. Claim for Declaratory Judgment

Life Spine's declaratory judgment claim is premised on Section 12(b) of the DBA, in which the parties agreed that any "[c]onfidential [i]nformation, trade secret (as defined by Illinois law), or other work product developed by [Aegis]" would "belong to [Life Spine]" if it "involved the use of [Life Spine]'s equipment, facilities, confidential information or trade secrets" or "at the time conceived or first reduced to practice, related to [Life Spine]'s current or planned business activities." (PX 1, DBA § 12(b).) Section 12(b) is included in the DBA's survival clause, so it continues in effect beyond the DBA's expiration. (Id. § 15(h).) To prevail on its declaratory judgment claim, Life Spine must show that: (1) it has a legal tangible interest; (2) Aegis has an opposing interest; and (3) there is an actual controversy between the parties with respect to those interests. *See Record-A-Hit, Inc. v. Nat'l Fire Ins.*

*Co. of Hartford*, 880 N.E.2d 205, 207 (Ill. App. Ct. 1st Dist. 2007). Life Spine asserts that it is entitled to ownership of the AccelFix-XT under Section 12 based on the evidence that Aegis and L&K used Life Spine's confidential and trade secret information to develop the AccelFix-XT. (R. 184, Pl.'s COL ¶ 350.) Based on the evidence that L&K is attempting to sell rights to the AccelFix-XT, Life Spine urges the conclusion that it has demonstrated an actual controversy between the parties with respect to their competing interests in the AccelFix-XT. (Id. ¶ 352.)

Aegis's primary response to Life Spine's argument is that issuing an injunction with respect to the declaratory judgment claim would be improper because it would give Life Spine all the relief that it could obtain at trial. But that assertion speaks to the propriety of issuing an injunction, not the threshold question of Life Spine's likelihood of success on the underlying claim.[14] With respect to the actual merits of this claim, Aegis argues that the DBA had expired by December 2018 when L&K began a redesign process, but again, that argument ignores the impact of the survival clause. (R. 128, Def.'s PI Resp. at 18.) Aegis's only other argument is its resuscitated assertion that L&K, not Aegis, developed the AccelFix-XT, and that all Aegis did was "provide[] its thoughts and input." (Id.) Again, that assertion flies in the face of the evidence showing that the design of a competing expandable cage was Aegis's idea, and that Aegis: hired consultants to

---

[14] The court disagrees with Aegis's assertion that the proposed injunction would award Life Spine all the relief it seeks. The preliminary injunction requested here would not render this case moot, as in the cases Aegis cites, (see R. 200, Def.'s COL ¶ 140), but would temporarily restrict activities that Aegis could later resume should it prevail at trial.

use the ProLift and provide information about its specifications, which Aegis then provided to L&K; requested a custom installer from Life Spine and then sent L&K confidential information about the installer, which it incorporated into its own design; and held out its surgeon consultants and its own CEO as key designers and inventors of the AccelFix-XT. The evidence strongly suggests that Aegis was a supportive partner to L&K throughout the AccelFix-XT development process. Accordingly, Life Spine has shown a likelihood of success on its claim that Aegis developed the AccelFix-XT in part by using Life Spine's confidential information and trade secrets, which would entitle it to a declaratory judgment under Section 12 of the DBA.

## B.    Irreparable Harm and Inadequate Remedy at Law

Having demonstrated a likelihood of success on the merits, Life Spine must also show "that it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if an injunction is not issued." *Foodcomm, Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). Life Spine argues that in the absence of an injunction it will continue to lose market share, suffer harm to its reputation and loss of good will from having a knockoff product on the market, and experience price erosion caused by Aegis's marketing of the cheaper knockoff version of ProLift. Life Spine argues that there is no adequate way to pin down or calculate the damages related to the business it will lose because of the AccelFix-XT's presence in the market. In response, Aegis argues that there is insufficient evidence with respect to Life

Spine's lost sales and market share, price erosion, and harm to its reputation to warrant the broad injunction Life Spine seeks here.

As a preliminary matter, Life Spine's trade secrets and breach of confidentiality claims have built-in presumptions with respect to irreparable harm. Aegis does not contest that where a party shows a likelihood of success on a trade secrets claim, it is entitled to a presumption of irreparable harm. *See Aon Risk Servs.*, 415 F. Supp. 3d at 851. Given Life Spine's strong showing on the likelihood that it will succeed on its trade secrets claims, the presumption of irreparable harm must apply here. Nor does Aegis dispute that it agreed that any breach of the DBA's confidentiality provision would cause Life Spine irreparable harm. Specifically, under Section 7(d) of the DBA, the parties stipulated that "[a]ny breach of the restrictions contained in this section is a breach of this Agreement that may cause irreparable harm to a party and as such each party is entitled to injunctive relief to enforce this Agreement." (PX 1, DBA § 7(d).) Courts analyzing irreparable harm in this district have considered such contractual agreements as a factor weighing toward a finding of irreparable harm. *See Mickey's Linen*, 2017 WL3970593, at *19; *OptionsCity Software, Inc. v. Baumann*, No. 15 CV 5019, 2015 WL 3855622, at *5 (N.D. Ill. June 19, 2015); *nClosures, Inc. v. Block & Co., Inc.*, No. 12 CV 9358, 2013 WL 158954, at *2 (N.D. Ill. Jan. 15, 2013). Accordingly, the court concludes that Life Spine has established a presumptive likelihood of irreparable harm in connection with its trade secrets misappropriation claim and its claim stemming from Aegis's breach of Section 7 of the DBA.

58

Even without the presumption and contractual provision related to irreparable harm, Life Spine argues that it is likely to suffer irreparable harm absent an injunction based on Aegis's targeting of its customer base and its market share. The "risk of loss of market share, loss of customers, and loss of access to potential customers" can constitute irreparable harm. *E-Link Tech. Co., Ltd. v. Shenzhen Uni-Sun Elecs. Co., Ltd.*, No. 20 CV 00247, 2020 WL 8079816, at *2 (N.D. Ill. May 14, 2020). Irreparable harm can result from the "complete loss" of an important customer relationship, *see Foodcomm*, 328 F.3d at 304, or where "a former insider lures customers away through a competing business," *Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900, 912 (C.D. Ill. 2015) (quotation and citation omitted). Irreparable harm is especially likely to stem from losses in a market environment where, once lost to a competitor, customers are difficult to win back. *Ill. Bell. Tel. Co. v. MCI Telecommc'ns Corp.*, No. 96 CV 2378, 1996 WL 717466, at *9 (N.D. Ill. Dec. 9, 1996); *OptionsCity Software*, 2015 WL 3855622, at *5. To establish that loss of customers or market share amounts to irreparable harm, the party seeking the injunction must point to actual evidence, not just speculation, demonstrating the likelihood of those losses. *See McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 683 F. Supp. 2d 740, 749 (N.D. Ill. 2010). At the same time, Life Spine is not required to identify the specific business or customers it has lost or might lose to Aegis, because "[c]ompetition changes probabilities" and "it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury

'irreparable.'" *See Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005).

Life Spine has offered some evidence that it is likely to lose hospital and surgeon customers absent an injunction, and that once it loses those customers, they would be difficult to win back. It is undisputed that Aegis is marketing the AccelFix-XT in the same finite pool of hospitals and surgeons in which Life Spine markets the ProLift. Cultivating surgeon and hospital customers is a time- and resource-intense process, requiring surgeon education and the clearance of significant hospital registration requirements. (Tr. 76-77, 376-78, 951-52.) Life Spine also has shown that it has lost both surgeon customers and hospital contracts in the time since the AccelFix-XT entered the market. (Tr. 951-54, 960-61, 1047-48; Cha Dep. Tr. 209.) There is also evidence that Aegis is attempting to secure a distribution partner for the AccelFix-XT that would significantly expand its presence in the market for spinal surgical implants. (Tr. 351-52.) Moreover, because hospitals do not publicize their contracts for spinal products, pinning down or quantifying the business Life Spine may lose to Aegis would be especially difficult. Life Spine's showing of loss and potential loss of customers and market share in a context in which those customers would be difficult to win back supports its assertions that it will be irreparably harmed absent the requested injunction.

Similarly, Life Spine's evidence that Aegis is using its knowledge of Life Spine's standard distributor price to offer the AccelFix-XT at a lower price than the ProLift is a factor weighing toward an irreparable harm finding. *See Scholle Corp.*

*v. Rapak LLC*, 35 F. Supp. 3d 1005, 1014-15 (N.D. Ill. 2014) (noting that offering a competing product at a price that exerts downward pressure on existing prices can constitute irreparable harm). Part of Aegis's sales strategy has been to offer the AccelFix-XT at competitive pricing. (Inzitari Dep. Tr. 226.) Jesse testified that since the AccelFix-XT came to market she has fielded frequent requests from hospitals to lower the price of the ProLift. (Tr. 948-49.)

Finally, Life Spine has shown some likelihood of irreparable harm stemming from the loss of goodwill and reputation connected to its reduced ability to successfully hold itself out as a unique product for niche hospital contracts. *See Dulisse*, 1998 WL 25158, at *4 (finding irreparable harm stemming from sale of competing product that "threatens to destroy the value of the unique design parameters and manufacturing procedures developed by [company] through years of experimentation"). Life Spine has worked to develop valuable "niche contracts" with hospitals, by showing that the ProLift is a unique product that can meet a hospital's clinical needs. (Tr. 958.) Having to compete for those contracts with a device that has been described as being "essentially the same" as the ProLift would undermine Life Spine's ability to market ProLift as unique devices. Life Spine already lost one niche contract that a hospital invited it to bid for after the hospital considered both the ProLift and the AccelFix-XT for the contract. (Tr. 959-60.) This evidence that the AccelFix-XT may be eroding Life Spine's ability to win niche contracts based on its uniqueness also weighs in favor of a finding of irreparable harm.

C.    **Balance of Harms**

Turning to the balancing phase of the preliminary injunction analysis, the court must weigh the harm Life Spine faces if its requested injunction is denied in error against the harms Aegis faces if it is wrongly granted, factoring in any harm to the public interest.  *See Valencia*, 833 F.3d at 966.  This is done on a sliding scale, meaning the more likely Life Spine is to succeed on the merits, the less the balance of harms must tip in its favor.  *See id.*

The injunction Life Spine seeks would prevent Aegis or anyone affiliated with Aegis from developing, manufacturing, marketing, distributing, or selling its competing line of surgical devices pending trial.  (R. 122.)  At the hearing, Aegis offered the testimony of its CFO to describe the harm such an injunction would likely mean for Aegis.  The CFO testified that the proposed injunction would cause Aegis to suffer a loss in sales revenue that would require it to lay off many of its employees.  He testified that if Aegis is unable to distribute the AccelFix-XT, it would jeopardize Aegis's ability to survive as a company.  The court recognizes that requiring a company to pull a product off the market and possibly laying off employees constitute real and serious harm, and it does not take that potential harm lightly.  *See, e.g., Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 908 (N.D. Ill. 2019).

That said, evidence was presented at the hearing suggesting that the harm to Aegis from a temporary restriction in distributing the AccelFix-XT may not be as extreme as its CFO described.  Namely, Aegis existed as a distributor for a decade

before it gained access to the AccelFix-XT, and it currently offers a number of products outside the AccelFix-XT line for sale. (Tr. 1538-39.) And nothing in the proposed injunction would stop Aegis from pursuing opportunities to distribute a different expandable cage, as it did with Life Spine.

The court also notes that Aegis objects to the proposed injunction because according to it, forcing Aegis to shelve its AccelFix-XT distribution activities would change, rather than preserve the status quo. But the Seventh Circuit has been critical of the formula in which preliminary injunctive relief is designed to preserve the status quo, noting that the crucial question is whether the moving party will be irreparably harmed in its absence and that to focus on identifying and preserving a status quo "is merely to fuzz up the legal standard." *Chi. United Indus., Ltd. v. City of Chi.*, 445 F.3d 940, 944 (7th Cir. 2006). In any event, Aegis's argument here rests on the premise that after it purchased 45 ProLift implants in December 2018, the status quo became that it owned those devices free and clear and could use them however it pleased. (R. 200, Def.'s COL ¶ 27.) For the reasons set forth in section A(1)(a) above, that is not an accurate representation of the status quo between the parties.

Using the requisite sliding scale approach, the court concludes that the strength of Life Spine's showing of likely success with respect to its trade secrets and contract claims, its strong showing of irreparable harm, and the public's interest in the enforcement of contracts and protection of trade secrets and confidential information, *see La Calhene*, 938 F. Supp. at 531, outweighs the

relatively weak evidence that Aegis would suffer catastrophic harm under the proposed injunction. Accordingly, Life Spine has met its burden of showing that injunctive relief is warranted.

## D.     Rule 65(c) Bond

The parties dispute whether Life Spine should be required to post an injunction bond pursuant to Federal Rule of Civil Procedure 65(c), which states that the court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined[.]" Life Spine points out that Aegis stipulated in the DBA that if it violated Section 7's confidentiality provisions Life Spine would be entitled to injunctive relief without bond, (see PX 1, DBA § 7(d)), and argues that a bond is unnecessary given that it is a company in good standing with a strong likelihood of success on the merits. (R. 192, Pl.'s Resp. to Def.'s COL at 153-54.)

The parties may have agreed that injunctive relief without a bond is the appropriate remedy to any breach of Section 7 of the DBA, but that agreement does not extend to Life Spine's remaining claims underlying the requested injunction. The Seventh Circuit has made clear that "[n]ormally an injunction bond or equivalent security is essential." *Roche Diagnostics Corp. v. Med. Automation Sys., Inc.*, 646 F.3d 424, 428 (7th Cir. 2011). That is because a party "injured by an erroneous preliminary injunction is entitled to be made whole." *Id.* Accordingly,

"[j]udges . . . should take care that the bond is set high enough to cover the losses that their handiwork could cause." *Id.*

Because Aegis has shown that it is likely to suffer financial harm if the injunction is entered in error, Life Spine's request for an injunction with no required bond is denied. Life Spine has not offered any proposed bond amount for the court to weigh against Aegis's proposal. Based on the information provided by Aegis's CFO at the hearing, (Tr. 1533), the court concludes that a bond in the amount of $6 million is necessary and sufficient to protect Aegis against any erroneous losses stemming from entry of the preliminary injunction.

## Conclusion

For the foregoing reasons, the motion for a preliminary injunction is granted.

**ENTER:**

Young B. Kim
**United States Magistrate Judge**