# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| LIFE SPINE, INC., | ) | |
| | ) | No. 19 CV 7092 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| AEGIS SPINE, INC., | ) | |
| | ) | June 29, 2021 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Life Spine, Inc. filed this lawsuit alleging that a former distributor of its medical devices, Aegis Spine, Inc. ("Aegis"), breached the parties' distribution agreement and misappropriated Life Spine's trade secrets, among other claims. In response to Life Spine's complaint, Aegis filed counterclaims alleging that Life Spine breached the distribution agreement and tortiously interfered with Aegis's customer contracts. Before the court is Life Spine's motion to dismiss Aegis's second amended counterclaims in their entirety. For the following reasons, the motion is granted with prejudice:

## Background

Many of the allegations underlying this case have been described in the court's two prior opinions resolving the parties' previous motions to dismiss. (R. 70; R 194.) On January 11, 2021, the court granted Life Spine's motion to dismiss Aegis's amended counterclaims for breach of contract, tortious interference with contract, and tortious interference with prospective business relationships. The

court granted the motion without prejudice in part, leaving Aegis the opportunity to replead. (R. 194.) On January 29, 2021, Aegis filed its second amended counterclaims, this time claiming only breach of contract and tortious interference with contract. (R. 198.) In support of these counterclaims Aegis makes the following allegations, which the court accepts as true, drawing all reasonable inferences in Aegis's favor for purposes of evaluating the motion to dismiss. *See Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 289-90 (7th Cir. 2016).

The parties entered into a Distribution and Billing Agreement ("DBA") in January 2018 authorizing Aegis to serve as a distributor for Life Spine in a territory consisting of a list of specific physicians. (R. 198, 2d Am. Counterclaims ¶¶ 9-10.) According to Aegis, Life Spine breached the DBA by failing to use commercially reasonable efforts to provide it with products for distribution. Specifically, Aegis alleges that in February and March 2018 it asked Life Spine to provide it with modified, shorter installers for Life Spine's ProLift spinal implants, and that despite Life Spine's promise to provide those installers "quickly," Life Spine took over a year to develop a modified installer and to make it available for Aegis. According to Aegis, Life Spine's efforts were not "commercially reasonable," and caused its surgeons to place fewer orders for ProLift implants from Aegis or to discontinue those purchases altogether. (Id. ¶¶ 16-17, 22, 24.)

In its counterclaims Aegis also alleges that after the parties entered into the DBA, Life Spine started a relationship with a distribution company Aegis refers to as "Distributor X." (Id. ¶ 27.) Beginning in April 2018, Life Spine authorized

Distributor X to sell ProLift implants to customers throughout the United States, including those in Aegis's distribution territory. (Id. ¶¶ 27-30.) Life Spine offered Distributor X more favorable prices and terms than it had given Aegis and failed to notify Aegis that it had authorized Distributor X to sell ProLift implants in Aegis's territory. (Id. ¶¶ 31-33.) Life Spine also made Distributor X its agent, reserving the right to control the manner in which Distributor X sold the ProLift implants and requiring Distributor X to maintain liability insurance so that it could indemnify Life Spine for any liability stemming from Distributor X's conduct. (Id. ¶¶ 37-38.) Life Spine then encouraged Distributor X to sell an updated version of the ProLift, called the ProLift Post Pack, "knowing that Distributor X would begin attempting to distribute the updated products to customers within Aegis's territory." (Id. ¶ 41.) This conduct resulted in Aegis losing sales to three surgeon customers and to two physicians to whom it had expected to sell the ProLift implants. (Id. ¶ 42.)

## Analysis

Life Spine has moved to dismiss both of Aegis's counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion tests the sufficiency of a counterclaim by asserting that it fails to state a claim on which relief could be granted. *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015). To survive a motion to dismiss under Rule 12(b)(6), a counterclaim must "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.E.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

A.  **Breach of Contract**

Aegis's breach of contract counterclaim rests on its allegations that Life Spine breached the DBA by failing to deliver it products in a timely manner and by allowing Distributor X to distribute Life Spine implants to Aegis's customers. To state a claim for breach of contract under Illinois law, Aegis must allege the following: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015) (citation omitted). In moving to dismiss the breach of contract counterclaim, Life Spine argues that Aegis fails to allege the requisite breach.

Starting with the allegations regarding timely delivery of products, Life Spine argues that the counterclaim fails to state a claim for breach of the DBA because it had no obligation under the DBA to develop custom-made installers for Aegis. "It is axiomatic that only duties arising out of a contract itself can give rise to a breach." *Gore v. Ind. Ins. Co.*, 376 Ill. App. 3d 282, 287 (1st Dist. 2007). Aegis's allegations with respect to timely delivery center on Section 3.h of the DBA, which required Life Spine to use "commercially reasonable efforts to deliver" products to Aegis by specified delivery dates. (R. 198, 2d Am. Counterclaims ¶ 14.) Aegis alleges that Life Spine breached its duty under Section 3.h with respect to Aegis's request that Life Spine develop "shorter," "more effective" versions of the ProLift

4

installer for Aegis's customers, because although Life Spine agreed to develop those custom products "quickly," it took over a year to do so. (Id. ¶¶ 16-22.)

The language of Section 3.h supports Life Spine's position with respect to its contractual duties.[1] Section 3.h does not establish a duty for Life Spine to create custom, modified instruments, let alone to deliver them according to a specific timeline. Section 3 is titled "Inventory and Other Materials Provided by Company," and Section 3.h, titled "Delivery," reads as follows:

> [Life Spine] shall use commercially reasonable efforts to deliver Product to [Aegis] by the delivery dates specified in [Aegis]'s consignment and/or purchase orders, provided that each such order specifies a delivery date that is presented to Life Spine no later than 3:00 p.m. for Sets and Osteobiologic Products or 5:00 p.m. for loose instrument replenishment Products from the date [Aegis] submits such order to [Life Spine]; all times are Central Standard Times, Monday through Friday excluding recognized company holidays.

(R. 45, Am. Compl. Ex. 3, DBA § 3.h.) The DBA defines "Products" as "those products offered by [Life Spine] which are available for distribution in the United States," and preserves Life Spine's discretion to add or modify the products in its product line. (Id. § 1.e.) A straight-forward reading of these provisions is that Section 3.h creates a duty for Life Spine to use commercially reasonable efforts to deliver by specified delivery dates products that are *available* for distribution. Aegis does not allege that the shorter installers it requested from Life Spine were

---

[1] In its Second Amended Counterclaims, Aegis states that "Life Spine attached the DBA to its amended complaint and it is incorporated herein." (R. 198, 2d Am. Counterclaims ¶ 9.) Because Life Spine attached the DBA to its amended complaint, it is considered as part of the pleadings for all purposes. See Fed. R. Civ. P. 10(c). In such circumstances, the court may examine "the contracts to determine the nature of the agreement" in ruling on a Rule 12(b)(6) motion. *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 466 (7th Cir. 2007).

5

available for distribution when it asked for them. Instead, to the contrary, Aegis alleges that Life Spine had to modify the installers to create custom versions that were *not available* at the time Aegis requested them. (R. 198, 2d Am. Counterclaims ¶¶ 16-22.)

Even if Section 3.h could be read to establish a duty for Life Spine to use commercially reasonable efforts to provide custom installers according to a specific timeline, Aegis does not allege that it specified a delivery date by which it expected delivery of the custom installers. Aegis alleges only that it communicated to Life Spine an "urgent and substantial need" for modified installers, not that it ordered them to be delivered by a set date. (Id. ¶ 85.) Section 3.h states that it is Aegis's specification of a delivery date that prompts Life Spine's duty to use commercially reasonable delivery efforts. Because Aegis fails to allege that it specified a delivery date for the modified installers, its breach of contract claim lacks the requisite duty arising out of a contract.

Turning to Aegis's allegations that Life Spine breached the DBA by allowing Distributor X to sell products in Aegis's territory, Life Spine asserts that Aegis violated Federal Rule of Civil Procedure 15(a)(2) by adding this theory to its breach of contract counterclaim without seeking the court's permission. (R. 203, Pl.'s Mot. at 7 n.2.) But instead of asking the court to strike this aspect of the breach of contract claim as improperly filed, *see, e.g., Jones v. United Airlines*, No. 11 CV 6374, 2012 WL 6216741, at *9 (N.D. Ill. Dec. 13, 2012) (collecting cases striking amended complaints filed in violation of Rule 15(a)(2)), Life Spine argues that the

claim should be dismissed pursuant to Rule 12(b)(6). Aegis failed to respond to this aspect of Life Spine's argument, and only addresses the sufficiency of its allegations under Rule 12(b)(6). In an effort to conserve judicial resources, rather than interpreting Life Spine's motion as one to strike the current allegations based on Aegis's failure to seek leave to amend, or engaging in a discussion of the futility of amending under Rule 15(a)(2), *see id.* at *10, the court focuses on the question the parties have briefed—whether Aegis sufficiently alleges a viable claim that Life Spine's engagement with Distributor X violated the DBA.

Life Spine argues that Aegis's breach of contract allegations with respect to Distributor X should be dismissed because they are untethered to any obligation prohibiting Life Spine from authorizing other distributors to sell Life Spine products in Aegis's territory, and because nothing in the DBA grants Aegis exclusive distribution rights in that territory. In response, Aegis argues that it properly alleges that Life Spine's conduct violated the DBA's appointment clause.[2] That clause, set forth in Section 2.a of the DBA, states that Life Spine "appoints [Aegis] as an independent sales representative of the Products, who is authorized to solicit Sales from Customers outlined in Exhibit A ('the Territory')." (R. 45, Am. Compl. Ex. 3, DBA § 2.a.) The appointment clause further states that Life Spine "reserves the right to engage in direct selling." (Id. § 2.a.ii.) According to Aegis, because the DBA expressly reserved Life Spine's right to engage in direct selling,

---

[2] Aegis does not rely on the duty of good faith and fair dealing in its response to Life Spine's motion and argues instead that it "grounded its claim on specific terms in the DBA." (R. 210, Def.'s Resp. at 6.)

7

while excluding any reference to indirect selling, the "necessary implication" was that Life Spine would not appoint other distributors to sell Life Spine products in Aegis's territory. (R. 210, Def.'s Resp. at 7.)

Aegis's proposed interpretation of the appointment clause would require the court to read that clause as establishing an exclusive distribution territory for Aegis. But nowhere in its second amended counterclaims does Aegis allege that the DBA made it the sole distributor or exclusive distributor in its territory. The plain language of the appointment clause identifies Aegis as "an independent sales representative" in its territory, not "the sole" or "the exclusive" or even "the independent sales representative" there. (R. 45, Am. Compl. Ex. 3, DBA § 2.a.) If Aegis had expected to derive exclusive distribution rights in its territory it could have negotiated for that right and included such language in the DBA. *See In re Marriage of Sweders*, 296 Ill. App. 3d 919, 922 (2d Dist. 1998) ("A strong presumption exists against provisions that could easily have been included in the agreement but were not."); *see also TMG Kreations, LLC v. Seltzer*, 771 F.3d 1006, 1011 (7th Cir. 2014) (where distribution contract expressly limited only direct sales, defendant had no duty to prevent its distributors from selling in plaintiff's territory, where plaintiff failed to negotiate a prohibition against such distribution); *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 380 (7th Cir. 2000) ("The parties surely could have included [exclusivity terms] in the Contract had they desired."). As the language stands, nothing in the DBA's appointment clause gives rise to a duty on Life Spine's part to refrain from

authorizing other distributors to sell Life Spine products in Aegis's non-exclusive territory.[3] *See Resol. Tr. Corp. v. Holtzman*, 248 Ill. App. 3d 105, 111 (1st Dist. 1993) (noting that the "court has no discretion to require parties to accept any terms other than those in their contract").

Aegis asserts that the appointment clause, when read together with the DBA's restrictive covenant, gave Aegis a "reasonable expectation" that Life Spine would refrain from authorizing other distributors to poach Aegis's customers. (R. 210, Def.'s Resp. at 6-7.) This argument fails for three reasons. First, the idea of a party's reasonable expectations is typically associated with the duty of good faith and fair dealing. *See, e.g., Gore*, 376 Ill. App. 3d at 286. But Aegis makes no argument with respect to how that duty plays into its breach of contract claim here.

Second, Aegis has not identified any contractual duty in the DBA's restrictive covenant—or elsewhere in the contract—preventing Life Spine from selling products to customers in Aegis's territory or allowing other distributors to do so. The DBA's restrictive covenant states that during the course of the parties' agreement and for one year thereafter, Aegis would not sell competitive products to "Company Customers," defined as "Customers with whom [Life Spine] put [Aegis] in contact or with whom [Aegis] developed a business relationship as a result of his or

---

[3] To the extent Aegis points to language from Life Spine's contract with Distributor X in support of its position here, at the Rule 12(b)(6) stage the court may not consider documents outside the pleadings without converting the motion to one for summary judgment. *See* Fed. R. Civ. P. 12(d). Moreover, the court would only consider extrinsic evidence to interpret an ambiguous contract provision, and Aegis does not argue that any provision of the DBA is ambiguous. *See Brooklyn Bagel Boys*, 212 F.3d at 380.

9

her associations with [Life Spine]." (R. 45, Am. Compl. Ex. 3, DBA § 8.a.) That definition excludes any "Customer with whom [Aegis] worked with before entering into" the DBA. (Id.) In other words, the restrictive covenant prevents *Aegis* from selling competing products to *Life Spine's* customers. It preserves Aegis's right to continue selling to its own customers. Nothing in those provisions, either separately or taken together, prevents Life Spine from allowing other distributors to sell to Aegis's customers. On its face the restrictive covenant restricts only Aegis.[4]

Third, Aegis's theory makes no economic sense. Aegis is competitively better off if a third-party distributor sells to Aegis's customers, rather than having Life Spine compete with Aegis. Life Spine knows the wholesale price that it extended to Aegis. As a result, Life Spine is more easily able to undercut Aegis on pricing when compared to a third-party distributor. As such, Aegis's theory lacks plausibility.

For these reasons, the court agrees with Life Spine that Aegis's breach of contract claim fails to allege that Life Spine had a contractual duty to refrain from allowing other distributors to sell products in Aegis's territory. Without a contractual duty, there can be no breach. *See Gore*, 376 Ill. App. 3d at 287. Accordingly, Aegis's breach of contract counterclaim fails to state a claim on which relief could be granted. Given the terms of the DBA, Aegis cannot cure this deficiency.

---

[4] The court's conclusion here should come as no surprise to Aegis. In its previous opinion dismissing Aegis's counterclaim for tortious interference with prospective business relationships, the court determined that the restrictive covenant Aegis relies on here "flows in only one direction, preventing Aegis from selling to Life Spine's customers for a year after the DBA's termination." (R. 194, Mem. Op. at 20.)

## B. Tortious Interference

Life Spine argues that Aegis's tortious interference with contract counterclaim should also be dismissed because none of Aegis's allegations supports a finding that Life Spine engaged in unjustified conduct, and because there are insufficient allegations of any contract between Aegis and its customers. To state a claim for tortious interference with contract under Illinois law, Aegis must allege enough facts to establish the following: "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 834 (N.D. Ill. 2019) (quotation and citation omitted).

To the extent Life Spine argues that Aegis fails to sufficiently allege the existence of a contract between itself and a third party, the court disagrees. Pointing to Aegis's allegation that "through the DBA, Aegis had valid and enforceable contracts with customers," Life Spine argues that because Aegis's customers are not signatories to the DBA, it has failed to allege the requisite third-party contract. (R. 203, Pl.'s Mot. at 11 (emphasis omitted).) But reading the counterclaims in the light most favorable to Aegis, it is clear that Aegis is referencing contracts for sale of products to its customers within the territory established in the DBA. Aegis alleges that Life Spine knew that Aegis had valid and enforceable contracts with customers and that Life Spine's conduct "induced some of Aegis's customers to breach their contracts to buy the (outdated) product

11

from Aegis." (R. 198, 2d Am. Counterclaims ¶¶ 45, 57, 70, 73-74.) That is enough to plausibly allege the existence of contracts between Aegis and third-party customers.

The second amended counterclaims also plausibly allege that Distributor X served as Life Spine's agent for purposes of the tortious interference claim. Life Spine argues that its contract with Distributor X bars any finding of agency. But a contract is only one factor in the agency analysis because the parties' actual conduct can also create an agency relationship. *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 744 (N.D. Ill. 2014). The existence of an agency relationship is a question of fact that turns on "whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885, 895 (N.D. Ill. 2009) (quotation and citation omitted). Here, Aegis has alleged that Life Spine controls Distributor X in numerous ways, including "by requiring forecasts, requiring specific training and marketing, requiring firm orders for product, requiring specific numbers of instruments and other ProLift products to be ordered, imposing specific shipping restrictions and limitations, and imposing confidentiality and other restrictions." (R. 198, 2d Am. Counterclaims ¶ 37.) Aegis further alleges that Life Spine required Distributor X to carry liability insurance and to indemnify Life Spine for any liability it might incur from Distributor X's actions. (Id. ¶¶ 38-39.) Those allegations are sufficient to plausibly allege that Distributor X acted as Life Spine's agent with respect to the conduct underlying Aegis's tortious interference claim.

The bulk of Life Spine's argument with respect to the tortious interference counterclaim is tied to its assertion that Aegis fails to allege that Life Spine's conduct was unjustified. It is the plaintiff's burden to plead sufficient facts to support a finding that the defendant's conduct was unjustified or improper. *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 WL 6845862, at *9 (N.D. Ill. Dec. 4, 2014). "Conduct may be improper if it is in violation of statutory provisions or contrary to established public policy" but conduct "to promote one's own economic interest is not generally considered improper unless it is inherently wrongful." *Id.* (internal quotation omitted); *see also Fresh N' Pure Distributors, Inc. v. Foremost Farms USA*, No. 11 CV 470, 2011 WL 5921450, at *10 (E.D. Wis. Nov. 28, 2011) (noting that under Illinois law allegations that defendant's actions were "anticompetitive" or would "stifle competition" are insufficient to state claim that conduct was unjustified).

Aegis alleges that Life Spine acted improperly in providing Distributor X with the identities of Aegis's customers and encouraging it to sell updated versions of the ProLift to those customers, while failing to notify Aegis that the updated versions existed. (R. 198, 2d Am. Counterclaims ¶¶ 60-61, 68-72.) Aegis further alleges that Life Spine authorized Distributor X to sell the ProLift implants at more competitive prices than it allowed to Aegis, giving Distributor X a significant commercial advantage. (Id. ¶ 31.) Aegis essentially accuses Life Spine of using Distributor X to "undercut" Aegis and to "gain a competitive advantage," causing the loss of Aegis's customer contracts. (R. 210, Def.'s Resp. at 12, 14.)

13

Most of the cases on which Aegis relies in support of its argument regarding unjustified conduct involve allegations of a level of misconduct that is missing from Aegis's counterclaims, like the misuse of the plaintiff's confidential information, *see Dames & Moore v. Baxter & Woodman, Inc.*, 21 F. Supp. 2d 817, 826 (N.D. Ill. 1998), or outright deceit by the defendant, *Medscript Pharmacy v. MyScript, LLC*, 77 F. Supp. 3d 788, 797 (N.D. Ill. 2015) (allegations that defendant falsely passed itself off as plaintiff to customers); *Manley v. Boat/U.S., Inc.*, No. 13 CV 5551, 2014 WL 1647117, at *5 (N.D. Ill. Apr. 23, 2014) (allegations that defendant lied about plaintiff going out of business, filing for bankruptcy, and having its license revoked). (R. 210, Def.'s Resp. at 12-14.) The sole case Aegis discusses in detail in its response, *Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691, 718 (N.D. Ill. 2017), also involves allegations that go beyond what Aegis alleges here. In analyzing the propriety of the defendant's conduct in that case, the court noted that the defendant falsely held itself out as the sole owner of a product, when the plaintiff was a joint owner, resulting in the plaintiff being cut out of revenue from third parties that it was contractually due. *Id.* at 704, 718. The court also noted that the defendant "repeatedly assured" the plaintiff that they "were moving forward together" on their joint development project, knowing that those assurances were false. *Id.* at 721. As with the other cases Aegis cites, the *Mission Measurement* court relied in part on the defendant's allegedly deceitful conduct in

declining to dismiss the plaintiff's tortious interference with contract claim. *Id.* at 718. Similar allegations are missing from Aegis's second amended counterclaim.[5]

The court finds *Stucchi USA v. Hyquip, Inc.*, No. 09 CV 732, 2010 WL 2990966 (E.D. Wis. July 28, 2010), to be more analogous to the present case.[6] In *Stucchi* the counterclaim defendants—a hydraulics equipment manufacturer and its distributor—moved to dismiss a distributor's counterclaim alleging that the defendants tortiously interfered with the counterclaim plaintiff's prospective contract with a customer. There, the plaintiff alleged that after entering into a distribution agreement with the defendants, it introduced the defendants to its customer, and the companies agreed to work together to create a new product for this customer. After the product was finished, the defendants allegedly decided to sell the new product directly to this customer without using the plaintiff as a distributor. *Id.* at *1. The court dismissed the tortious interference claim after finding that the plaintiff failed to allege improper conduct. Specifically, it held that because there were no allegations that the parties had entered into an exclusive distribution agreement, there would be no basis to find that the defendant's

---

[5] Aegis asserts that it was improper for Life Spine to contract with Distributor X with respect to the ProLift Post Pack without informing Aegis but concedes "that the DBA did not require Life Spine to inform Aegis of updated products." (R. 210, Def.'s Resp. at 13.) There are no allegations—and Aegis does not argue—that Life Spine engaged in the kind of falsification or deceit present in cases it cites.

[6] The *Stucci* court applied Wisconsin law, rather than Illinois law, but the standard for finding unjustified conduct in the tortious interference context appears to be similar. *Compare id.* at *6 (noting under Wisconsin law that intentional interference must be "improper") *with House of Brides*, 2014 WL 6845862, at *9 (noting same under Illinois law).

15

interference with the customer contract was improper. *Id.* at *6. In other words, the court held that even if the defendants' conduct interfered with the plaintiff's third-party customer contract, the tortious interference claim could not survive dismissal because there were insufficient allegations that the manner of interference was improper. *Id.*

Similarly, the court here concludes that Aegis's tortious interference claim fails to plausibly allege that the manner in which Life Spine interfered with Aegis's customer contracts was unjustified. Aegis essentially alleges that Life Spine gave Distributor X more favorable terms without informing Aegis or giving Aegis similarly favorable terms. But absent allegations that Aegis had exclusive distribution rights in its territory or that Life Spine engaged in some level of improper behavior, the counterclaim fails to plausibly allege tortious interference with Aegis's contracts. *See House of Brides*, 2014 WL 6845862, at *9. Accordingly, Life Spine's motion to dismiss the tortious interference with contract claim is granted. Having failed to amend its counterclaim to overcome a motion to dismiss, the dismissal is with prejudice.

## Conclusion

For the foregoing reasons, the court grants Life Spine's motion to dismiss Aegis's second amended counterclaims with prejudice.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**