## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **LIFE SPINE, INC.,** | ) | |
| | ) | **No. 19 CV 7092** |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **AEGIS SPINE, INC.,** | ) | |
| | ) | **January 30, 2023** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

Plaintiff Life Spine, Inc. ("Life Spine") alleges in this diversity action that Defendant Aegis Spine, Inc. ("Aegis") stole confidential information and breached contractual obligations in order to develop and market a medical device that directly competes with a Life Spine product. Before the court are cross motions for partial summary judgment on the breach of contract and tort claims related thereto. (See R. 432, Def.'s Mot. for Partial Summ. J. ("DMPSJ"); R. 437, Pl.'s Mot. for Partial Summ. J. ("PMPSJ").) Life Spine contends that the undisputed facts show Aegis breached the Distribution and Billing Agreement ("DBA") while Aegis argues that DBA is unenforceable and ambiguous as a matter of law. The parties also contest whether the court should grant summary judgment on Life Spine's breach of fiduciary duty, fraudulent concealment, and conversion claims. For the following reasons, the cross motions are granted in part and denied in part:

**Facts**[1]

**A.     The Business Relationship**

The parties are both medical-device companies that develop and market so-called "expandable cage" spinal implants, among other things.  (See R. 440, Pl.'s Statement of Material Facts ("PSOF") ¶¶ 1-6, 9-10; R. 434, Def.'s Statement of Material Facts ("DSOF") ¶¶ 1-5.)  Aegis is a subsidiary of L&K Biomed Co., Ltd. ("L&K"), a South Korea-based medical device company, and several current and former high-ranking Aegis employees have also worked for L&K.  (R. 440, PSOF ¶¶ 7-8.)  Life Spine's "flagship device" is its ProLift Expandable Spacer System ("ProLift"), which features two key components—an implant inserted into a patient's spine during surgery and an installer used to insert and expand the implant.  (Id. ¶¶ 4-5.)  Aegis also distributed and sold several expandable cage products, including of relevance here the AccelFix-XT ("XT"), which it distributed and sold from September 2019 until this court enjoined its sale in March 2021.  (Id. ¶¶ 9-11.)  The XT is manufactured by L&K, but Aegis claims intellectual property rights in it.  (Id.; R. 434, DSOF ¶ 5.)

In April 2016,  Aegis and L&K agreed on the need to develop an expandable cage product.  (Id. ¶ 12.)  The following year in October 2017, Aegis's CEO Tony Ahn met with L&K's Chairman George Kang to discuss the importance of developing an

---

[1]   The court reviewed underseal information the parties submitted when considering the motions.  As such, the court made efforts to avoid disclosing confidential information in this opinion unless such disclosure was necessary to explain its ruling.

2

expandable cage given the market opportunity in the United States. (Id. ¶ 14.) The day after this meeting, Aegis's Marketing Director, Alex Kang ("Kang"), made plans to meet with Life Spine's Vice President of Marketing and Business Development, Mariusz Knap, at the upcoming North American Spine Society ("NASS") conference. (Id. ¶ 15.) There, Kang proposed to Knap that Aegis serve as a distributor of the ProLift. (Id.; R. 434, DSOF ¶ 6.) Two months later, Life Spine agreed to send Aegis a ProLift device for demonstration purposes after the parties entered into Confidentiality and Loaner Agreements. (R. 440, PSOF ¶¶ 16-17.) Then on January 25, 2018, Life Spine and Aegis executed the contract that forms the basis of this dispute—the DBA.[2] (Id. ¶ 18; R. 434, DSOF ¶ 12.) According to the DBA:

> [Life Spine] is a developer, manufacturer, and marketer of orthopedics and neurosurgical spine products, and desires that the sale and use of such products be actively and diligently promoted in the Territory . . . [and Aegis] desires to actively and diligently promote the sale and use of [Life Spine]'s orthopedics and neurosurgical spine products in the Territory.

(DBA at Recitals.) Under this agreement, Life Spine fulfilled its promise to consign ProLift devices to Aegis in a quantity that allowed Aegis to meet its sales quota. (R. 440, PSOF ¶ 20.)

Although the DBA initially was to last for only two months, the parties extended this period in writing to August 31, 2018. (Id. ¶ 22.) The parties then "verbally promised at the fall 2018 NASS convention to 'continue [operating] under the existing terms of the [DBA] as [the parties] continue[d] negotiating . . . [a]

---

[2] The executed DBA appears in the record at R. 429, PSOF Ex. A. and R. 423, DSOF Ex. 14. For simplicity, the court cites the DBA simply as "DBA at [Section]."

3

stocking agreement,'" (id. ¶ 23), and in fact continued doing business under the DBA's terms, (id. ¶ 24).

## B.  Life Spine's Claims

Life Spine accuses Aegis of having engaged in duplicitous conduct during the course of their business relationship in order to steal their confidential information and gain a competitive edge in the expandable cage market.  In May and June 2018, Aegis shipped two ProLift implants and a ProLift installer to L&K without informing Life Spine—even though it knew L&K was Life Spine's competitor and had decided to develop an expandable cage in a "[f]orm similar to Life Spine's ProLift."  (R. 440, PSOF ¶ 29; see also id. ¶ 28.)  Aegis also provided ProLift devices to two doctors who Aegis hired as surgical consultants on the development of XT. (Id. ¶¶ 30-32.)  These two doctors went on to provide Aegis with feedback regarding the ProLift devices in 2018 and 2019.  (Id. ¶¶ 33-35.)

Then in September 2018, Aegis's Marketing Director Kang sent an email to L&K including an image and information regarding a custom-made ProLift installer.  (Id. ¶ 37.)  Life Spine had previously indicated to Kang that it considered that image and related information to be "confidential information."  (Id. ¶ 38.) Additionally, Aegis used the DBA's "transfer price" at which Life Spine supplied ProLift to Aegis for its own business purposes in setting prices for its XT devices. (Id. ¶ 39.)  Neither Aegis's CEO, Tony Ahn, nor its then-Director of R&D, Jack Lee, ever reviewed the DBA to understand Aegis's obligations under the agreement.  (Id. ¶ 56.)  When Life Spine requested the return of 12 ProLift instruments from Aegis

on August 1, August 7, and October 1, 2019, (id. ¶¶ 50-51), Aegis failed to return them because it says it does not have them in its possession, (Id. ¶ 51; see R. 423, DSOF ¶¶ 34, 38.)

## Legal Standard

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there exists "no genuine issue of material fact" such that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 814 (7th Cir. 2017). A material fact is a fact relevant to the outcome of the pending action. *See Bunn v. Khoury Enters., Inc.*, 753 F.2d 676, 681 (7th Cir. 2014). "A 'genuine issue' exists with respect to any such material fact . . . when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 681-82 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Conversely, "where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for the jury to do." *Bunn*, 753 F.3d at 682 (emphasis in original). There is no dispute that Illinois law governs the breach of contract and tort claims at issue here.

## Analysis

Aegis seeks summary judgment based on two alternative theories. First, Aegis contends that the DBA is unenforceable as a matter of law. (R. 433, DMPSJ Br. at 1). As such, Aegis argues that summary judgment should be granted on Life Spine's breach of contract claims that Aegis violated the DBA (Count III) and on all

5

claims relying on obligations created by the DBA—that is, Life Spine's claims for declaratory relief (Count IV), breach of fiduciary duty (Count V), fraudulent concealment (Count VII), and constructive fraud (Count X). (Id. at 2.) But if the court concludes that the DBA is generally enforceable, Aegis seeks more limited relief. Specifically, Aegis asks the court to: (1) find that the restrictive covenant in Section 8(b) of the DBA is void and unenforceable under Illinois law and therefore grant summary judgment on all claims based upon that section; (2) construe Section 7(a) to exclude "ProLift implants and instruments" from the definition of "Confidential Information"; and (3) narrow Life Spine's declaratory relief claim "to trade secrets actually developed by Aegis based on Life Spine's own trade secrets." (Id. at 3.) Regardless of whether the DBA is enforceable, Aegis also seeks summary judgment on Life Spine's breach of fiduciary duty (Count V), fraudulent concealment (Count VII), constructive fraud (Count X), and conversion (Count XIII) claims. (Id. at 2-3.) Life Spine's motion, meanwhile, seeks summary judgment in its favor on these claims. (R. 439, PMPSJ Br. at 1.)

The court begins by considering the parties' arguments on Life Spine's breach of contract claims, with the exception of those relating to the 12 missing ProLift instruments. Because Life Spine's claim for declaratory judgment is essentially an argument that Aegis breached Section 12(b) of the DBA, the court addresses that claim in the "breach of contract" section below. Next, the court considers the parties' arguments regarding Life Spine's breach of fiduciary duty, constructive fraud, and fraudulent concealment claims. Finally, the court discusses the claims

relating to the 12 missing ProLift instruments—including Life Spine's claims for breach of Section 3(c) of the DBA and conversion, as well as Aegis's suggestion that any liability it bears for the missing instruments should be calculated under Section 3(a).

## A.     Breach of Contract

Both parties seek summary judgment on Life Spine's breach of contract claims.  (R. 439, PMPSJ Br. at 1; R. 433, DMPSJ Br. at 2.)  To succeed on them under Illinois law, Life Spine must demonstrate: "(1) the existence of a valid and enforceable contract; (2) substantial performance by [Life Spine]; (3) a breach by [Aegis]; and (4) resultant damages."  *Dual-Temp of Ill., Inc. v. Hench Control, Inc.*, 821 F.3d 866, 869 (7th Cir. 2016); *see also PML Dev. LLC v. Vill. of Hawthorn Woods*, 2022 IL App (2d) 200779, ¶ 41 (June 29, 2022).  Aegis's motion focuses on the first of these elements, arguing that important provisions of the DBA are void and unenforceable as a matter of law, (R. 433, DMPSJ Br. at 1, 5-13), whereas Life Spine seeks summary judgment only as to liability, having indicated its intent to prove its damages at trial, (see R. 439, PMPSJ Br. at 14).  Thus, the court focuses on the first three elements.

When construing a contract under Illinois law, "the primary objective is to give effect to the intention of the parties."  *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 689-91 (7th Cir. 2017).  This inquiry begins with an initial question of law as to whether the contract is clear or ambiguous.  *Platinum Supplemental Ins., Inc. v. Guar. Tr. Life Ins. Co.*, 989 F.3d 556, 563 (7th

Cir. 2021). A contract is ambiguous "if it is capable of being understood in more sense than one." *Sherwood Commons Townhome Owners Ass'n, Inc. v. Dubois*, 148 N.E.3d 900, 912 (Ill. App. Ct. 2020). "Mere disagreement between the parties as to meaning does not itself make the contract ambiguous, and the court will not strain to find an ambiguity where none exists." *Page v. Alliant Credit Union*, 52 F.4th 340, 346 (7th Cir. 2022) (internal quotations omitted).

If the court determines that the contract includes an ambiguity, "construction of the contract becomes a question of fact and extrinsic evidence is admissible to ascertain the parties' intent." *See City of Peoria v. Peoria Area Advancement Grp., LLC*, 2017 IL App (3d) 160216-U, ¶ 62 (May 2, 2017); *accord Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991). Consequently, "there is a disputed fact precluding summary judgment when the material writing contains an ambiguity which requires admission of extrinsic evidence." *Sullivan & Crouth Holdings, LLC v. Ceko*, 2014 IL App (1st) 133028-U, ¶ 28 (Dec. 19, 2014) (quoting *Loyola Academy v. S&S Roof Maint. Inc.*, 586 N.E.2d 1211, 1215 (Ill. 1992)). However, as with other applications of fact to law, the court may decide the issue without submission to the jury if "the parties' intent can be determined solely from extrinsic facts not in dispute." *Peoria Area*, 2017 IL App (3d) 160216-U, ¶ 62.

By contrast, when the terms of a contract are unambiguous, its construction remains a question of law. *See Lexington Ins. Co. v. Horace Mann Ins. Co.*, 186 F. Supp. 3d 920, 929 (N.D. Ill. 2016); *Whitlock*, 581 N.E.2d at 667. "Where a written agreement is clear and explicit, a court must enforce the agreement as written."

*Platinum*, 989 F.3d at 563.  This requires the court to ascertain "[b]oth the meaning of the instrument[] and the intention of the parties . . . from the face of the document without the assistance of parol evidence or any other extrinsic aids." *Id.* In so doing, "[the] court must construe the meaning of [the] contract by looking at the words used," and "unless the agreement unequivocally specifies its own meanings, the court must interpret the words of the contract with their common and generally accepted meanings." *RTC Indus., Inc. v. Makray Mfg. Co.*, 2021 IL App (1st) 200496-U, ¶ 23.  Thus, undefined terms "will be construed with reference to the average, ordinary, normal, reasonable person." *Page*, 52 F.4th at 346.  As such, the court may not consider or discuss extrinsic evidence of the parties' intent or meaning when interpretating unambiguous provisions of the DBA.

### 1.    Enforceability of the DBA

Turning to the first element, the parties do not dispute the core factual requirements of offer, acceptance, and consideration for contract formation. *See Franklin v. Nanavati*, 176 N.E.3d 919, 924 (Ill. App. Ct. 2020); (R. 440, PSOF ¶ 18; R. 466, Def.'s Resp. to PSOF ¶ 18).  Aegis instead challenges the enforceability of the DBA under Illinois law.  (See R. 433, DMPSJ Br. at 5-13.)  Before considering the merits of Aegis's argument, the court must consider Life Spine's objections that the validity of the DBA has already been established by judicial admission and that Aegis should be estopped from challenging it.  (See R. 461, Pl.'s Resp. at 2-6.)  As for judicial admission, it is undisputed that Aegis admitted in its answer that the DBA, "including all of Aegis's promises and agreements contained therein, is valid and

enforceable under Illinois law." (See R. 107, Amended Answer ¶ 102 (quoting R. 45, First Amended Compl. ¶ 102).) According to Life Spine, this admission resolves the enforceability issue. (See R. 461, Pl.'s Resp at 2-3.) But judicial admissions "have the effect of withdrawing a fact from contention," it is well established that "only facts can be judicially admitted, not legal conclusions or statements of the law." *Cent. Nat'l Gottesman, Inc. v. J.S. Paluch Co., Inc.*, No. 19 CV 6997, 2021 WL 2939968, at *4 (N.D. Ill. July 12, 2021). Whether the DBA is enforceable under Illinois law is inherently a question of law. As such, although Aegis's answer is contrary to its current position, the doctrine of judicial admission has no applicability here.

Nevertheless, Aegis's turnabout regarding the DBA's enforceability can be addressed through the doctrine of judicial estoppel. Judicial estoppel "is an equitable doctrine invoked by a court at its discretion" that "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal quotations omitted). The doctrine "protects the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013) (internal quotations omitted). Although the doctrine is "not reducible to any general formulation of principle," *New Hampshire*, 532 U.S. at 750, courts consider three factors to guide the inquiry:

> (1) whether "a party's later position must be clearly inconsistent with its earlier position"; (2) whether "the party has succeeded in

10

persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled"; and (3) whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*Grochocinski*, 719 F.3d at 795 (quoting *New Hampshire*, 532 U.S. at 750-51).

All three factors are met in this case. First, Aegis took the position in its motion to dismiss that the DBA—by virtue of its integration clause—displaced two earlier agreements of the parties. (See R. 47, Def.'s Br. at 4-6; R. 61, Def.'s Reply at 1-6.) This application of the parol evidence rule necessarily implied the validity of the DBA. *See* 11 Williston on Contracts § 33:14 (4th ed.) ("[A]pplication of the parol evidence rule depends on the existence of a valid integrated contract."); *World Ins. Co. v. Smith*, 329 N.E.2d 518, 520 (Ill. App. Ct. 1975) ("The law is clear in Illinois that, as between parties to an instrument, extrinsic evidence is inadmissible to vary, alter, or contradict a written instrument which is complete, unambiguous, valid and unaffected by fraud, duress, mistake, or illegality."). As for the second factor, Aegis succeeded in persuading the court to adopt its position, having prevailed in its motion to dismiss Life Spine's claims alleging breach of the earlier contracts, and the court having based its decision upon the integration clause. (See R. 70, Mem. Op. and Order at 6-11.)

Third, allowing Aegis to argue now that the DBA is unenforceable would unfairly benefit Aegis at Life Spine's expense. If the DBA indeed were unenforceable, then its integration clause likewise would have no force, and the court should not have dismissed Life Spine's breach of contract claims asserted

11

under the earlier agreements. Such an outcome would render meaningless Life Spine's nearly three-year effort to litigate its contract claims under the DBA. Aegis, meanwhile, would approach trial having knocked out all contract claims against it. Accordingly, Aegis is judicially estopped from now arguing that the DBA is unenforceable because Life Spine would suffer "an unfair detriment" while Aegis "would derive an unfair advantage." *Grochocinski*, 719 F.3d at 795; *see also United States v. Segal*, 938 F.3d 898, 906 (7th Cir. 2019) (litigant judicially estopped from "arguing that the same contract he previously succeeded in enforcing for his benefit should now be set aside as unconscionable").

The court also considers the broader context of Aegis's change in position regarding the enforceability of the DBA. As Life Spine accurately notes, Aegis "has spent years litigating this case from the position that the DBA *is* enforceable." (R. 478, Pl.'s Reply at 2 (emphasis in original).) Such position is reflected in Aegis's motion to dismiss, (R. 47, Def.'s Br. at 4-6), answer, (R. 107, Amended Answer ¶ 102), counterclaims, (R. 107, Def.'s Amended Countercl. ¶ 33; R. 198, Def.'s Second Amended Countercl. ¶ 78), and opposition to Life Spine's motion for preliminary injunction, (R. 128, Def.'s Resp. to Prelim. Inj. Mot. at 9-16 ("Aegis complied with its contractual obligations [under the DBA].")). This court has interpreted the DBA against the backdrop that "[t]he parties do not dispute that the DBA is a valid and enforceable contract," (R. 212, Mem. Op. and Order at 28), and the Seventh Circuit has analyzed the DBA upon the assumption of its validity, *see Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 543-45 (7th Cir. 2021). For

12

Aegis to flip its position now for strategic convenience undermines the courts' and the parties' fundamental understanding of the dispute since the case's inception. This is precisely the kind of manipulative conduct that judicial estoppel is designed to prevent, as it threatens the integrity of the judicial process. *See New Hampshire*, 532 U.S. at 749-50; *Grochocinski*, 719 F.3d at 795. Aegis is accordingly estopped from arguing that the DBA is unenforceable.[3]

Furthermore, even if judicial estoppel did not apply, severing the offending provisions—not invalidating the entire DBA—would be the appropriate remedy for any infirmities in Sections 7(a) or 8(b). In Illinois, "[a] court may sever the unenforceable portion of an agreement and enforce the remainder if the stricken portion is not essential to the bargain, but an entire contract or a clause therein fails if the stricken portion constitutes an essential term of the contract or clause." *Gleike Taxi Inc. v. Challenger CAB, LLC*, No. 13 CV 6715, 2016 WL 1450048, at *8 (N.D. Ill. April 13, 2016) (internal quotations omitted); *see also Butler v. Deal*, 794 Fed. Appx. 542, 544 (7th Cir. 2020). A term is essential if "it is so closely connected with the remainder of the contract that to enforce the valid provisions of the contract without it would be tantamount to rewriting the agreement." *Ritchie Cap. Mgmt., LLC v. Kermath*, No. 15 CV 8021, 2017 WL 2378076, at *5 (N.D. Ill. June 1,

---

[3] Aegis cites Illinois law to argue that judicial estoppel, like judicial admissions, applies only to statements of fact. (See R. 481, Def.'s Reply at 3.) However, the Seventh Circuit has held that federal law—not state law—governs judicial estoppel, *see Wells v. Coker*, 707 F.3d 756, 760 (7th Cir. 2013), and federal law does not limit the doctrine's application in this manner, *see Matter of Cassidy*, 892 F.2d 637, 641-42 (7th Cir. 1990).

2017) (quoting *Wigginton v. Dell, Inc.*, 890 N.E.2d 541, 549 (Ill. App. Ct. 2008)). "The existence of a severability clause in a contract certainly strengthens the case for the severance of unenforceable provisions because it indicates that the parties intended for the lawful portions of the contract to be enforced in the absence of the unlawful portions." *Id.* (quoting *Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1343 (Ill. App. Ct. 1993)).

Aegis argues here that the DBA is unenforceable because the restrictive covenant in Section 8(a) is void as an unreasonable restraint of trade and the definition of "Confidential Information" in Section 7(a) is purposefully vague. (See R. 433, DMPSJ Br. at 5-8.) The court addresses these arguments in more detail herein. But for purposes of the immediate issue, it is sufficient to note that Aegis's only argument as to why these provisions are essential is that Life Spine admitted them to be so. (See id. at 6-8 (citing R. 434, DSOF ¶ 33).) Setting aside that Life Spine disputes it has made such admissions, (see R. 458, Pl.'s Resp. to DSOF at 14), and that the deposition testimony Aegis cites does not support its argument, (see R. 423, DSOF ¶ 32, Ex. 2 at 22:1-23:7), Aegis makes no effort to explain why the court should consider this extrinsic evidence. Although Aegis argues that the definition of "Confidential Information" in Section 7(a) is ambiguous—another argument discussed in more detail later—Aegis identifies no ambiguities that would hinder the court's ability to ascertain the essential terms of the DBA based on its plain language. (See R. 433, DMPSJ Br. at 5-8.)

Therefore, looking to the plain language of the contract as this court must, *see Platinum*, 989 F.3d at 563, the court agrees with Life Spine that the "main goal" of the DBA is "for Aegis to act as a sales distributor and for Life Spine to provide it with product to sell." (R. 461, Pl.'s Resp. at 17; see also DBA at Recitals (describing the purpose of the DBA).) If Sections 7(a) and 8(b) never existed, the DBA's terms describing the provision, distribution, and sale of Life Spine's products would not be altered in any way. The court therefore cannot say that severing these provisions— if found unenforceable—would be "tantamount to rewriting the agreement." *Ritchie*, 2017 WL 2378076, at *5. That the parties also adopted a severability clause, (see DBA at Section 15(d)), reinforces the court's conclusion that any unenforceable provisions in Sections 7(a) or 8(b) would not render the entire contract unenforceable. Because the DBA is generally enforceable, the court rejects Aegis's derivative arguments that it is entitled to summary judgment on claims that enforce obligations under the DBA. (See R. 433, DMPSJ Br. at 2.)

## 2.    Termination of the DBA

Aegis also disputes whether any duties remained enforceable after August 31, 2018, the date upon which the parties had previously agreed in writing that the DBA would terminate. (See R. 465, Def.'s Resp. at 11, 23; R. 440, PSOF ¶ 22.) Life Spine contends that the parties' duties continued beyond this date because of the DBA's survival clause, an oral extension of the DBA, and the parties' continued performance under the terms of the DBA. (R. 439, PMPSJ Br. at 4 & n.1.) The court agrees.

15

First, the survival clause of the DBA provides that "[n]otwithstanding anything to the contrary in this Agreement, the provisions of Sections 2.g, 3, 6, 7, 8, 9.d, 9.e, 10, 12, 13, 14, 15 will survive the expiration or termination of this Agreement." (DBA § 15(h).)  This court previously found that the provisions listed therein survived the August 31, 2018 termination date.  (R. 212, Mem. Op. and Order at 29-31.)  Aegis now argues that the court never addressed the enforceability of this provision under Illinois law, and that Illinois law "bars perpetual and unending contracts."  (R. 465, Def.'s Resp. at 11.)  Although Illinois law "generally disfavors perpetual contracts," *A.T.N., Inc. v. McAirlaid's Vliesstoffe GmbH & Co. KG*, 557 F.3d 483, 486 (7th Cir. 2009), the DBA is not one of them.  To the contrary, it involves appropriate durational limits with the survival of only certain obligations.  Illinois law allows contracting parties to specify that certain obligations survive the termination of a contract.  *See Matthews v. Chi. Transit Auth.*, 51 N.E.3d 753, 776-77 (Ill. 2016) ("Contractual rights that have accrued or vested . . . will survive the termination of the contract. . . .  This concept of vesting is applicable where the agreement includes explicit language providing that certain rights or benefits extend beyond the termination date of that agreement.").  As such, the DBA's survival clause is enforceable under Illinois law.

Second, Life Spine points to evidence that the parties "verbally promised at the fall 2018 NASS convention to 'continue [operating] under the existing terms of the [DBA] as [the parties] continue[d] negotiating . . . [a] stocking agreement.'" (R. 440, PSOF ¶ 23 (quoting *id.* Ex. D).)  Aegis does not dispute that this

16

conversation took place or that such promises were made.[4]  (R. 466, Def.'s Resp. to PSOF ¶ 23.)   Aegis argues instead that: (1) such an extension needed to be in writing to be effective; (2) Life Spine has not demonstrated the required elements of offer, acceptance, and mutual consideration; and (3) evidence from Life Spine's Chief Operating Officer Richard Mueller shows that no contract existed.  (R. 465, Def.'s Resp. at 23.)  But Aegis's argument that oral extensions are not enforceable is contrary to the law of the case that, "even if the [DBA] implicitly banned oral extensions, Illinois law . . . permits oral modification despite such bans," as determined by the Seventh Circuit.  *Life Spine,* 8 F.4th 531 (citing cases).  Life Spine has satisfied the required elements of offer, acceptance, and mutual consideration with undisputed evidence that the parties exchanged promises and continued doing business in accordance with those promises.  (See R. 440, PSOF ¶¶ 23-24; R. 466, Def.'s Resp. to PSOF ¶¶ 23-24.)  And although Mueller raised questions about this relationship in August 2019, (see R. 466, Def.'s Resp. to PSOF ¶¶ 23-24), such evidence does not nullify an oral agreement made in 2018, (see R. 478, Pl.'s Reply at 13 n.9).[5]  Absent any genuine issue of material fact, the

---

[4]  Aegis argues that the statements of Life Spine's representative are "inadmissible hearsay."  (R. 466, Def.'s Resp. to PSOF ¶ 23.)  But as Life Spine rightly explains, this verbal promise is a performative utterance "not within the scope of the hearsay rule."  *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999); (see also R. 478, Pl.'s Reply at 13 n.9).

[5]  The parties both cite to and quote from pages 187-93 of Mueller's May 24, 2022 deposition transcript, attached to Defendant's Response to Plaintiff's Statement of Material Facts as Exhibit 4.  (See R. 466, Def.'s Resp. to PSOF ¶¶ 23-24; R. 478, Pl.'s Reply at 13 n.9.)  But these pages are not included in the excerpts attached as

court concludes that the parties orally extended the DBA beyond its August 31, 2018 termination.

Finally, Life Spine has demonstrated that the parties' continued performance kept the DBA in force as an implied-in-fact contract. Under Illinois law, an implied-in-fact contract "is one in which a contractual duty is imposed by a promissory expression which may be inferred from the facts and circumstances and the expressions [on] the part of the promisor which show an intention to be bound." *Gociman v. Loyola Univ. Chi.*, 41 F.4th 873, 883 (7th Cir. 2022). Aegis concedes that the parties "continued to do business," and does not dispute that "the parties continued to operate under the terms of the DBA after August 31, 2018." (R. 466, Def.'s Resp. to PSOF ¶ 24.) As such, the undisputed fact that Life Spine and Aegis continued to perform as required by the DBA after its termination date is sufficient for the court to reasonably infer that the terms of the DBA remained in force at least as an implied-in-fact contract, even if the court were to reject Life Spine's oral extension theory. *See Gociman*, 41 F.4th at 883.

---

Exhibit 4. (See R. 466-5, Def.'s Resp. Ex. 4 (transcript excerpts include pages 102-05 and 114-17).) The court cannot consider evidence not in the record. *See* LR 56.1. That said, the quoted portions give the court no reason to reconsider its oral extension determination. That Mueller wanted a written contract or worried that "you can't just keep going on like we have a contract in place" says nothing about whether the mutual promises exchanged between representatives of Life Spine and Aegis at the fall 2018 NASS convention resulted in an oral extension of the DBA by action of Illinois law. (R. 466, Def.'s Resp. to PSOF ¶ 23.) Furthermore, Mueller apparently understood that "we were working under . . . the old contract while we were negotiating a new contract." (R. 478, Pl.'s Reply at 13 n.9.) Such testimony supports the court's conclusion that the parties orally agreed to extend the DBA.

18

### 3.    Life Spine's Performance

Life Spine also argues that it fully performed as required.  As explained, Illinois law requires "a party suing for breach of contract . . . [to] prove that [it] has substantially complied with all the material terms of the agreement."  *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 976 N.E.2d 1014, 1025 (Ill. App. Ct. 2012) (internal quotations omitted).  And "[o]nly a material breach of a contract provision will justify nonperformance."  *PML Dev. LLC v. Vill. of Hawthorn Woods*, 2022 IL App (2d) 200779, ¶ 41 (June 29, 2022).  A breach is material if "it is so substantial and fundamental as to defeat the objects of the parties in making the agreement, or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement."  *Id.* (internal quotations omitted).

Life Spine argues that it substantially performed under the DBA by using "all reasonable efforts" to provide sufficient inventory to Aegis and by providing "ancillary equipment or materials" including "training and promotional materials." (R. 439, PMPSJ Br. at 5; R. 440, PSOF ¶ 20.)  Aegis for the most part agrees with Life Spine's assessment of its performance but disputes that Life Spine complied with the DBA's Section 7(b) requirement—that Life Spine take "appropriate action by instruction, agreement, or otherwise with [its] employees to satisfy its obligations under this Agreement with respect to the use, copying, modification,

protection, and security of Confidential Information."[6] (R. 465, Def.'s Resp. at 12 (quoting DBA § 7(b)); see also R. 466, Def.'s Resp. to PSOF ¶ 20.) But Aegis makes no effort to explain why this supposed breach was "so substantial and fundamental as to defeat the objects of the parties in making the agreement," and the court declines to do Aegis's work. *PML*, 2022 IL App (2d) 200779, ¶ 41. Without any such showing, the court cannot conclude that Life Spine's alleged failure to train its employees regarding Aegis's confidential information excuses Aegis's acts breaching the terms of the DBA. *See InsureOne*, 976 N.E.2d at 1025 ("[A] partial breach by one party does not justify the other party's subsequent failure to perform; both parties may be guilty of breaches, each having a right to damages.").

Furthermore, Aegis has not identified a genuine issue of material fact regarding Life Spine's performance as to Section 7(b). The evidence Aegis cites, (see R. 466, Def.'s Resp. to PSOF ¶ 20; R. 453, DAMF ¶ 17), appears to discuss how Life Spine designates its own material as confidential and says nothing about what actions Aegis took regarding its confidential information, (see id. Ex. 1 at 117,[7] Ex.

---

[6] Aegis argues that the phrase "or otherwise" makes this provision ambiguous. (See R. 465, Def.'s Resp. at 13). The court disagrees. Section 7(b) plainly requires that each party "take appropriate action . . . with such party's employees to satisfy its obligations" regarding "Confidential Information." Performance of this provision is therefore measured by whether the action taken allows the parties' employees "to satisfy" the DBA's "Confidential Information" requirements, and the "or otherwise" phrase indicates that it remains within the parties' discretion to determine the best action for that party. (Id.)

[7] Aegis also cites to page 26 of the deposition transcript in its Response to PSOF, but this page is not included. (See R. 466-2, Def.'s Resp. to PSOF Ex. 1.)

3 at 154-55). Life Spine meanwhile cites evidence that it took several steps to comply with the confidentiality requirements of Section 7(b). (See R. 477, Pl.'s Resp. to DAMF ¶ 17.) Based on this record, no reasonable jury could conclude that Life Spine failed to perform as required under the DBA.

### 4. DBA Section 3(a)

Because Life Spine has established the enforceability and performance elements of its breach of contract claims, the court next considers the parties' arguments regarding the individual DBA provisions that Life Spine alleges Aegis breached, beginning with Life Spine's claim that Aegis breached its fiduciary duties in violation of Section 3(a) of the DBA. That section provides in relevant part that Life Spine "will retain all right, title and interest in and to any and all such Inventory [provided to Aegis], but [Aegis] will maintain custody and/or control of each item of Inventory in a fiduciary capacity, as a trustee of [Life Spine's] property rights therein." (DBA § 3(a).) The court first considers Aegis's efforts to knock out the breach of Section 3(a) claim in its motion. Aegis argues that because an independent contractor is typically not a fiduciary, its duties under Section 3(a) must be narrowly construed as "limited to 'maintain custody and/or control' of the devices and instruments Life Spine provided under the DBA." (R. 433, DMPSJ Br. at 20-21.) With this construction in mind, Aegis argues that no evidence suggests it failed to maintain custody or control of the consigned inventory. (Id. at 21.) In the alternative, Aegis argues that the liquidated damages provision in Section 3(a)

provides the full extent of Life Spine's remedy for any breach of this fiduciary duty. (Id.)  Neither argument is persuasive.

First, Aegis's proposed construction of Section 3(a) "flies in the face of the provision's plain language, which clearly states that Aegis agreed to maintain custody and control of the products in a fiduciary capacity." (R. 212, Mem. Op. and Order at 42.)  The DBA made Aegis an independent contractor of Life Spine, (see DBA § 10(a)), and then specifically made Aegis a fiduciary with respect to maintaining custody and control of the products Life Spine provided for Aegis to sell, (see DBA § 3(a)).  Thus, consistent with the case law Aegis cites, (see R. 433, DMPSJ Br. at 20), the DBA carved out a specific situation in which fiduciary duties apply.  For Aegis to argue that the independent contractor clause somehow further narrows the limited fiduciary duty outlined in Section 3(a) reverses the relationship between those terms.  The question is not whether Aegis maintained custody or control of Life Spine's products, but whether it did so in a manner that fulfilled its obligations as a fiduciary and trustee of Life Spine's property rights.  (See DBA § 3(a).)  As Aegis fails to make any factual showing regarding this latter issue, the court denies its motion for summary judgment regarding Section 3(a).

Aegis's second argument also lacks merit.  The liquidated damages formula under Section 3(a) describes Aegis's liability "for any shortage of or damages to the Inventory and/or missing implants and instruments from Sets." (Id.)  On its own terms, the clear intent of this provision is to provide a contractual remedy for missing or damaged products, and no language in the DBA suggests the parties

intended it to apply to breaches of Aegis's fiduciary duties. The liquidated damages formula operates separately from the fiduciary duty clause, and its presence in the same subparagraph does not limit Life Spine's ability to recover other damages for Aegis's breaches of its fiduciary obligation. The breach of Section 3(a) claim therefore survives Aegis's motion.

The court next considers Life Spine's cross arguments that the court should grant it summary judgment on the Section 3(a) claim as a matter of law. Life Spine says Aegis breached this provision in two ways. First, Life Spine alleges that Aegis's CEO Tony Ahn shipped two ProLift implants and a ProLift installer to Aegis's South Korean parent company L&K under the following circumstances:

(1)    after having been instructed by L&K's Chairman that it was "important for L&K and Aegis to develop an expandable cage";
(2)    after identifying ProLift as a competitor to the cage L&K and Aegis were developing;
(3)    after L&K (including its head of R&D, Sangsoo Lee) had decided to proceed with developing a cage in a "Form similar to Life Spine's ProLift";
(4)    at the request of Sangsoo Lee, who "wanted to see for himself the implant and installer produced by Life Spine; and
(5)    without informing Life Spine.

(R. 439, PMPSJ Br. at 6-7 (quoting R. 440, PSOF ¶¶ 28-29).) Second, Life Spine argues that Aegis shipped the ProLift devices to two of its surgical consultants "with the knowledge and understanding that the consultants would use (and did use) the device to help develop a direct competitor to ProLift." (Id. at 7-9; R. 440, PSOF ¶¶ 30-35.)

Aegis does not dispute that it shipped two implants and an installer to L&K on the timeline Life Spine lays out. (R. 466, Def.'s Resp. to PSOF ¶¶ 28-29.) But

Aegis argues that the devices were only temporarily shipped to L&K and never left Aegis's custody or control, and it disputes the characterization that it shipped the devices to L&K so that L&K could reverse engineer them.  (Id.; R. 465, Def.'s Resp. at 13-14.)  Aegis also does not dispute that it shipped ProLift devices to its retained consultants on the development of XT or that the consultants provided Aegis and L&K with feedback regarding ProLift.  (See R. 466, Def.'s Resp. to PSOF ¶¶ 30-35.)  However, Aegis disputes the assertion that its consultants examined the ProLift devices outside of the surgical context envisioned by the DBA.  (Id. ¶ 30.)  Aegis also argues that: (1) the DBA did not prohibit it from soliciting the opinions of surgeon customers to whom it sold the ProLift cages; (2) Life Spine had "no right to control the manner in which Aegis performed its obligations" because it was an independent contractor; (3) it is ambiguous "whether the phrases 'fiduciary capacity' and 'trustee' in § 3(a) were intended to cover Aegis's engagement of consultants"; and (4) Life Spine's interpretation of Section 3(a) converts that provision into an unenforceable restrictive covenant.  (R. 465, Def.'s Resp. at 14-16.)

The court again notes that Section 3(a) required Aegis to: (1) "maintain custody and/or control" of the devices it received from Life Spine; and (2) do so "in a fiduciary capacity, as a trustee of [Life Spine]'s property rights therein."  (DBA § 3(a).)  As no ambiguity exists in this language, the court interprets the words used based upon "their common and generally accepted meanings."  *RTC Indus.*, 2021 IL App (1st) 200496-U, ¶ 23.  Black's Law Dictionary defines "custody" as "[t]he care and control of a thing or person for inspection, preservation, or security," *Custody*,

*Black's Law Dictionary* (11th ed. 2019), and "control" as "the power or authority to manage, direct, or oversee," *Control*, *Black's Law Dictionary* (11th ed. 2019). Based on these definitions, the court agrees that the "maintain custody and/or control" clause only required the devices to remain within Aegis's legal authority rather than within its actual physical possession. (See R. 465, Def.'s Resp. at 13.)

As for Section 3(a)'s second prong, by agreeing to act in a fiduciary capacity and as Life Spine's trustee with respect to Life Spine's devices, Aegis agreed to owe Life Spine "the utmost candor, care, loyalty, and good faith" in its exercise of legal authority over those devices. *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 827, 831 (N.D. Ill. 2006); *see also Fiduciary*, *Black's Law Dictionary* (11th ed. 2019). Thus, Life Spine is entitled to summary judgment if the undisputed material facts show that its devices either left the bounds of Aegis's legal authority or if Aegis exercised its authority over the devices in a manner inconsistent with its duties of candor, care, loyalty, and good faith.

The court first applies this framework to the ProLift devices Aegis shipped to L&K without Life Spine's knowledge. Consistent with this court's previous rulings discussing the relationship between Aegis and L&K, the court agrees with Aegis that the devices sent to L&K did not leave Aegis's legal authority. (See R. 465, Def.'s Resp. at 13; R. 88, Mem. Op. and Order at 3-9; R. 330, Mem. Op. and Order at 4-9.) That said, the undisputed facts show that Aegis shipped the ProLift devices to L&K—a competitor of Life Spine that Aegis knew to be trying to develop a competing expandable cage in a "[f]orm similar to Life Spine's ProLift"—at L&K's

25

request and without informing Life Spine. (R. 440, PSOF ¶ 29.) Even if it is true that Sungak Choi, the L&K employee who allegedly designed XT, "never saw a ProLift device or installer," (R. 466, Def.'s Resp. to PSOF ¶ 29), Aegis has identified no good faith basis for shipping a known ProLift competitor the ProLift devices without Life Spine's consent. Such behavior violated the fiduciary duty of loyalty Aegis owed to Life Spine under Section 3(a), and in failing to inform Life Spine of the transfer, Aegis violated its fiduciary duty of candor.

The court next evaluates the parties' arguments regarding the ProLift devices Aegis shipped to its consulting surgeons. Aegis's arguments on this issue have no merit. As for the suggestion that Aegis's independent contractor status means Life Spine had "no right to control the manner in which Aegis performed its obligations," (R. 452, Def.'s Resp. at 15), the court explained above that such status does not allow Aegis to escape the limited but specific fiduciary obligations it agreed to in Section 3(a). Aegis also misses the point when it argues that it is uncertain whether the phrases "fiduciary capacity" and "trustee" were intended to cover the engagement of consultants. (See R. 465, Def.'s Resp. at 15.) The plain and unambiguous language of Section 3(a) imposes fiduciary obligations on Aegis with respect to the handling of devices it secured from Life Spine—and sharing ProLift devices with consultants for purposes of developing a competing device clearly violates the fiduciary duty of loyalty. Additionally, Section 3(a) is not a restrictive covenant and it does not "preclude Aegis from engaging surgeons and developing its own competing device." (Id. at 16.)

26

Nevertheless, Aegis has identified a genuine issue of material fact that precludes the court from granting summary judgment in Life Spine's favor. Although Life Spine is correct that "providing ProLift devices to [Aegis's] consultants for the purpose of developing a competing device" would violate the fiduciary duty of loyalty, (R. 439, PMPSJ Br. at 9), viewing the record in Aegis's favor, which the court must, it is not clear that Aegis shipped the devices for such purpose. Aegis essentially argues that the two doctors in question were customers under the DBA who later became consultants and shared their experiences using ProLift. (See R. 465, Def.'s Resp. at 14-15; R. 466, Def.'s Resp. to PSOF ¶ 30.) Section 3(a) limits Aegis's fiduciary obligations to the manner in which it exercised its authority over the devices Life Spine supplied. Thus, if Aegis provided the devices to the doctors for their intended purpose and no other and these doctors used the devices for their intended purpose and no other, then Aegis's handling of the devices would be consistent with its duties of candor, care, loyalty, and good faith—even if those doctors later became consultants who provided extensive feedback about their experiences using ProLift. That Aegis sought feedback from the doctors as consultants regarding their experiences using ProLift might still violate the DBA, (see, e.g., DBA § 8(b)(i) (Aegis's agreement not to "attempt to reconstruct or discover any underlying ideas, formats, programming or design of the Products or any portion thereof")), but it would not violate Aegis's Section 3(a) fiduciary obligations in such circumstances.

Life Spine views the evidence differently and asks the court to infer that: (1) Aegis provided the doctors with the ProLift devices for the explicit purpose of developing a competing device; (2) Aegis provided them with the ProLift devices for such purpose under the pretext of conducting a good faith transaction; or (3) the doctors began as good faith customers who subsequently abused their access to ProLift after being retained as consultants for Aegis. (See R. 440, PSOF ¶¶ 31-35.) A reasonable jury could draw these inferences from the evidence presented. But the evidence, when viewed in Aegis's favor, also allows a reasonable jury to infer that Aegis provided the doctors with access to the ProLift devices as customers in good faith and that the doctors' use of the devices did not stray beyond their intended uses. (See R. 466, Def.'s Resp. to PSOF ¶¶ 30-31.) Accordingly, the court grants Life Spine's motion for summary judgment insofar as the undisputed evidence shows that Aegis violated its Section 3(a) fiduciary obligations when it shipped ProLift devices to L&K but finds that a genuine issue of material fact precludes summary judgment on the issue related to Aegis's shipping of the devices to its consultants.

### 5.    DBA Sections 7(a) & 7(b)

Section 7(a) defines "Confidential Information" as "information related to the other party, which is of a confidential or proprietary nature." (DBA § 7(a).) It then illustrates the categories of information falling within this definition:

> Confidential Information may include but is not limited to copyright, trade secrets or other proprietary information, techniques, processes, schematics, software source documents, pricing and discount lists and schedules, customer lists, contract terms, customer leads, financial

information, sales and marketing plans, and information regarding the responsibilities, skills and compensation of employees.

(Id.)  Section 7(a) goes on to provide in relevant part that:

[e]ach party agrees not to use such other party's Confidential Information, either directly or indirectly, for any purpose other than as required for performance of such party's obligations hereunder. . . . Each party agrees to treat the Confidential Information with at least the degree of care and protection with which it treats its own confidential information, but in any event with no less than reasonable care and protection, and to use the Confidential Information only for the purpose set forth in this Agreement.

(Id.)  Section 7(a) also requires that each party "treat as confidential the terms and conditions of this Agreement."  (Id.)  Finally, Section 7(b) requires that each party agree not to "disclose or otherwise make such Confidential Information available to third parties without the other party's prior written consent" except where the information at issue was already public or separately known to the disclosing party. (Id. § 7(b).)

Aegis argues that the language defining "Confidential Information" is so ambiguous as to be unenforceable, or at least sufficiently imprecise to preclude "the actual ProLift implants and instruments" from that definition.  (See R. 433, DMPSJ Br. at 7-8, 10-13, 15-17.)  Aegis therefore seeks summary judgment "on any claim Aegis breached § 7(a) in the way it treated or handled the actual ProLift implants or instruments, including any claim that Aegis violated 7(a) by providing ProLift implants or instruments to L&K."  (Id. at 17.)  The court denies this request.

First, Aegis's argument that Section 7(a) is ambiguous depends on an inaccurate characterization of the DBA as "telling the reader only what *may*

29

constitute confidential information, not what *is* Confidential Information."[8] (Id. at 7 (emphasis in original).) If Section 7(a)'s definition of "Confidential Information" consisted only of the open-ended "may include but is not limited to" phrase, the question of whether that language is too vague would merit careful consideration. As Life Spine correctly notes, however, Aegis's argument ignores the actual definition provided by the DBA, (see R. 457, Pl.'s Resp. at 9)—"Confidential Information" refers to "information related to the other party, which is of a confidential or proprietary nature,"[9] (DBA § 7(a)). Aegis identifies no ways in which this plain and clear language could be susceptible to multiple meanings, and the court sees none. The court therefore concludes that the DBA unambiguously defines "Confidential Information." The "may include but is not limited to" phrase lists categories of information the parties consider as falling within this definition, and although the list is non-exhaustive, it is nevertheless cabined by the requirement that "Confidential Information" must be confidential or proprietary. Even so, whether certain information is confidential or proprietary then becomes a question of fact beyond the court's power to ascertain from contract interpretation

---

[8] The parties dispute whether the court has already found Section 7(a) to be unambiguous, resulting in the preclusion of Aegis's argument by the law of the case doctrine. (See R. 433, DMPSJ Br. at 11 n.2; R. 461, Pl.'s Resp. at 5; R. 481, Def.'s Reply at 8.) To the extent the court did not explicitly consider the definition of "Confidential Information" in its previous rulings, (see R. 212, Mem. Op. and Order at 33-34), it does so now.

[9] Although the DBA says that "Confidential Information" is confidential, such definition is not circular despite its appearance. The DBA makes clear that "Confidential Information" is merely a placeholder phrase having no meaning other than that given to it by the contract, much like a variable in an algebraic equation.

or construction.  (See R. 212, Mem. Op. and Order at 33-35 (interpreting and applying Section 7(a) in like manner).)  The only exception to this general rule is that Section 7(a) specifically requires the parties "to treat as confidential the terms and conditions of this Agreement."  (Id.)

Because Aegis fails to persuade the court to simply throw out Section 7(a) as too vague to enforce, the court considers Aegis's alternative argument that summary judgment is appropriate because the absence of a specific reference to implants, instruments, sets, or inventory in Section 7(a)'s list of examples indicates a clear intent to exclude them from the contract.  (R. 433, DMPSJ Br. at 16-17.) Aegis therefore asks the court to construe the definition of "Confidential Information" "such that it does not apply to the actual ProLift implants and instruments Aegis distributed."  (Id. at 16.)

The court already rejected this argument at the preliminary injunction stage when initially raised, reasoning that the argument "ignores the fact that the list set out in the DBA's definition of confidential information is non-exhaustive. . . .  And there is no real dispute that the ProLift cage and installer house within them information about the 'techniques' and 'processes' that apply to how their components and subcomponents interact."  (R. 212, Mem. Op. and Order at 34.) Considering the procedural posture of a preliminary injunction hearing, the court declines to treat this finding as binding law of the case.  *See Commc'ns Maint., Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1206 (7th Cir. 1985) ("A court must be cautious in adopting findings and conclusions from the preliminary injunction stage in ruling

on a motion for summary judgment."). But Aegis gives the court no reason to reconsider its logic. Instead, it continues to ignore the basic structure of Section 7(a), which defines "Confidential Information" in reference to information that is confidential or proprietary and provides a non-exhaustive list of categories falling within that definition. The plain intent of such language is that information which is confidential or proprietary but not falling into one of the illustrative categories is still considered confidential information. Illinois law does not allow Aegis or the court to rewrite this language. *See Romspen Mortg. Ltd. P'ship v. BGC Holdings LCC – Arlington Place One*, 20 F.4th 359, 371 (7th Cir. 2021) ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used."). That the list of examples does not explicitly include "implants" or "instruments" is therefore beside the point.

Furthermore, Aegis makes little effort to engage with the factual questions of whether the ProLift implants or instruments are themselves confidential or contain confidential or proprietary information. The parties briefly debate whether the evidence demonstrates that the ProLift implants and instruments are confidential. (See R. 461, Pl.'s Resp. at 11-13; R. 481, Def.'s Reply at 9-12.) Both parties mistakenly treat the question of "whether any specific process, technique, document, or contract term, etc. is confidential" as a gap in the contractual definition of "Confidential Information." (R. 461, Pl.'s Resp. at 11 (internal quotations omitted); see R. 481, Def.'s Reply at 7-10).) But as the court explained,

the definition of "Confidential Information" is clear and unambiguous—it includes information relating to the other party that is of a confidential or proprietary nature, as understood based on the common meaning of those terms. *See RTC Indus.*, 2021 IL App (1st) 200496-U, ¶ 23. Whether the parties treated any specific information as confidential or proprietary is a question of fact, and the competing evidence of usage cited by the parties goes to this factual issue. (See R. 461, Pl.'s Resp. at 13; R. 481, Def.'s Reply at 11-12.) As such, genuine issues of material fact preclude summary judgment on whether the specific ProLift devices provided to Aegis themselves constituted confidential information.

Lastly, Aegis skirts around the question of whether the ProLift implants and instruments could house confidential information. Contrary to Aegis's assertions, the issue is not whether "terms in . . . § 7(a) are 'housed within' other terms," (R. 481, Def.'s Reply at 11), but whether information of a confidential or proprietary nature is housed within the ProLift implants and instruments, (see R. 212, Mem. Op. and Order at 34). In a trade secrets case focused on the ProLift device, it seems almost self-evident that the ProLift implants or instruments would involve confidential or proprietary information to some degree, and that even if the finished products Aegis received were not themselves confidential or proprietary, they could be treated or handled in such a way as to allow the discovery and misuse of "Confidential Information." This is not a matter of contract interpretation, but a testable question of fact. And because Aegis cites no evidence showing that it could not have obtained and misused information of a confidential or proprietary nature

through its treatment or handling of ProLift devices, it has not demonstrated its right to summary judgment "on any claim that Aegis breached § 7(a) in the way it treated or handled the actual ProLift implants or instruments." (R. 433, DMPSJ Br. at 17.)

As for Life Spine's motion, Life Spine argues that Aegis violated Sections 7(a) and 7(b) by sending L&K an email in September 2018 including an image and disclosing certain details "about customized ProLift installers." (R. 439, PMPSJ Br. at 10-11.) Life Spine also argues that Aegis violated Section 7(a) by improperly using the confidential "transfer price" at which Life Spine provided ProLift to Aegis for its own business purposes of setting a competitive price point. (Id. at 11-12.) Aegis responds with the now-familiar argument that neither the custom feature at issue nor the transfer price are listed as "Confidential Information" in Section 7(a) and that Life Spine treated neither as confidential. (See R. 465, Def.'s Resp. at 18-19.) Aegis further argues that Life Spine failed to demonstrate that L&K "actually considered, used, or even viewed" the subject email. (Id. at 19.)

To succeed on its claim that Aegis breached its confidentiality obligations under Section 7, Life Spine must demonstrate: (1) that the subject information was "of a confidential or proprietary nature," (DBA § 7(a)); and (2) that Aegis used that information for a purpose "other than as required for performance of [its] obligations" under the DBA, (id.), exercised "less than reasonable care and protection" in its treatment of that information, (id.), or disclosed that information to a third party without Life Spine's written consent, (id. § 7(b)). Aegis does not

34

dispute that its Marketing Director emailed the information to L&K as described by Life Spine despite knowing that Life Spine designated the "same image and related information" as confidential information.  (R. 440, PSOF ¶ 38; see also R. 466, Def.'s Resp. to PSOF ¶¶ 37-38.)   The undisputed evidence therefore shows that the information about the custom feature was of a confidential nature, sharing the information with L&K was not necessary for the performance of Aegis's obligation under the DBA, and Aegis disclosed the information without Life Spine's written consent.

Nevertheless, Aegis suggests that Life Spine fails to explain how the email falls within one of the "Confidential Information" categories and argues that Life Spine generally does not maintain the confidentiality of its devices.  But these arguments ignore the terms of the DBA, which consider any information "of a confidential or proprietary nature" to be confidential information, and the evidence Life Spine cites that indicates the confidential treatment of this specific information.  (See R. 440, PSOF ¶ 38.)  Furthermore, whether other companies use a similar feature or L&K actually "considered, used, or even viewed" the disclosing email is irrelevant.  (See R. 465, Def.'s Resp. at 19.)  The undisputed evidence shows that Aegis misused and disclosed without permission Life Spine's "Confidential Information" in violation of Sections 7(a) and 7(b), and summary judgment is proper on this issue.

As for Life Spine's second argument that Aegis improperly used the transfer price for its own business purposes in setting prices for its own competing implant

devices, Aegis does not dispute that it used the transfer price in such a manner. (See R. 439, PMPSJ Br. at 11-12; R. 440, PSOF ¶ 39; R. 466, Def.'s Resp. to PSOF ¶39.) But Aegis argues that the transfer price is not confidential information as defined in Section 7(a). (See R. 465, Def.'s Resp. at 19; R. 466, Def.'s Resp. to PSOF ¶39.) Aegis's argument has more merit than Life Spine gives it credit. (See R. 478, Pl.'s Reply at 8-9.) The non-exhaustive list illustrating the categories of information considered "Confidential Information" does not specifically include "pricing and discount lists and schedules." (Id. at 9.) Instead, the list indicates that "Confidential Information" includes "copyright, trade secrets or other proprietary . . . pricing and discount lists and schedules," (DBA § 7(a)), recognizing that some pricing information will not be proprietary and therefore not confidential. In other words, as explained above, whether any specific piece of information—here, the transfer price—is considered confidential information depends on whether the party owning that information indeed treated it as confidential or propriety.

Life Spine points to unequivocal evidence that it did because the transfer price is specified in the DBA and Section 7(a) specifically designates as confidential "the terms and conditions of this Agreement." (See id. Ex. C; id. § 7(a).) This is dispositive, and it does not matter that Aegis can point to situations where Life Spine disclosed other pricing information. (See R. 466, Def.'s Resp. to PSOF ¶¶ 39-40.) That information was not the transfer price and was not written into the DBA. (See id.; R. 478, Pl.'s Reply at 9.) Aegis also argues that the prices Life Spine's Mariusz Knap negotiated with Aegis were not confidential. (See R. 466, Def.'s Resp.

to PSOF ¶ 39.)   But while Knap testified that he did not consider the price he proposed to Aegis to be confidential, the parties do not dispute that this negotiation occurred in November 2017—before the parties agreed to the DBA in January 2018. (See R. 434, DSOF ¶¶ 6-7; R. 458, Pl.'s Resp. to DSOF at 37; R. 440, PSOF ¶ 18.)   As such, regardless of what the parties considered to be confidential during their earlier negotiations, in signing the DBA they explicitly agreed to make the transfer price confidential by attaching it as an exhibit to the agreement.   Because the DBA is a fully integrated agreement, Aegis cannot now point to extrinsic evidence predating the DBA to undermine the meaning of one its terms.   Aegis identifies no other evidence challenging the confidentiality of the transfer price.   Accordingly, the undisputed material facts show that Aegis breached Section 7(a) by using the transfer price listed in the DBA for its own business purposes, and summary judgment for Life Spine is also proper on this issue.

### 6.   DBA Section 7(b)

The court next considers Life Spine's argument that Aegis failed to instruct its employees regarding their confidentiality obligations under the DBA.   As discussed, each party agreed to "take appropriate action by instruction, agreement, or otherwise with such party's employees to satisfy its obligations under this Agreement with respect to the use, copying, modification, protection, and security of Confidential Information."   (DBA § 7(b).)   Life Spine cites testimony given during the preliminary injunction hearing that "[n]either Aegis's CEO, Tony Ahn, nor its

37

then-Director of R&D, Jack Lee, ever read the DBA, nor did anyone explain their obligations under the agreement to them." (R. 440, PSOF ¶ 56.)

Aegis does not dispute that Ahn or Lee so testified, (R. 466, Def.'s Resp. to PSOF ¶ 56), but argues that Section 7(b) "does not explain what 'appropriate action' is required" and that "the records cited do not establish that the parties had agreed to this read of § 7(b)." (Id.) These arguments lack merit. Section 7(b) is not ambiguous, so the court must construe the parties' intent from its plain language. *Platinum*, 989 F.3d at 563. That language provides that an "appropriate action" is one that would allow Aegis to "satisfy its obligations under [the DBA] with respect to the use, copying, modification, protection, and security of Confidential Information." (DBA § 7(b).) The DBA suggests two actions a party could take with its employees to meet this requirement—instruction or agreement—but ultimately the "or otherwise" clause affords the parties discretion to decide on a course of action. (Id.) Here, the undisputed facts show that Aegis took no action to meet its confidentiality obligations with respect to its employees, including its top management personnel. (See R. 478, Pl.'s Reply at 9-10.) As such, the undisputed facts show that Aegis breached Section 7(b).

### 7. DBA Section 8(b)

Aegis also seeks summary judgment on Life Spine's Section 8(b) claim, arguing that this section is unenforceable. Section 8(b) provides that:

> [Aegis] agrees not to attempt, and will prevent its employees and contractors from attempting to: (i) disassemble, adapt, reverse engineer, decompile, modify, alter; create derivative works, translate or otherwise attempt to reconstruct or discover any underlying ideas,

38

formats; programming or design of the Products or any portion thereof; (ii) remove, alter or obscure, in any way, any proprietary rights, copy protections, product identification, trademark attribution or copyright or other notices (including patent markings, copyright notices and trademarks); or (iii) copy the design, knowledge, functionality or otherwise of the Product in any way.

First, Aegis complains that the restriction lacks geographic or temporal limits. (R. 433, DMSPJ Br. at 9.)  Second, Aegis argues that Section 8(b) "forever prohibits [it] from creating any device having 'in any way' any 'design, knowledge, *functionality* or otherwise' of *any product* Life Spine ever distributes or sells, regardless of whether Aegis ever saw, touched, or had access to such product."  (Id. at 10 (emphasis in original).)

Under Illinois law, the enforceability of a restrictive covenant is a question of law.  *See Coady v. Harpo, Inc.*, 719 N.E.2d 244, 248 (Ill. App. Ct. 1999).  Illinois law applies a reasonableness test for evaluating the legality of restrictive covenants, *see generally Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393 (Ill. 2011), but a more stringent standard is applied to employment contracts than to covenants related to the sale of a business, *see Arcor, Inc. v. Haas*, 842 N.E.2d 265, 272-73 (Ill. App. Ct. 2005).  In determining whether to apply the more stringent employment standard or the less stringent business-sale standard, courts consider both the relative bargaining power of the parties and the interests to be protected by the covenant at issue.  *See id.*; *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1146 (Ill. App. Ct. 1999).

Aegis argues for the more stringent standard here, reasoning that the intent behind Section 8(b) is to prevent Aegis from poaching Life Spine's customers.

39

(R. 481, Def.'s Reply at 5.) However, the plain language of Section 8(b) protects technical details relating to Life Spine's products, not its customer base. Still, the concern for safeguarding intellectual property exists in both contexts—in the employment context insofar as it would prevent Aegis from gaining a competitive advantage over Life Spine at its expense, *see Eichmann*, 719 N.E.2d at 1146, and in the business sale context insofar as it shields the value of Life Spine from damage, *see Aquila Inv. Grp., LLC v. Hiller*, No. 16 CV 2351, 2019 WL 13227324, at *14 (C.D. Ill. May 31, 2019). Because consideration of the interests to be protected does not tip the scale toward either version of the standard, the relative bargaining power of the parties is the decisive factor. A "business-to-business" distribution agreement "is more akin to the sale of a business than to an employment contract because the businesses are more likely to possess equal bargaining power." *ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 276 (N.D. Ill. 2020); *see also PeopleFlo Mfg., Inc. v. Sundyne, LLC*, No. 20 CV 3642, 2021 WL 3129264, at *7 (N.D. Ill. July 23, 2021). The court therefore adopts the less stringent version of the reasonableness standard.

Under that standard, a restrictive covenant is reasonable "if it does not injure the public, cause undue hardship to the promisor, and the restraint imposed is no greater than necessary to protect the promisee's legitimate business interests." *PeopleFlo*, 2021 WL 3129264, at *7. Although the overall question as to the enforceability of a restrictive covenant is a question of law, "whether a legitimate business interest exists is based on the totality of the facts and circumstances of the

individual case" and courts must give the parties "a full opportunity to develop the necessary evidentiary record." *Reliable Fire*, 965 N.E.2d at 403-04. Generally, courts must also consider the temporal and geographic scope of the restrictions. *See, e.g.*, *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 976 N.E.2d 1014, 1032 (Ill. App. Ct. 2012). However, confidentiality agreements "will not be deemed unenforceable for lack of durational or geographic limitations where trade secrets and confidential information are involved." *Coady*, 719 N.E.2d at 250 (citing *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 n.10 (7th Cir. 1995)); *see also* 765 ILCS 1065/8(b)(1). Finally, courts must consider that although Illinois law disfavors contracts inhibiting trade, "an equally important public policy . . . is the freedom to contract." *PeopleFlo*, 2021 WL 3129264, at *7 (internal citations omitted).

Applying this framework, the court is not persuaded by Aegis's argument that Section 8(b) is unenforceable because of a lack of temporal or geographic limitations. Such an argument is precluded by the Illinois doctrine allowing enforcement of restrictive covenants involving trade secrets and confidential information. *See Coady*, 719 N.E.2d at 250. Although the parties offer scant analysis as to whether Section 8(b) falls within the gambit of a "confidentiality agreement," Illinois law makes clear that a broad understanding of that term applies. The statute from which the rule stems explicitly provides that "a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical

limitation on the duty." 765 ILCS 1065/8(b)(1). This statutory language covers any contract relating to the secrecy or use of trade secret information, not simply nondisclosure agreements—allowing parties to contract more freely to protect against the disclosure of their confidential information by word or deed. Just as in *ExactLogix*, 508 F. Supp. 3d at 275-78, where the court analyzed a similar restrictive covenant in a software licensing agreement through the lens of a "confidentiality agreement," this court does too. Section 8(b) works in tandem with Sections 7 and 12 to protect Life Spine's confidential and proprietary information and trade secrets. As such, the lack of limits on temporal or geographic scope cannot render it unenforceable.

The court further finds that the lack of limits to the temporal or geographic scope of Section 8(b) is not unreasonable. A geographic limitation would be self-defeating as it would shift Section 8(b) from a provision that prohibits copying or reverse engineering Life Spine's products into one that allows such conduct. *See PeopleFlo*, 2021 WL 3129264, at *8 (finding imposition of geographic limits "makes little sense" in the context of businesses in supplier-to-customer relationships). Nor is it unreasonable that Section 8(b) has no durational limit. Considering the iterative nature of invention and technological development, Life Spine has a strong interest in protecting its intellectual property rights after an arbitrary contractual period to prevent its competitors from catching up with its innovations. The unrestricted temporal and geographic scope of Section 8(b) preserves the pre-DBA status quo in which Aegis lacked access to—and therefore

could not reverse engineer or copy—Life Spine's products. As a sophisticated business entity operating in a specialized medical device market, Aegis had the ability to bargain for different terms. The court is disinclined to release Aegis from a provision to which it freely agreed merely because it may now have buyer's remorse.

The court finds more persuasive Aegis's second argument that Section 8(b) impermissibly "forever prohibits [it] from creating any device having 'in any way' any 'design, knowledge, *functionality* or otherwise' of *any product* Life Spine ever distributes or sells, regardless of whether Aegis ever saw, touched, or had access to such product." (R. 433, DMPSJ Br. at 10 (emphasis in original).) This argument overstates the extent of the restriction, but it still highlights potential overbreadth in Section 8(b)(iii)—that is, to the extent it prohibits Aegis from "copy[ing] the design, knowledge, functionality or otherwise of the Product in any way." (DBA § 8(b)(iii).) As Aegis notes, the DBA defines "Products" as "those products offered by [Life Spine] which are available for distribution in the United States, which may be amended by [Life Spine] in its sole and absolute discretion at any time and from time to time as specific Products are added, modified, or deleted within [Life Spine's] product line." (Id. § 1(e).) However, this provision is not included in the DBA's survival clause. (See id. § 15(h)). As such, the court concludes that the parties intended for Life Spine's unilateral authority to amend the definition of "Products" to terminate with the contract. Consequently, Section 8(b) does not prevent Aegis from attempting to copy "any product Life Spine ever distributes or

sells," (R. 433, DMPSJ Br. at 10), but only those in Life Spine's product line during the term of the DBA.

Even so construed, Aegis is correct that Section 8(b)(iii) prohibits it from copying even aspects of "the design, knowledge, functionality or otherwise" of Life Spine's products that are publicly available. Life Spine argues that the key word in Section 8(b) is "copy," such that Section 8(b)(iii) prohibits Aegis from "relying on Life Spine's products to create a product," but allows the development of competing products "based on independent R&D." (R. 461, Pl.'s Resp. at 9.) This point is well taken, as "copy" refers to "[a]n imitation or reproduction of an original," *Copy*, *Black's Law Dictionary* (11th ed. 2019), and an Aegis device developed through a wholly independent process would not imitate or reproduce the ProLift device. But Life Spine's argument does not address Aegis's concern that Section 8(b) would prevent it from relying on publicly available information about Life Spine's products in the development of its own devices.

Accordingly, while the court agrees that Aegis has identified an area of potential overbreadth, it nonetheless finds that Aegis has failed to demonstrate that no genuine issues of material fact exist regarding the extent of Life Spine's legitimate business interests. *ExactLogix* is again instructive. In that case, the court found a restrictive covenant prohibiting a software licensee from "copy[ing] any features, functions or graphics of the Software" overbroad because such language tried to make "essentially all of the information" about the software confidential even though "the information in question is available to large numbers

44

of the public." *ExactLogix*, 508 F. Supp. 3d at 275, 277.  In so finding, the *ExactLogix* court based its decision upon "the specific facts of [the] case," pointed to a factual record demonstrating the availability of the software to the public and recognized that the offending contractual language "could be sufficient in some circumstances." *Id.* at 277.  By contrast, here Aegis has not discussed how the factual record supports its motion, and as explained above regarding Section 7(a), the parties clearly have material disputes about the degree to which the products provided to Aegis by Life Spine were confidential.  As such, the court cannot assume the extent of Life Spine's business interests.  If it turns out that no or very little information about the ProLift is publicly available, then Section 8(b)(iii) may provide a reasonable restriction.  Consistent with Illinois Supreme Court precedent requiring courts to evaluate the reasonableness of legitimate business interests under the totality of the circumstances, *see Reliable Fire*, 965 N.E.2d at 403-04, the parties must have a full opportunity to develop the relevant factual record at trial.

The court therefore denies Aegis's motion for summary judgment with respect to Section 8(b).  And because the court rejects Aegis's argument regarding a lack of geographic or temporal limitation, the court holds that Section 8(b) is enforceable overall.  However, Aegis may renew its argument regarding the enforceability of Section 8(b)(iii) following the development of the relevant record at trial.[10]

_____

[10]  Should Aegis decide to renew this argument, the parties must also address at that time whether severing Section 8(b)(iii) or "blue penciling" it to make it

Turning next to Life Spine's motion, Life Spine argues that Aegis breached Section 8(b)(i) by attempting to discover the "shear compression value" of the ProLift implant, pointing to evidence that it kept this value confidential but that a determination of the value appeared in "Aegis's internal documents." (R. 439, PMPSJ Br. at 12-14; R. 440, PSOF ¶¶ 41-48.) Aegis concedes that a slide deck prepared by L&K reflects a figure for the shear compression value of ProLift, but claims this evidence is inadmissible hearsay and disputes that either it or L&K discovered that figure by testing ProLift or used the figure to copy or reverse engineer the ProLift device. (See R. 465, Def.'s Resp. at 20-21; R. 466, Def.'s Resp. to PSOF ¶ 48.)

As the court concluded above that Section 8(b)(i) is enforceable, Aegis would be in breach if Life Spine can demonstrate that Aegis made an "attempt" to "discover any underlying ideas, formats, programming or design of the [ProLift]." (DBA § 8(b)(i).) However, the ban on discovering any underlying ideas comes as a catch-all term at the end of a list of prohibited acts all relating to the misuse of Aegis's access to ProLift by learning from or building upon the provided devices. (See id.) As a result, unlike Section 8(b)(iii), Aegis cannot have breached Section 8(b)(i) if the evidence shows that it merely consulted publicly available information. *See Citizens Ins. Co. of Amended V. Thermoflex Waukegan, LLC*, 588 F. Supp. 3d

---

enforceable would be the appropriate relief. *See Russell Dean, Inc. v. Maher*, 17 CV 8440, 2018 WL 4679573, at *6 (N.D. Ill. Sept. 28, 2018).

845, 855 (N.D. Ill. 2022) ("Under the doctrine of *noscitur a sociis*, the catch-all [term] should be interpreted by the company it keeps.").

Life Spine presents evidence that Aegis computed the shear compression value for ProLift, that such value reflects an underlying idea behind the ProLift device, and that there was no way to publicly access this value. (See R. 440, PSOF ¶¶ 42-45.) The necessary implication of this evidence is that Aegis took steps that produced an estimate of ProLift's shear compression value. Importantly, Life Spine need not prove precisely how Aegis reached this result—the fact that Aegis has an estimate for the ProLift's shear compression value when this data is confidential demonstrates that Aegis could only have obtained this information if it attempted to discover "underlying ideas, formats, programming or design of the [ProLift]." (DBA § 8(b)(i).)

Aegis's attempt to knock out Life Spine's evidence as a hearsay document from L&K lacks merit. Although the slide deck in which the figure appears bears the mark "L&K Biomed," the evidence makes clear that an Aegis employee emailed that slide deck to L&K, (see R. 443, PSOF Ex. OO at Aegis 011713), thereby demonstrating both that the document reflects a non-hearsay statement of an opposing party, *see* Fed. R. Evid. 801(d)(2), and that Aegis had agency over the inclusion of the ProLift shear compression value in the slide deck. It matters not that Aegis denies the testing of ProLift ever took place because it is otherwise unable to explain why an estimate for the ProLift shear compression value appears in one of its own documents. (See R. 466, Def.'s Resp. to PSOF ¶¶ 42, 45-48.)

Similarly, whether the figure appearing in Aegis's documents is a correct estimate is irrelevant. (See id. ¶¶ 42, 47.) And although Aegis tries to argue that the shear compression value was publicly available from the FDA upon request because two journal articles were able to obtain access to some data, those journal articles actually reflect aggregated and de-identified data collected precisely to overcome the lack of public access to data about individual devices. (See id. ¶ 45; id. Ex. 26 at 27 ("[P]ublicly available mechanical performance data . . . are scarce. The objective of this study was to increase transparency in the FDA review process by presenting aggregated . . . mechanical testing results."); id. Ex. 27 at 88 ("[P]ublicly available mechanical performance data are scarce.").) In short, the undisputed material facts, even when viewed in the light most favorable to Aegis, demonstrate that Aegis breached Section 8(b)(i) of the DBA.

### 8. DBA Section 12(b)

The last issue exclusively dealing with the DBA concerns Life Spine's effort to obtain declaratory judgment and the assignment of Aegis's rights in its AccelFix-XT, -XL, and -XTP devices under Section 12(b). (See R. 439, PMPSJ Br. at 17-23.) Section 12(b) provides that:

> [a]ny Confidential Information, trade secret (as defined by Illinois law), or other work product developed by [Aegis] during the term of this Agreement shall belong to [Life Spine] if it: (a) involved the use of working time; (b) involved the use of [Life Spine's] equipment, facilities, confidential information or trade secrets; (c) at the time conceived or first reduced to practice, related to [Life Spine's] current or planned business activities; or (d) resulted from work performed for [Life Spine]. Trade secrets include negative know-how, which is information about what [Life Spine] tried that did not work, if that information is not generally known or easily ascertainable by [Life

48

> Spine's] competitors and would give them an advantage in knowing
> what not to do. [Aegis] assigns and agrees to assign to [Life Spine] all
> rights in all [Life Spine's] work product (as just described).

Aegis first argues that this provision is "rife with ambiguity" because it incorporates the definition of "Confidential Information" from Section 7(a) and provides no definition of "work product," "working time," or "developed." (R. 433, DMPSJ Br. at 17.) Aegis then argues that Section 12(b)(c) is an unenforceable restraint on trade because it "effectively eliminates Aegis as a competitor even for ideas or information developed entirely separate from Life Spine." (Id. at 18.) Ultimately, Aegis contends that the court should correct these issues by rewriting Section 12(b) to read "any trade secrets, as defined by Illinois law, created by [Aegis] during the term of this Agreement, shall belong to [Life Spine] if that trade secret was created using [Life Spine's] trade secrets." (Id. (internal citations omitted).)

Aegis's argument that this section is ambiguous lacks merit. Aegis has not explained how any of the words to which it objects could give the contract multiple meanings. The court has already found that "Confidential Information" as defined in Section 7(a) is not ambiguous. The definitions of "work product" and "working time" plainly refer to the results of Aegis's labors and time Aegis spent working to fulfill its obligations to Life Spine. Aegis tries to create an ambiguity by asking how Section 12(b) would treat a hypothetical product that began development before the term of the DBA started and completed development after the DBA expired. (R. 433, DMPSJ Br. at 17-18.) What this hypothetical really asks is whether the definition of "developed" encompasses both "fully developed" and "partially developed." That is not an ambiguity making the contract susceptible to different

understandings, but rather a definitional question for resolution by considering the surrounding language and the "common and generally accepted meanings" of such terms. *RTC Indus.*, 2021 IL App (1st) 200496-U, ¶ 23. "The court will not strain to find an ambiguity where none exists." *Page*, 52 F.4th at 346.

Aegis next argues that Section 12(b)(c) is an unreasonable restraint on trade. (R. 433, DMPSJ Br. at 18.) This subsection assigns work product developed by Aegis during the term of the DBA to Life Spine if that work product, "at the time conceived or first reduced to practice, related to [Life Spine's] current or planned business activities." (DBA § 12(b)(c).) Like Section 8(b), Section 12(b)(c) is a restrictive covenant that seeks to protect Life Spine's intellectual property and, as such, the court analyzes Section 12(b)(c) under the less-stringent business-sale reasonableness standard. Thus, the court must consider whether the restrictive covenant causes injury to the public, creates undue hardship to Aegis, or imposes a restraint greater than necessary to protect Life Spine's legitimate business interests. *See PeopleFlo*, 2021 WL 3129264, at *7. Aegis argues that the Section 12(b)(c) restraint exceeds Life Spine's legitimate business interests by making it impossible for Aegis to develop products or technologies that compete with Life Spine. (R. 433, DMPSJ Br. at 18.) On this point, the court agrees with Aegis.

Contrary to Life Spine's assertions, (see R. 461, Pl.'s Resp. at 15), the plain language of Section 12(b)(c) includes no exception for independently developed work product. Nor does it indicate an intent to prevent Aegis from "using its privileged access to Life Spine's materials and the time that should be spent working on behalf

of Life Spine to engage in activity that would be harmful to Life Spine." (Id.) Instead, subsection (c) seeks to prevent interference with Life Spine's "current or planned business activities." (DBA § 12(b)(c).) The clear intent of such language is to make it exceedingly difficult, if not impossible, for Aegis to enter the market with competing products—even if Aegis developed those products independently from its work under the DBA. This restraint far exceeds whatever legitimate business interests Life Spine has in protecting its confidential and proprietary information or ensuring that Aegis does not misuse Life Spine's information to Life Spine's detriment. Section 12(b)(c) is therefore an unreasonable and unenforceable restraint of trade. *See Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1110 (N.D. Ill. 2016) (finding development of evidentiary record regarding legitimate business interests unnecessary when "the covenant is patently unreasonable").

Finally, although the court finds subsection (c) of Section 12(b) unenforceable, it declines Aegis's invitation to strike all of Section 12(b). The court agrees with Life Spine that such proposal is "not principled," "introduces entirely new language," and deletes subsections (b) and (d) of 12(b) without explanation. (R. 461, Pl.'s Resp. at 16.) As such, the court concludes that because subsection (c) has no purpose beyond inhibiting competition, eliminating that subsection from Section 12(b)—which the court finds otherwise enforceable—is the appropriate remedy. *See Russell Dean*, 2018 WL 4679573, at *6. The court therefore grants Aegis's motion for summary judgment as to any claim for declaratory relief under Section 12(b)(c).

51

And because Life Spine seeks summary judgment on its declaratory judgment claim only under Section 12(b)(c), that motion is denied. (See R. 439, PMPSJ Br. at 17-23.)

## B. Breach of Fiduciary Duty and Constructive Fraud

As for the tort causes of action, the court agrees with Aegis that Life Spine's breach of fiduciary duty and constructive fraud claims are duplicative of its breach of contract claim concerning Section 3(a) of the DBA. The court applies Illinois law to evaluate whether these claims are duplicative. *See DD, Karma LLC v. Paniaguas*, No. 20 CV 1567, 2021 WL 1239198, at *3 n.4 (N.D. Ill. March 25, 2021). In Illinois it is well-settled that courts may dismiss duplicative counts in a complaint where "the claims are based on the same operative facts and the same injury." *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 795-96 (N.D. Ill. 2010).[11] Courts often apply this doctrine to dismiss breach of fiduciary duty claims that are duplicative of breach of contract claims. *See id.* (citing cases); *Golbert v. Aurora Chi. Lakeshore Hosp., LLC*, No. 19 CV 8257, 2021 WL 952528, at *10 (N.D. Ill. March 11, 2021) (citing cases).

---

[11] Although Life Spine argues that the court should also look at "whether the elements of the alleged violations are the same," (R. 461, Pl.'s Resp. at 20 (quoting *Atwater v. McLean Cnty. Orthopedics, Ltd.*, No. 16 CV 1217, 2016 WL 7408816, at *2 (C.D. Ill. Dec. 22, 2016)), Illinois law is explicit—"[t]he relevant inquiry in determining whether claims are duplicative is not whether the claims are composed of the same legal elements, but whether the claims allege the same operative facts and injury . . . or whether the claims are based upon the same alleged conduct." *Nettleton v. Stogsdill*, 899 N.E.2d 1252, 1270 (Ill. App. Ct. 2008).

As Aegis accurately describes, (see R. 433, DMPSJ Br. at 19), Life Spine bases its claims for breach of fiduciary duty and breach of Section 3(a) of the DBA on the same set of operative facts and alleges the same damages for both claims, (see R. 45, First Amended Compl. ¶¶ 107, 113, 123-29; R. 439, PMPSJ at 6-9, 15-16. Life Spine makes no attempt to convince the court otherwise. (See R. 461, Pl.'s Resp. at 21.) Life Spine instead argues that dismissing its breach of fiduciary duty claim would deprive it of the opportunity to seek punitive damages. (Id.) But while Life Spine is generally correct that "punitive damages are not recoverable for breach of contract," an exception exists when "the breach amounts to an independent tort and there are proper allegations of malice, wantonness or oppression." *Morrow v. L.A. Goldschmidt Assocs., Inc.*, 492 N.E.2d 181, 183-84 (Ill. 1986) (internal quotations omitted). Because Life Spine alleges that Aegis willfully breached the fiduciary obligations it agreed to in Section 3(a), (R. 45, First Amended Compl. ¶¶ 127-28), this exception applies and Life Spine's concern is extinguished. Accordingly, Aegis's motion for summary judgment on Life Spine's breach of fiduciary duty claim is granted.

Summary judgment in favor of Aegis is also proper on Life Spine's constructive fraud claim, because Life Spine's briefing treats constructive fraud as indistinguishable from breach of fiduciary duty, (see R. 439, PMPSJ Br. at 16 (quoting *Kovac v. Barron*, 6 N.E.3d 819, 832 (Ill. App. Ct. 2014) ("[B]reach of fiduciary duty is constructive fraud."))). As such, the court concludes that Life

Spine's constructive fraud claim is also duplicative of its Section 3(a) breach of contract claim.

In sum, Life Spine's claims for breach of Section 3(a) of the DBA, breach of fiduciary duty, and constructive fraud are essentially the same claim seeking the same relief. In granting summary judgment in favor of Aegis on the breach of fiduciary duty and constructive fraud claims, the court consolidates those counts with the breach of contract claim for the ease of the litigants and the jury. But the scope of Aegis's liability under Section 3(a) remains unchanged, and the court explicitly finds that Life Spine is entitled to seek punitive damages on its breach of Section 3(a) fiduciary duty claim as discussed above.

## C.    Fraudulent Concealment

Aegis makes three principal arguments in support of summary judgment on Life Spine's fraudulent concealment claim. First, that the claim is duplicative of Life Spine's breach of Section 3(a) and fraudulent misrepresentation claims. (R. 433, DMPSJ Br. at 22.) Second, that "there is no evidence Aegis actively concealed any material facts" because its relationship with L&K was advertised and known in the industry. (Id. at 23.) Third, that undisputed facts show that Life Spine failed to investigate Aegis before signing the DBA, and therefore the alleged concealment stems only from Life Spine's failure to conduct due diligence. (Id.) None of these arguments is persuasive.

As to the first, the fraudulent concealment claim is not duplicative of the breach of Section 3(a) and fraudulent misrepresentation claims. As discussed

above, claims are duplicative if they "are based on the same operative facts and the same injury." *DeGeer*, 707 F. Supp. 2d at 795-96. A review of the elements required to prove these three claims shows that all three involve related, but distinct, facts. To succeed on a fraudulent concealment claim, a plaintiff must show:

> (1) concealment of a material fact, (2) intent to induce a false belief where there exists a duty to speak, (3) that the other party could not have discovered the truth through reasonable inquiry and relied upon the silence as an indication that the concealed fact did not exist, (4) that the other party would have acted differently had it known of the concealed information, and (5) that its reliance resulted in its injury.

*Ashby v. Pinnow*, 179 N.E.3d 295, 304 (Ill. App. Ct. 2020). To succeed on a fraudulent misrepresentation claim, a plaintiff must show "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induces the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Onvi, Inc. v. Radius Project Dev., Inc.*, No. 19 CV 3201, 2022 WL 540796, at *4 (N.D. Ill. Feb. 23, 2022) (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996)). And to succeed on its claim alleging breach of Section 3(a) of the DBA, Life Spine must demonstrate that Aegis violated its duty to maintain custody and control of Life Spine's products in a fiduciary capacity under that section. Thus, these claims put different facts at issue—what Aegis said (fraudulent misrepresentation), what Aegis failed to say (fraudulent concealment), and what Aegis did (breach of Section 3(a)).

As to the second argument, the court agrees with Life Spine that the public nature of Aegis's relationship with L&K is inapposite. (Id. at 24.) In its amended

complaint, Life Spine alleges that Aegis concealed the material facts that it was "using Life Spine's proprietary ProLift devices and confidential information for the purpose of developing AccelFix" and "disclosing Life Spine's proprietary ProLift devices and confidential information to third parties, including L&K." (R. 45, First Amended Compl. ¶¶ 144-45.) Life Spine does not allege as a basis for its fraudulent concealment claim that Aegis hid its relationship with L&K. Aegis's argument therefore constitutes a red herring, and Aegis has failed to demonstrate that "there is no evidence [it] actively concealed any material facts." (R. 433, DMPSJ Br. at 23.)

Aegis's third argument is likewise misplaced. Aegis argues that Life Spine conducted "*no investigation* at all into Aegis prior to signing the DBA and providing Aegis with access to ProLift." (Id. (citing R. 423, DSOF ¶¶ 27-29) (emphasis in original).) Life Spine disputes the factual claim that it conducted "no investigation at all." (See R. 458, Pl.'s Resp. to DSOF at 11-12.) Regardless, Life Spine's fraudulent concealment claim explicitly deals with Aegis's conduct *after* the parties entered into the DBA, and Aegis agreed to the fiduciary obligations in Section 3(a). (See R. 45, First Amended Compl. ¶¶ 144-46; R. 461, Pl.'s Resp. at 25.) Thus, whatever investigation may have occurred before the parties signed the DBA is irrelevant to Life Spine's fraudulent concealment claim because no such investigation could discover that Aegis was misusing "Life Spine's proprietary ProLift devices and confidential information" before Aegis had access to the same. (R. 45, First Amended Compl. ¶¶ 144-45.) As such, Aegis's motion for summary judgment on this claim is denied.

56

### D.    Missing Instruments

Finally, the court turns to the parties' cross motions for summary judgment on claims relating to the 12 missing ProLift instruments, pursuant to which Life Spine seeks to enforce the "late return fee" in Section 3(c) of the DBA against Aegis and to hold Aegis liable in tort for conversion of the missing instruments.  (See R. 481, Def.'s Reply at 12-13; R. 429, PSOF at 15-17.)  There is no dispute that 12 ProLift instruments, which Aegis possessed and failed to return following Life Spine's request, are missing.  (See R. 434, DSOF ¶ 34; R. 458, Pl.'s Resp. to DSOF at 15.)  It is likewise undisputed that Life Spine requested their return on August 1, August 7, and October 1, 2019.  (See R. 440, PSOF ¶ 50; R. 466, Def.'s Resp to PSOF ¶ 50.)

While conceding that it may have lost these instruments, Aegis provides a declaration from its Chief Legal Officer dated September 1, 2022, attesting that it searched for and could not locate the missing instruments.  (See R. 433, DMPSJ Br. at 25; R. 434, DSOF ¶ 38, Ex. 4.)  Life Spine responds that "Aegis has never previously stated . . . that it broke[ ] or misplaced any implants or instruments." (R. 458, Pl.'s Resp. to DSOF at 17; see also R. 440, PSOF ¶ 52; R. 459, PAMF ¶ 12.) Life Spine also points to evidence that the missing instruments were shipped to Aegis and that Aegis therefore had possession before Life Spine's 2019 requests for their return.  (See R. 439, PMPSJ Br. at 17; R. 440, PSOF ¶¶ 50-51.)  Aegis disputes the assertion that it never previously informed Life Spine the instruments were

lost, citing for support an October 19, 2019 internal email referring generally to "lost instruments.". (See R. 466, Def.'s Resp. to PSOF ¶ 52.)

Based upon these facts, Life Spine seeks to enforce the late return fee in Section 3(c) of the DBA against Aegis. That section says, "[w]hen [Life Spine] requests Product to be returned to [Life Spine], [Aegis] must return Product within 72 hours of request. If Product is not returned [Aegis] shall immediately become liable at a daily fee of $250.00. The fee will begin after 72 hours from initial [Life Spine] request." (DBA § 3(c).) Life Spine contends that Aegis has been accruing fees under Section 3(c) since it requested return of these instruments in 2019 and that Aegis now owes more than $3 million in late fees. (See R. 439, PMPSJ Br. at 9, 15.) But Aegis also seeks summary judgment, contending that liability for missing instruments must be calculated under Section 3(a) and that Section 3(c)'s late fee constitutes an unenforceable penalty under Illinois law. (See R. 433, DMPSJ Br. at 13-15.)

The court considers the last argument first. Under Illinois law, "a liquidated damages clause is valid and enforceable if: (1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages that might occur; and (3) actual damages would be uncertain in amount and difficult to prove." *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 863 (7th Cir. 2020). "The burden of proof rests on the party resisting enforcement of a liquidated damages clause to show that the agreed-upon damages

are clearly disproportionate to a reasonable estimate of the actual damages likely to be caused by a breach." *Id.* (internal quotations omitted).

Aegis contends that Section 3(c)'s late fee provision is unenforceable because Life Spine admitted in deposition testimony that the purpose of Section 3(c) was to deter Aegis from breaching the DBA and because Life Spine now seeks millions of dollars in late fees. (R. 433, DMPSJ Br. at 14-15.) But there is no ambiguity in Section 3(c) and so the court must determine the parties' intent from the plain language of the contract. *See Platinum*, 989 F.3d at 563. That language shows that "the parties intended to agree in advance to the settlement of damages that might arise" from Aegis's failure to return requested Products within the allowed 72-hour window. *Smart Oil*, 970 F.3d at 863. Furthermore, although Aegis laments the large amount now requested by Life Spine, it makes no effort to explain how the agreed-upon $250 per day late fee "is clearly disproportionate to a reasonable estimate of the actual damages likely to be caused by a breach." *Id.* As Aegis has failed to meet its burden, the court declines to find that Section 3(c) is an unenforceable penalty under Illinois law.[12] *See NAR Bus. Park, LLC v. Ozark Auto. Distribs., LLC*, 430 F. Supp. 3d 443, 459 (N.D. Ill. 2019) ("[R]easonable per-diem liquidated damages that vary by the length of delay are generally enforceable.").

-----

[12] Aegis's argument is essentially that a reasonable liquidated damages clause can turn into an unreasonable penalty if the offending party delays so long that the liquidated damages far exceed actual damages. To prevent such bad faith gamesmanship, the legal standard explicitly focuses on the reasonable expectations of the parties at the time they agreed to the liquidated damages clause. *See Smart Oil*, 970 F.3d at 863; *NAR*, 430 F. Supp. 3d at 459.

But the court agrees with Aegis that the DBA imposes liability for missing instruments according to Section 3(a), not Section 3(c).  Section 3(a) provides in relevant part that "[Aegis] will bear the sole and entire risk and responsibility for all" inventory provided to it by Life Spine and that "[Aegis] will be responsible for any shortage of or damages to the Inventory and/or missing implants and instruments from Sets, assessed at fifty percent (50%) of [Life Spine's] List Price over a calculated annual shortage allowance."  (DBA § 3(a).)  This language is not ambiguous—Aegis is "responsible for *any shortage of* or damages to the Inventory and/or *missing implants and instruments* from Sets" according to the formula established in that section.  (Id. (emphasis added).)  To be sure, Merriam-Webster defines "shortage" as "lack, deficit."  *Shortage, noun*, Merriam-Webster, https://www.merriam-webster.com/dictionary/shortage (last visited Jan. 20, 2022).

Thus, Section 3(a)'s plain language makes clear that it applies to "any" lack or deficit of product.  By contrast, applying Section 3(c) to missing product would require the impossible—Aegis can never return instruments it does not have, and so it would accumulate late fees in endless perpetuity under that section.  Illinois law directs courts to "reasonably interpret[ contracts] to avoid absurd results" such as this.  *Vill. of Kirkland v. Kirkland Props. Holding Co., LLC I*, 2022 IL App (2d) 200780, ¶ 28.  Reading the DBA as a whole and giving effect to all of its provisions as this court must, *see Bray v. City of Chi.*, 2022 IL App (1st) 201214, ¶ 31, a more reasonable interpretation is that Section 3(c) applies when Life Spine requests the return of product within Aegis's possession or control while Section 3(a) anticipates

that the loss or shortage of some inventory is unavoidable and allocates risk accordingly. The court notes, however, that these two clauses are not mutually exclusive. If Aegis had possession of instruments, failed to return them to Life Spine upon request, and then lost them, it would be liable for the daily late fees under Section 3(c) for the period it had possession but failed to return them and the specified amount under Section 3(a) for losing the instruments.

Before examining the facts in light of this contractual framework, the court considers how Life Spine's conversion claim and Aegis's arguments regarding the same further complicate the landscape. Aegis argues that the conversion claim is duplicative of Life Spine's efforts to enforce Section 3(c) and that there is no evidence Aegis assumed unauthorized control of Life Spine's property. (R. 433, DMPSJ Br. at 24-25.) The court again reiterates that claims are duplicative only if they "are based on the same operative facts and the same injury." *DeGeer*, 707 F. Supp. 2d at 795-96. To prevail on its conversion claim, Life Spine must prove that "(1) [it] has a right to the property; (2) [it] has an absolute and unconditional right to the immediate possession of the property; (3) [it] made a demand for possession; and (4) [Aegis] wrongfully and without authorization assumed control, dominion, or ownership over the property." *Fujifil N. Am. Corp. v. D/C Export & Domestic Packing, Inc.*, 339 F. Supp. 3d 790, 801 (N.D. Ill. 2018). As Life Spine rightly points out, unlike conversion, liability under Section 3 requires no showing that Aegis "assumed control, dominion, or ownership over the property." (R. 461, Pl.'s Resp. at 25.) Accordingly, the claims are not duplicative.

But Aegis correctly points out that Life Spine must do more than simply demonstrate that "Aegis has not returned the instruments" to show unauthorized control. (Id. at 25; see R. 433, DMPSJ Br. at 25.) Indeed, Illinois law requires "an intentional exercise of dominion or control over a chattel," and makes clear that "an act which is merely negligent is not sufficient to establish conversion." *Fujifil*, 339 F. Supp. 3d at 801 (citing cases). Importantly, however, refusal of a request to return property to someone entitled to its immediate possession establishes this element if the refusing party had possession of the property at the time of the demand. *See Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998); Restatement (Second) of Torts § 237 (Amended L. Inst. 1965). Furthermore, such refusal need not be made in express terms. *See* Restatement § 237 cmt. g. ("Equivocation, or a denial that the defendant has the chattel, or even a promise to surrender it which is broken immediately without excuse, or a failure to reply at all to the demand may be enough to amount to a refusal," although "[s]uch questions are frequently for the jury.")

There can be no dispute that Aegis no longer has the instruments at issue. (See R. 434, DSOF ¶ 38.) Even if Aegis never previously told Life Spine that the instruments were missing, Life Spine points to no evidence that would allow a reasonable jury to conclude otherwise. (See R. 458, Pl.'s Resp. to DSOF at 17.) Accordingly, Aegis is liable for the instruments in accordance with the formula set forth in Section 3(a). (See R. 433, DMPSJ Br. at 13-14.)

But this is not the end of the story because the parties present conflicting evidence regarding what transpired before Aegis's September 1, 2022 statement that it could not locate the instruments. (R. 434, DSOF ¶ 38, Ex. 4.) On this record, a reasonable jury could conclude that Aegis lost the missing instruments in the ordinary course of business prior to Life Spine's 2019 requests for their return. In such a case, any liability belonging to Aegis would be calculated only under the Section 3(a). Alternatively, a reasonable jury could conclude that Aegis possessed the missing instruments when Life Spine requested their return on August 1, 2019, but for some unintentional reason lost possession of the devices thereafter and was unable to return them. If the jury can identify a period for which Aegis possessed the devices and failed to return them despite Life Spine's request, Aegis's potential liability would be calculated according to the Section 3(a) for losing the instruments and the late return clause of Section 3(c) for not returning them during the time it had possession.

A reasonable jury could also conclude that Aegis possessed the instruments at the time of Life Spine's requests, intentionally refused to return them at that time (as evidenced by Aegis's failure to inform Life Spine the instruments were missing until the September 1, 2022 declaration), and then lost the instruments at some time in the intervening years. Only this scenario would involve a finding that Aegis exercised intentional control over the instruments. *See* Restatement, § 237 cmt. f, g. In such circumstances, Aegis would have liability under the DBA— according to the Section 3(a) and Section 3(c) for the duration of any period in which

the jury could conclude Aegis had possession of the instruments but did not return them—and in tort for conversion. As the jury must decide these issues of material fact, the court cannot grant summary judgment for either party on Life Spine's Section 3(c) late return fee or conversion claims.

Finally, Aegis asks the court to conclude that it owes Life Spine nothing under the Section 3(a) formula. (Id.) Under this formula, Aegis would owe money only if 50% of the total list price of the missing instruments is greater than an annual shortage allowance of 1% of Aegis's 12-month Net Sales Revenue. (DBA § 3(a).) The DBA defines "Net Sales Revenue" as "the revenues actually collected by [Life Spine] on Sales of Products by [Aegis] . . . less all taxes and assessments, including sales tax, and less prompt payment discounts and credited returns." (Id. § 1(c).) Aegis and Life Spine reach different calculations as to the value of the annual allowance. (See R. 434, DSOF ¶ 36; R. 458, Pl.'s Resp. to DSOF at 16-17.) But because only Life Spine's proposed calculation is based upon the revenues Life Spine collected as required by the DBA, a reasonable jury could only adopt Life Spine's proposed figure. (R. 458, Pl.'s Resp. to DSOF at 16-17.)

Aegis and Life Spine also reach different estimates as to the 50% of total list price value. (See R. 434, DSOF ¶ 35; R. 458, Pl.'s Resp. to DSOF at 15-16.) As both estimates exceed the annual allowance calculated by Life Spine, the court cannot conclude that Aegis owes nothing under the Section 3(a) formula. However, because Aegis and Life Spine use different methodologies to reach their estimates, this court cannot weigh between the two alternatives. (Compare R. 434, DSOF, Ex. 5 at 3-4

with R. 458, Pl.'s Resp. to DSOF at 15-16.)  The jury will need to decide which methodology and estimate is more credible and accurate.  Under the Section 3(a) formula, Aegis will then owe Life Spine an amount equal to the difference between the estimate selected by the jury and the annual allowance as calculated by Life Spine in its response to Aegis's statement of facts.

## Conclusion

For the foregoing reasons, Aegis's motion for partial summary judgment is granted as to Life Spine's claims for breach of Section 12(b)(c), breach of fiduciary duty, and constructive fraud, but denied as to Life Spine's claims for breach of Sections 3(a), 3(c), 7(a), 7(b), and 8(b), fraudulent concealment, and conversion.  Life Spine's cross motion is granted as to its claims for breach of Sections 3(a), 7(a), 7(b), and 8(b) of the DBA, but denied as to its claims for breach of Section 3(c) and Section 12(b)(c), breach of fiduciary duty, constructive fraud, and conversion.  Accordingly, of the claims at issue in the parties' partial cross motions for summary judgment, only Life Spine's claims that Aegis is liable for breach of Section 3(c) of the DBA, fraudulent concealment, and conversion proceed to trial, as do its claims for damages under Section 3(a), 7(a), 7(b), and 8(b).

ENTER:

Young B. Kim
United States Magistrate Judge

65