## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **LIFE SPINE, INC.,** | ) | **No. 19 CV 7092** |
| **Plaintiff,** | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| **AEGIS SPINE, INC.,** | ) | |
| **Defendant.** | ) | **April 13, 2023** |

### MEMORANDUM OPINION and ORDER

Plaintiff Life Spine, Inc. ("Life Spine") alleges that Defendant Aegis Spine, Inc. ("Aegis") stole confidential information and breached contractual obligations in developing the AccelFix-XT ("XT"), a medical device that directly competes with Life Spine product the ProLift Expandable Spacer System ("ProLift"). Before the court are Life Spine's three motions to exclude Aegis's experts Brad Culbert's, Erick Antonsson's, and John Jarosz's rebuttal opinions. For the following reasons,[1] each motion is granted in part and denied in part:

---

[1] The court reviewed sealed information the parties submitted when ruling on the motions and, thus, made efforts to avoid disclosing confidential information in this opinion unless such disclosure was necessary to explain its ruling.

## Background[2]

This is an action between two medical device companies that develop and market "expandable cage" spinal implants. (R. 494, Mem. Op. and Order at 2.) Life Spine's relevant product is the ProLift and Aegis's relevant product is the XT, a similar device manufactured by its South Korea-based parent company, L&K Biomed Co., Ltd. ("L&K"), in which Aegis claims intellectual property rights. Aegis distributed and sold XT from September 2019 until this court enjoined its sale in March 2021, and distributes other L&K expandable cage products, including the AccelFix-XL ("XL") and the AccelFix-XTP ("XTP"). (Id.)

Aegis and L&K began discussing the need to develop an expandable cage product in spring 2016, and then Aegis proposed to Life Spine in fall 2017 that it serve as a ProLift distributor. (Id. at 2-3.) The parties then executed a confidentiality and loaner agreement, and Life Spine sent Aegis a ProLift device for demonstration purposes. (Id. at 3.) In January 2018 the parties entered into an agreement authorizing Aegis to sell and distribute ProLift. (Id.) But Life Spine says Aegis engaged in duplicitous conduct to steal its confidential information and gain a competitive edge in connection with the design and development of XT, which violated the parties' agreements. (Id. at 4.) And in September 2019 Aegis ceased selling ProLift in favor of XT.

---

[2] The court's January 30, 2023 ruling on the parties' cross motions for partial summary judgment includes additional facts of this case. (R. 494.)

Life Spine filed this lawsuit in October 2019 and moved for a preliminary injunction enjoining Aegis from marketing and selling the XT during the pendency of the case. In August 2020 Life Spine's medical device expert, John Ashley, submitted a report in support of Life Spine's motion, opining on the extent to which Life Spine's ProLift products and associated information were used in the design and development of XT ("Opening Report"). Before the nine-day preliminary injunction hearing, Aegis did not submit its own expert report challenging Ashley's opinions. This court granted Life Spine's preliminary injunction motion in March 2021.

In February 2022 the court issued a schedule requiring the parties to serve their opening expert reports by June 17, 2022, and rebuttal expert reports by July 22, 2022. (R. 374.) Ashley submitted a supplemental report in June 2022 ("Supplemental Report") opining as to: (1) whether any information he had reviewed since his Opening Report caused him to withdraw or change any of his opinions; and (2) whether and the extent to which ProLift products and associated information were also used in the design and development of Aegis's XL and XTP products. In response Aegis disclosed expert reports from Culbert (medical device expert) and Antonsson (engineering and design expert). Aegis also disclosed a report from Jarosz (damages expert) to rebut the opinions of Life Spine's damages expert, Kevin Montague.

## Analysis

Life Spine moves to exclude portions of Culbert's, Antonsson's, and Jarosz's rebuttal opinions. This court has "broad latitude" in determining the admissibility of expert opinions, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999), provided it applies the framework set forth in Federal Rule of Evidence 702, *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 430-31 (7th Cir. 2013). That rule permits testimony from a qualified expert if:

> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)  the testimony is based on sufficient facts or data;
> (c)  the testimony is the product of reliable principles and methods; and
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

*See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589-91 (1993). In short, a proposed expert must be qualified, and the expert's testimony must be "relevant and reliable." *Kumho Tire*, 526 U.S. at 141. The expert's proponent bears the burden of showing that these requirements are met. *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

To determine whether an expert is qualified, the court compares "the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). An expert's testimony is relevant if it "assist[s] the trier of fact with its analysis of any of the issues involved in the case." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). And the expert's opinion is reliable if it is based in

4

the knowledge and experience of the applicable discipline, *Kumho Tire*, 526 U.S. at 149, which is the case if the expert's theory "can be (and has been) tested," "has been subjected to peer review and publication," "has a known potential rate of error," and is "generally accepted in the relevant scientific community," *Schultz*, 721 F.3d at 431 (citing *Daubert,* 509 U.S. at 593-94). At bottom, "the key to the gate is not the ultimate correctness of the expert's conclusions," but rather "the soundness and care with which the expert arrived at her opinion, focusing 'solely on principles and methodology, not on the conclusions they generate.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). If the methodology is reliable, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596). In addition, rebuttal opinions must be offered to "contradict or rebut evidence on the same subject matter identified by another party," Fed. R. Civ. P. 26(a)(2)(D)(ii), and thus may not simply "provide additional support for [a party's] case in chief," *Noffsinger v. The Valspar Corp.*, No. 09 CV 916, 2011 WL 9795 at *6 (N.D. Ill. Jan. 3, 2011).

## A.    Brad Culbert

At the outset, Life Spine moves to exclude medical device expert Culbert's rebuttal opinions that: (1) 10 months is not an "uncharacteristically short" amount of time to design, develop, and test a company's first expandable cage device before

submitting a 510(k) application to the FDA[3] ("10-months opinion"); and (2) there is nothing "peculiar" about the manner in which the XL and XTP design history files ("design files") were developed that would justify Ashley to question whether Aegis and L&K accurately recorded those devices' design histories ("design-file opinion").

### 1. 10-Months Opinion

Ashley opines that the 10 months it took Aegis's XT team to design, develop, and test the XT before filing a 510(k) application was "uncharacteristically short," citing the more than 20 months his team at CoAlign Innovations, Inc. ("CoAlign") took to achieve the same milestone with their own expandable spinal cage device. (R. 435, Pl.'s Mot. to Exclude Culbert Ex. B at 14-16.) But Culbert says otherwise, explaining that it took his team at Interventional Spine ("Inter-Spine") 10 to 11 months on the same process for its device. He further explains that: (1) at that time there was no device with the same lifting mechanism on the market; (2) Inter-Spine's device was the primary predicate for ProLift and includes the same five basic components as ProLift and the XT; and (3) by contrast the device Ashley and CoAlign developed incorporated an entirely different, pneumatic lifting mechanism. (Id. Ex. A at 27, 31-32.) In other words, Culbert says Ashley is comparing apples to oranges.

---

[3] A company must seek clearance from the FDA before introducing a new medical device into interstate commerce. The 510(k) clearance process allows a company to gain that clearance by showing that its device is "substantially equivalent" to an already-approved predicate device in the market. *See* 21 U.S.C. § 360(k); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 478 (1996).

But Life Spine points out that Inter-Spine submitted two 510(k) applications for its device because the first—submitted after the 10- to 11-month period Culbert references—was rejected.  As a result of the initial rejection, Life Spine contends that time spent before that submission is irrelevant and Culbert's opinion would confuse the jury if permitted to be offered.  (Id. at 5-6.)  Aegis counters that Ashley's opinion was not that 10 months to successful 510(k) application was "uncharacteristically short," but rather that 10 months was "too short of a time to go through . . . development, testing, and submission."  (See R. 462, Def.'s Resp. at 5-7.)  By its own terms, Ashley's opinion supports Aegis's interpretation.  (R. 435, Pl.'s Mot. to Exclude Culbert Ex. B at 14 ("An application for FDA 510(k) clearance for [XT] was filed after an uncharacteristically short overall period of design, development, and testing."), 15 ("In my opinion, ten months—from reviewing initial designs to seeking regulatory approval—is an uncharacteristically short overall period of time . . . to have independently designed, developed, and successfully tested [XT]."), 16 ("In contrast . . . it took . . . my team at CoAlign over 20 months to move from our initial design . . . to filing our 510(k) application."))

Further, even if the court reads a 510(k)-approval requirement into Ashley's report, it would not render Culbert's opinion irrelevant.  Culbert explains that the initial application was rejected because "[a]s one of the first expandable cages seeking FDA approval . . . the FDA sought clinical testing data to ensure the cage would function properly upon insertion."  (See id. Ex. A ¶ 49.)  It is difficult to imagine anything more relevant than the time it took to design, develop, and test a

device largely akin to ProLift and the XT before anything similar was in the market. That the device did not receive clearance initially cannot prevent the jury from hearing about the process, learning why the application did not pass muster, and judging for itself how to weigh this opinion evidence.

Life Spine also argues that Culbert's opinion about what happened after Inter-Spine's initial 510(k) application was rejected must be excluded as unreliable because Culbert was no longer employed with Inter-Spine—and had not been for months—when its device ultimately received clearance. (Id. at 6-8.) Life Spine complains that Culbert thus has no basis to opine that Inter-Spine "did not spend additional time" beyond the initial 10 to 11 months of work associated with its first application designing, developing, and testing its device before filing its second, ultimately successful 510(k) application. (Id. at 7.) On this point, Culbert explains that Inter-Spine tabled its work on the device when the initial 510(k) application was rejected and had yet to resume it by the time he left Inter-Spine in early 2010. Culbert's report also includes the following:

> 50. Years later, as more and more expandable cages began to enter the market, [Inter-Spine] revived the Opticage project. While I was no longer at [Inter-Spine] at this time, I was aware that [Inter-Spine] later resumed work on the Opticage and ultimately obtained FDA approval. I have received the publicly available information associated with the subsequent 510(k) submission for Opticage, filed on November 27, 2011 (K113527). It appears that no clinical testing data was required for this later submission, as [Inter-Spine] was able to instead identify clear predicate devices that had already completed this process. As seen in the pictures included in the publicly available marketing materials for Opticage (right), the device depicted in the '382 Patent figures (left) appears to be the device that was brought to market.

(R. 462, Def.'s Resp. at 8-9.) The court agrees with Aegis that Life Spine's characterization of Culbert's testimony on this point is misleading. While Culbert lacks firsthand knowledge of what transpired after he left Inter-Spine, he does know that: (1) the initial 510(k) application was rejected because of the lack of clinical testing data; (2) the 510(k) application the FDA ultimately accepted makes no mention of clinical testing data, but identifies two predicate devices that received 510(k) clearance in the interim period; and (3) marketing photos of the approved version of Inter-Spine's device show the figures from the patent application describing the device Culbert invented years earlier. The jury can draw the inferences it feels are warranted based on this information, which is both relevant and reliable, and address the issue of whether, and if so, how much, additional development and testing occurred between the FDA's initial rejection of Inter-Spine's first application and the FDA clearance years later in November 2011.

In short: (1) Culbert designed, tested, and submitted a device with the same mechanism in as much time as Aegis purports to have spent doing the same with respect to the XT; (2) unlike the XT, Culbert's design was the first of its kind but his team still managed to develop the device in 10 to 11 months; and (3) Ashley's opinion is based on the timeframe to design, test, and submit a device with a mechanism different from ProLift and XT. While it is undisputed that Culbert's device did not pass its first attempt at FDA clearance, that distinction is fertile ground for cross-examination, and the court is confident that the jury can follow

along without confusion. Life Spine's motion is denied as to Culbert's 10-months opinion.

### 2.    Design-File Opinion

Life Spine challenges Culbert's design-file opinion—that there is nothing "peculiar" about the way certain XL and XTP design files were developed that could reasonably cause Ashley to question the accuracy of the design history the files purport to record. This dispute centers on Ashley's opinion that the XL and XTP design files:

> discuss the dovetail issue in a manner that strikes me as highly peculiar assuming the design team intended merely to record the design history of its products. Indeed, it appears that the files were written for the purpose of attempting to establish that the design team relied exclusively on publicly-available information—specifically, the '382 [Inter-Spine] Patent—to arrive at the design and dimensions of the AccelFix dovetail.

(R. 435, Pl.'s Mot. to Exclude Culbert Ex. C at 19.) Ashley points out that the files: (1) state 18 times that the design team relied on the "published" Inter-Spine patent to design the expansion mechanism and dovetail, which Ashley said there was no reason to have indicated; (2) reiterate that dovetails are "widely" or "commonly" used in various industries, including the medical device industry, which Ashley states he could "think of no purpose related to engineering or recording design history" to have done; and (3) include two definitions of "dovetail" that were copied and pasted from internet sources, something Ashley says neither he nor any member of his design teams had ever done in his 30 years in the field. (See id. Ex. C at 19-20.)

In rebuttal, Culbert opines in his report as follows:

> Given the fact that Mr. Ashley and I are reviewing design history files prepared in the Korean language, with portions translated into English language (and as indicated in the certificate of translation, by individuals other than the original authors) and by a design team operating in a different culture, there is no scientific basis for Mr. Ashley's conclusion that the design history files were "written for the purpose of attempting to establish that the design team relied exclusively on publicly available information." In my review of the design history files, they detail analysis of public information and internal design work.

(Id. Ex. A at 30.)

Life Spine contends that Culbert's opinion on this point improperly relies on unidentified differences between American and Korean culture and a suggestion that there may be translation errors despite that Culbert is not an expert in Korean culture or language and cannot read Korean. As such, Life Spine argues that Culbert is unqualified to offer an opinion based on the same, which opinion is also unreliable. Aegis responds that these are mere "facts" upon which Culbert may reach a conclusion. The court agrees with Life Spine that Culbert's testimony on Korean culture and language exceeds the scope of Rule 702, because he does not ground his statement in any expertise relating to medical device development or his relevant discipline, *see Kumho Tire*, 526 U.S. at 149, and is not qualified to suggest that the jury should discount Ashley's opinion based upon translation issues and cultural differences. Accordingly, Culbert's design-file opinion must be excluded.

## B.   Erik Antonsson

Life Spine moves to exclude rebuttal opinions by Aegis's engineering and design expert, Antonsson, indicating that: (1) the ProLift installer could not safely

implant an XT cage during surgery; (2) ProLift's outer dovetail radius cannot be a trade secret; (3) Life Spine's trade secrets are not reflected in the XT; (4) the XL and XTP devices have certain measurements; and (5) the timeline in which L&K developed the AccelFix devices was not uncharacteristically short.

### 1. Compatibility

Life Spine argues that Antonsson's opinion that the ProLift installer could not be used to safely implant an XT cage during surgery exceeds the scope of permissible rebuttal testimony because Ashley opines only that the ProLift installer "can be used to attach and expand the [XT] implant," and says nothing whatsoever about doing so during surgery. (R. 436, Pl.'s Mot. to Exclude Antonsson at 5-6.) But even so, Antonsson's opinion directly challenges Ashley's claim that the two devices are compatible, so it is proper. *See Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008) ("The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party.").

Life Spine next questions the reliability of Antonsson's opinion and his qualifications to give it. (R. 436, Pl.'s Mot. to Exclude Antonsson at 6-7.) Life Spine does not challenge Antonsson's qualifications to opine that when the ProLift installer is used with the XT implant cage the "[XT] implant can angle up and down by approximately +/-10 degrees." (Id. Ex. A at 17.) Nor could it given that Antonsson has a Ph.D. in mechanical engineering and has been certified as an expert witness in numerous cases as to the engineering of various devices, including spinal implants. But Life Spine is correct that Antonsson goes on to conclude that

this flex means that surgical insertion is not safe without explaining the basis for that opinion. Because Antonsson lacks the "superior knowledge, skill, experience, or education" to offer this opinion and does not explain the basis for it, it is excluded. *Gayton*, 593 F.3d at 616; *see also Kumho Tire*, 526 U.S. at 149 (holding that where an expert's "factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline'" (quoting *Daubert*, 509 U.S. at 592)).

### 2. Legal Conclusion

Life Spine argues that Antonsson improperly offers a legal conclusion that the ProLift's outer dovetail radius cannot be a trade secret. (R. 436, Pl.'s Mot. to Exclude Antonsson at 7.) Aegis responds that Antonsson addresses only "whether the factors identified by" Ashley—including ProLift's dovetail radius—"are in fact secret," which is "appropriate and expected" expert testimony in a trade secret case. (R. 463, Def.'s Resp. at 7 n.1 (citing *U.S. Gypsum Co. v. Lafarge N. Am. Inc.* ("*Gypsum I*"), 670 F. Supp. 2d 748, 762 (N.D. Ill. 2009)).) The court agrees with Aegis. "Expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible" in a jury trial. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Yet that an expert "uses certain terms that also have legal import is not a reason, by itself, to bar his opinions," *Georgia-Pac. Consumer Prods. LP v. Kimberly-Clark Corp.*, No. 09 CV 2263, 2010 WL 1334714, at *6 (N.D. Ill. March 31, 2010), provided those opinions relate "to a

13

central contested fact" and the terms are "common" and "in everyday usage," *U.S. Gypsum Co. v. LaFarge N. Am. Inc.* ("*Gypsum II*"), 670 F. Supp. 2d 768, 774 (N.D. Ill. 2009). That is the case here.

To be sure, Illinois law defines "trade secret" as information that "is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). Antonsson's opinion does not use the term "trade secret." (R. 436, Pl.'s Mot. to Exclude Antonsson Ex. A at 21.) Instead, Antonsson says in his report:

> [B]ecause the [ProLift's] outer dovetail radius can be selected and manufactured using a commercially available tool bit without any need for experimentation, in my opinion the . . . outer dovetail radius is neither secret (it is in the public domain, a standard size for such external radii, and commercially available) nor could a dovetail maker derive any independent economic value from making this selection.

(Id.) And while certain phrases he does use—"commercially available" and "independent economic value"—appear in trade secret cases, Antonsson's testimony bears on factual, not legal conclusions. Courts in this district have allowed similar testimony. *See Gypsum I*, 670 F. Supp. 2d at 756 (permitting non-legal expert to testify on "what information was generally available" and "what regularly constitutes a trade secret" in relevant industry); *Gypsum II*, 670 F. Supp. 2d at 774-75 (noting that court was "not troubled" by non-legal expert's use of "misappropriate" in opining that defendants wrongfully obtained the plaintiff's private information, instructing only that expert use "other common words" to

14

describe facts and limit use of words and phrases that may "express a conclusion that falls within the jury's purview"); *Georgia-Pac.*, 2010 WL 1334714 at *6 (holding that experts may "offer testimony that 'embraces an ultimate issue to be decided by the trier of fact'" and "reference[] various statutes and use[] certain terms that also have legal import" if they do not opine on ultimate issue).

Life Spine nonetheless notes that the court in *Caudill Seed & Warehouse Company, Inc. v. Jarrow Formulas, Inc.* found impermissible opinions that "an item . . . is 'generally known' or 'readily ascertainable.'" (See R. 436 at 7 (quoting *Caudill Seed*, No. 13 CV 82, 2019 WL 1435934, at *3-5 (W.D. Ky. March 29, 2019)).) But Antonsson does not offer such opinions—and even the court in *Caudill Seed* recognized that an expert may "provide facts and analysis which lead the jury toward [a legal] conclusion" if he "avoid[s] utilizing legal terminology and statutory terms of art to the extent possible." 2019 WL 1435934 at *4. As such, the court declines to exclude Antonsson's dovetail opinion on this basis.

Life Spine also challenges the reliability of the dovetail opinion, arguing that the fact that a dovetail radius could be milled using a commercially available tool bit does not mean that the "tools Life Spine uses . . . are publicly known," the ProLift is indeed manufactured using that tool, or the dimensions of ProLift's dovetail radius are publicly known or could never be afforded trade secret protection. (R. 475, Pl.'s Reply at 4.) But these challenges go to weight, not reliability.

### 3.    XT Device

Life Spine asserts that Antonsson's opinion that its trade secrets are not reflected in the XT devices is an inadmissible legal conclusion on "the ultimate question[] of misappropriation." (R. 436, Pl.'s Mot. to Exclude Antonsson at 8, Ex. A ¶¶ 3, 78-100).) But Antonsson's testimony says nothing about misappropriation. He simply compares the measurements of the aspects of ProLift that Life Spine identified as trade secrets with the corresponding features of XT. (See id. Ex. A ¶¶ 78-100.) Life Spine may not like that Antonsson's opinions run counter to Ashley's opinion that "the five fundamental components of ProLift and [XT] are substantially identical," (id. Ex. B at 20), but that does not make the opinion improper, cf. *O.M.A., S.r.l. v. Simon DeYoung Corp.*, No. 10 CV 00861, 2014 WL 587171, at *5 (N.D. Ohio Feb. 14, 2014) (denying defendant's summary judgment in part because plaintiff's expert opined that defendant's machine was a "knock-off copy" based on measurements reflecting "close duplication" of "nearly all the essential" dimensions of plaintiff's machine); *see also Kinergy Corp. v. Conveyor Dynamics Corp.*, No. 01 CV 211, 2003 WL 26110512, at *9 (E.D. Mo. Oct. 14, 2003) (permitting expert testimony that although machines at issue were "fairly similar in appearance," there were enough differences in dimensions to conclude that defendant's was "not an exact copy").

Life Spine also suggests that the measurements would not be helpful to the jury, which could measure and compare the dimensions itself, and points out that trade secret misappropriation does not require "an exact, one-to-one match between

16

the trade secret misappropriated and the accused product(s)." (R. 475, Pl.'s Reply at 5.) But Life Spine's own expert references the similarity of certain dimensions across the ProLift and AccelFix devices. (See, e.g., R. 436, Pl.'s Mot. to Exclude Antonsson Ex. B at 12 (noting that the specifications between the ProLift and XT components' structure "are approximately the same"), Ex. C at 12 (noting that dovetail for the AccelFix devices and ProLift had "remarkably similar" dimensions), 22 (noting inside radius of AccelFix and ProLift devices' dovetails were "nearly identical").) And similarity is certainly relevant to a misappropriation inquiry. *See Sokol Crystal Prods., Inc. v. DSC Commc'ns. Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994) (holding that it was "entirely reasonable" for the jury to infer that defendant used plaintiff's trade secret given similarity between products); *see also Am. Can Co. v. Mansukhani*, 742 F.2d 314, 330 (7th Cir. 1984) ("In most instances, the close similarities between [two] products would no doubt support findings that trade secrets had been misappropriated."). Because dimensional similarities (or differences) are one factor in the misappropriation analysis, it is proper for the experts to compare technical measurements. *See Kinergy Corp.*, 2003 WL 26110512, at *9 (concluding that dimensional comparisons were "based upon [the expert's] expertise in the field and may aid the jury in understanding the technical drawings that are expected to be admitted," and were relevant "even if an exact duplication is not required by trade secrets law"); *see also Flotec, Inc. v. S. Rsch, Inc.*, 16 F. Supp. 2d 992, 1002-03 (S.D. Ind. 1998) (comparing dimensions and

tolerance measurements to conclude that they were not trade secrets to support preliminary injunction).

Life Spine adds that Antonsson's dimension opinion is unreliable because he did not review other evidence demonstrating Aegis's access to confidential ProLift information. (R. 436 at 9-10.) But again, Antonsson opines only that the XT does not reflect the measurements Life Spine claims are trade secrets—not that Aegis did not engage in misappropriation. Accordingly, this is no basis for exclusion.

### 4. XL and XTP Devices

Life Spine next seeks to exclude Antonsson's opinions regarding the XL and XTP devices because he "did not perform a thorough analysis related to those devices." (R. 436, Pl.'s Mot. to Exclude Antonsson at 10, Ex. D at 173-74.) For support, Life Spine points to the following deposition testimony:

Q:   Did you review the XTP design history file to produce your work in this case?
A:   My focus was on the XT, and so I was aware of the design history files for those other devices, but I focused on the XT.

*   *   *

Q:   I'm asking you, did you review the XTP design history file for purposes of your work in this case?
A:   Again, I was aware of it. I didn't read it closely because of my focus on the XT device.
Q:   All right. You didn't read the XTP design history file closely?
A:   That's correct.
Q:   Did you read the XL design history file closely?
A:   No. Same answer.

(Id. at 10-11.) Aegis complains that Life Spine selectively quotes from Antonsson's deposition, omitting testimony indicating that Antonsson did in fact review the XL

18

and XTP design files and relied on them in forming his opinions, albeit to a lesser degree than for XT. (R. 463, Def.'s Resp. at 10-11.) The court agrees with Aegis and notes that although Antonsson admits to having more details about XT, he still was able to take certain measurements of XL and XTP, and his opinion simply compares those measurements to XT and ProLift. Any issue with the accuracy of those measurements can be addressed during cross-examination. *See Daubert*, 509 U.S. at 596 (noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

### 5. Timeline

Finally, Life Spine seeks to exclude Antonsson's opinion countering Ashley's opinion that L&K developed the AccelFix devices in an "uncharacteristically short amount of time." (R. 436, Pl.'s Mot. to Exclude Antonsson at 11, Ex. A ¶¶ 101-102.) Life Spine points out that while Antonsson faults Ashley for failing to consider various factors in arriving at that conclusion—including the amount of resources allocated to the project, whether prototype fabrication and testing is done inhouse or outsourced, the organizational structure of the company and management directives and priorities, and the education, training, size, and expertise of the engineering and prototyping teams—Antonsson admits that he also did not consider those factors in denouncing Ashley's opinion. (Id. at 11-12.) As a result, the court agrees with Life Spine that Antonsson could not reliably conclude that L&K developed AccelFix in something other than an "uncharacteristically short amount

of time" for failure to consider these factors without considering them himself. Therefore, this opinion is excluded.

## C.    John Jarosz

Life Spine moves to exclude the following four opinions Aegis's damages expert John Jarosz offers to rebut its own damages expert Montague's opinions: (1) Montague's lost profits calculation is flawed for failure to consider Life Spine's involvement in a False Claims Act ("FCA") lawsuit; (2) Montague's lost profits calculation is flawed for failure to consider ProLift's quality issues; (3) Montague's improper gains calculation is inflated for failure to subtract the amount Aegis could have earned legitimately if it had put its time and attention to endeavors other than AccelFix; and (4) Montague improperly relies on Aegis's and other companies' overall financial performance as opposed to ProLift and AccelFix-specific analyses.

### 1.    FCA Lawsuit

In his damages opinions Montague assumes that if Aegis had not replaced its ProLift inventory with AccelFix in September 2019, it would have continued to sell ProLift and all of its AccelFix customers would have purchased ProLift. But Jarosz opines that Montague should have considered, among other things, whether and how much the FCA lawsuit filed against Life Spine impacted the demand for its ProLift devices. (R. 438, Pl.'s Mot. to Exclude Jarosz Ex. A ¶¶ 134-39.) For support Jarosz cites Life Spine's "acknowledged wrongdoing" in settling that lawsuit. (Id. Ex. A ¶ 136.) Life Spine quibbles with that characterization, notes that this court already concluded at the preliminary injunction hearing that Life Spine made no

such acknowledgement and argues that delving into the FCA lawsuit would result in a "mini trial" forcing Life Spine to "defend itself against the settled FCA allegations."  (Id. at 5; R. 479, Pl.'s Reply at 7-8.)  But the issue here is neither Life Spine's culpability in that lawsuit nor the proper interpretation of the publicly available information regarding the same.  Rather, the issue is the effect, if any, that public information had on actual or potential customers.

Jarosz cites an August 2019 email from Heidi Cha (former Aegis Marketing Manager) to Jenn Jesse (Life Spine's Sales Manager) in which Cha purports to explain why Aegis was ending its relationship with Life Spine and indicates that two of Aegis's customers no longer wanted to purchase ProLift because of the FCA lawsuit.  (R. 438, Pl.'s Mot. to Exclude Jarosz Ex. A ¶ 138.)  Jarosz also cites a chart showing Life Spine's ProLift sales before and after the FCA lawsuit was made public.  (Id. Ex. A ¶ 137.)  Life Spine asserts that the email constitutes inadmissible hearsay, the chart reflects sales data for only one version of ProLift, and Jarosz's characterization of that chart is misleading.  (Id. at 6-7, 9.)  As such, Life Spine argues that Jarosz's opinion that the FCA lawsuit harmed ProLift sales lacks a reliable basis.  (Id.)

Aegis responds that it does not offer the Cha email for the truth of the matter asserted—that is, that the customers stopped purchasing ProLift because of the FCA lawsuit—but rather as "one consideration that must be factored into the but-for world being constructed in a proper lost profits analysis."  (R. 464, Def.'s Resp. at 9.)  Life Spine argues that this concession means Jarosz's opinion fails out of the

gate. It also points to other evidence it says shows that: (1) the FCA lawsuit had no impact on customers' willingness to purchase ProLift; and (2) the Cha email reflects that the FCA lawsuit was "a pretextual basis for Aegis to stop selling ProLift" and hide that the ProLift customers it references had always planned to switch to AccelFix once it entered the market. (R. 438, Pl.'s Mot. to Exclude Jarosz at 8-11.)

The court disagrees with Life Spine. With proper instruction on the limited basis for which the jury may consider the Cha email, the court finds that both it and the sales data chart are appropriate bases for Jarosz's opinion, and that Life Spine's arguments otherwise can be explored on cross-examination. In sum, Jarosz may not opine that Life Spine "acknowledged wrongdoing" in connection with the FCA lawsuit or speak about the substance of the lawsuit or Life Spine's involvement in the lawsuit in inflammatory terms. But Life Spine's motion is denied to the extent it seeks to bar Jarosz from opining that Montague should have considered the FCA lawsuit's impact in the "but-for world" his opinion contemplates.

### 2. Poor Quality

Life Spine asks the court to exclude Jarosz's opinion that quality issues would have affected its sales had Aegis continued to sell ProLift beyond September 2019, contending once more that there is no reliable evidence for this opinion. Aegis argues that Life Spine again mischaracterizes Jarosz's opinion, which is not offered to prove that "surgeons definitively ceased using ProLift in favor of AccelFix as a result of quality issues," but rather "to establish another hole in Mr. Montague's lost profit analysis by his failure to *even consider* quality issues." (R. 464, Def.'s Resp. at

10 (emphasis in original).) Yet Life Spine argues that Jarosz should not be permitted to even go that far because it addressed the quality complaints Jarosz noted by creating a custom product and customers continued to use ProLift thereafter, proving quality was not an issue. (R. 479, Pl.'s Reply at 8-9.) But again, Life Spine can cross-examine Jarosz on this point and otherwise attempt to refute his testimony, and the jury may draw its own conclusions about the weight of Jarosz's opinions.

### 3. Improper Gains

Life Spine argues that Jarosz's opinion that improper gains chargeable to Aegis should be reduced by the amount Aegis could have earned if it had directed its time and attention to products other than AccelFix should be excluded. The court agrees with Life Spine on this point. To be sure, recovery under the Illinois Trade Secrets Act includes the amount of unjust enrichment caused by the defendant's misappropriation. 765 ILCS 1065/4(a); *RRK Holding Co. v. Sears, Roebuck & Co.*, 563 F. Supp. 2d 832, 836 (N.D. Ill. 2008). Unjust enrichment sounds in equity, *First Midwest Bank v. Cobo*, 90 N.E.3d 567, 575 (Ill. App. Ct. 2017), and is "measured by the reasonable value of the benefits defendants unjustly received," *Toushin v. Ruggiero*, 189 N.E.3d 1012, 1037 (Ill. App. Ct. 2021). Reducing a defendant's responsibility to a wronged plaintiff by a hypothetical amount it could have earned had it behaved properly is not equitable. Life Spine's motion is granted as to this opinion.

23

4.     **Overall Financial Performance**

Life Spine's motion is likewise granted as to Jarosz's opinion that Aegis has made "no gains" through its misconduct because that opinion relies on Aegis's overall financial performance, rather than data pertaining strictly to ProLift and AccelFix devices.  Aegis complains that Life Spine fails to point to any authority that forecloses this manner of analysis.  (R. 464, Def.'s Resp. at 13.)  However, not only does Aegis fail to cite any authority on the same point, but this court is persuaded by its own research that Jarosz's method is a bridge too far.  *See SKF USA Inc. v. Bjerkness*, No. 08 CV 4709, 2010 WL 3155981, at *9 (N.D. Ill. Aug. 9, 2010) (calculating defendant's improper gains for purposes of misappropriation as defendant's "profits from servicing customers using [plaintiff]'s trade secrets"); *see also RRK Holding*, 563 F. Supp. 2d at 837 (affirming damages award where jury instruction limited improper gains to just those resulting from misappropriation). Simply put, it would be inequitable to erase profits Aegis earned improperly simply because it made minimal gains overall during the same period.  Jarosz's opinion is irrelevant to the extent it relies on Aegis's overall financial performance.

Life Spine also seeks to exclude Jarosz's opinion that Montague's analysis of Life Spine's incremental profit margin on ProLift sales is suspect because three other medical device companies had far lower profit margins companywide.  Life Spine says this is an apples-to-oranges comparison that is irrelevant and confusing. But Aegis asserts, and the court agrees, that Life Spine misunderstands the purpose of Jarosz's comparison, which is simply to call into question Montague's

24

analysis. (See R. 438, Pl.'s Mot. to Exclude Jarosz Ex. A ¶ 145.) Life Spine may cross-examine Jarosz and otherwise attempt to discredit his opinion and the comparison, but the court declines to exclude this aspect of his opinion.

## Conclusion

For the foregoing reasons, Life Spine's motions to exclude Culbert's, Antonsson's, and Jarosz's opinions are each granted in part and denied in part.

ENTER:

Young B. Kim
United States Magistrate Judge